**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| In re: | Chapter 11 |
| **FULCRUM LOAN HOLDINGS, LLC,** *et al.*[1] | **Case No. 24-56114-pwb** |
| **Debtors.** | **(Jointly Administered)** |

**BAY POINT CAPITAL PARTNERS II, LP'S MOTION FOR**
**APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Bay Point Capital Partners II, LP ("Bay Point" or "Movant"), as the primary creditor of

debtors Strategic Retreat Holdings, LLC; HIP II, LLC f/k/a Hampton Island Preserve II, LLC;

JARBAI, LLC; Fulcrum Loan Holdings, LLC; Fulcrum Tale, LLC; and Hampton Island, LLC

(collectively, the "Debtors"), hereby moves this Court (the "Motion") for entry of an Order,

pursuant to 11 U.S.C. § 1104(a), directing the appointment of a chapter 11 trustee in the above-

captioned jointly administered bankruptcy cases (the "Bankruptcy Cases"). In support of this

Motion, Movant respectfully states as follows:[2]

## **INTRODUCTION**

1.    Bay Point first became involved with one or more of the Debtors in 2017, when

Bay Point made its first loan associated with these Bankruptcy Cases.[3] Since that time, Bay Point

has been in regular contact with the Debtors' ultimate principal – Ron Leventhal ("Leventhal") –

---

[1] The Debtors in these jointly-administered Chapter 11 cases, along with the last four digits of each
Debtor's federal tax identification number are: Fulcrum Loan Holdings, LLC (7401), Fulcrum Tale
LLC (2038), Strategic Retreat Holdings, LLC (2894), HIP II, LLC  (0611), and JARBAI (1447).

[2] The Declaration of Bill Madson ("Madson Dec.") in support of this Motion is attached hereto as
Exhibit A. The Declaration of Greg Jacobs ("Jacobs Dec.") in support of this Motion is attached
hereto as Exhibit B.

[3] *See* Jacobs Dec., ¶ 4.

1

discussing various exit options so that the Debtors can ultimately pay off the debts owed to Bay Point. Jacobs Dec., ¶ 5. To that end, Bay Point made numerous additional loans and entered into at least two forbearance agreements (collectively, the "<u>Forbearance Agreements</u>") with the Debtors. Jacobs Dec., ¶ 6.

2.     During the 7 years that Bay Point has been involved with the Debtors, the Debtors assets have been marketed for sale and have further sought additional refinancing options. Jacobs Dec., ¶ 7. Previously, the Debtors received significant interest from prospective buyers, but at least one of the offers received by Debtors was rejected even though it would have paid all creditors in full and generated a significant return to equity. It appears that the offer in question did not generate a significant enough return to equity to be accepted. Bay Point is not aware of any refinancing offers received by the Debtors that would pay Bay Point in full. *See* Jacobs Dec., ¶ 7.

3.     During that same period of time, the Debtors and Leventhal involved in significant litigation with former business partners and investors. At least one of those cases is still pending.[4]

4.     At this point, Bay Point has lost confidence in Leventhal's ability to faithfully lead the Debtors. These Bankruptcy Cases have been pending for more than 5 months. In that time, almost nothing has happened to move the cases along. Bay Point has been negotiating a post-petition debtor-in-possession facility with the Debtors since these cases were filed. Recently, the Debtors, through Leventhal, decided to walk away from that option – with no apparent alternative way to finance these Bankruptcy Cases.

5.     Further, Bay Point has been negotiating a proposed sale process with the Debtors during the same period. Bay Point and the Debtors previously discussed a sale process that would have resulted in the assets being sold by Thanksgiving. *See* Jacobs Dec., ¶ 8. Obviously, these

---

[4] *See Lyle, et al. v. Liberty Capital, LLC, et al.*, Fulton Co. Sup. Ct., Case No. 2017CV295620.

discussions did not result in an agreement and now the respective parties are on the eve of Thanksgiving – not having advanced this case one inch. Indeed, Bay Point believes that the parties are now farther apart in discussions that they were months ago. Specifically, Leventhal recently walked the Debtors back their prior agreement to permit Marshall Glade of B. Riley to control the sale process (causing a significant conflict of interest for Leventhal – which, as discussed below, is a serious concern given Leventhal's prior history of self-dealing). Bay Point has been clear from day 1 that it would not consent to Leventhal running the sale process – and both parties had previously agreed that Marshall Glade was a good choice for that task.[5]

6.      The Debtors need a new point person – one who the markets can trust to follow through with an agreed sale process. At this point, Leventhal's continued control of the Debtors is harming the Debtors and their assets, as it appears that he continues to operate the Debtors solely for his own person benefit without regard to his fiduciary duties now owed to creditors.

7.      The pending litigation has called into question Leventhal's motives in running one of the Debtors and other affiliated entities.  As stated by the State Court-appointed Special Master in that case – "Leventhal's affidavit testimony, together with the present badges of fraud, evince an actual intent to hinder or delay Liberty Capital's creditors in the collection and enforcement of their debts." *Report and Recommendation on (i) Plaintiffs' Cross-Motions for Partial Summary Judgment, (ii) Plaintiff's Objection to Inadmissible Evidence and Request to Strike, and (iii) Defendant Leventhal's Expedited Motion to Cancel Lis Pendens*, attached hereto as Exhibit B (the

---

[5] Leventhal has also now suggested that he will challenge the amount of Bay Point's claim. As part of the Forbearance Agreements, Debtors acknowledged the amount and validity of Bay Point's debt. As such, it appears that Leventhal's desire to challenge Bay Point's claim appears to be a transparent attempt to deny Bay Point its credit bid rights under the Bankruptcy Code – presumably in an attempt to drive down the price of the Debtors' assets so that Leventhal can purchase them free and clear through a separate entity, just like he previously did in the State Court foreclosure proceedings (discussed below).

"Special Master Report"). The Special Master Report was made just over one month prior to the filing of these Bankruptcy Cases.

8.     Further, the Debtors have failed to maintain their assets during the pendency of these Bankruptcy Cases (and for a significant period of time prior to the filing of these Bankruptcy Cases). Bay Point representatives have visited the Debtors' properties and have confirmed that areas of the properties are in disrepair. Madson Dec., ¶¶ 4, 5. Despite that fact, the Debtors – under Leventhal's direction – already made at least one misrepresentation to this Court regarding the amount of malfeasance and neglect that has taken place under the direction of Leventhal.[6]

9.     In short, Leventhal is operating the Debtors for the ultimate benefit of Leventhal. The conduct described below makes it clear that Leventhal cannot remain in control of the Debtors during the Bankruptcy Cases. His history of self-dealing and misrepresentations establish that Leventhal is not fit to be an honest steward of the Debtors in the Bankruptcy Cases and cannot be trusted to act in the best interest of the Debtors' estates. As such, the appointment of a Chapter 11 trustee is warranted pursuant to 11 U.S.C. § 1104(a).

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over the subject matter of the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in the Motion are 11 U.S.C. §§ 1104(a) and 1112(b).

---

[6] As discussed more fully herein, the Debtors made representations to this Court about the need to maintain electrical service to operate pumps necessary to water the grass on a golf course located on the Subject Property. At the time that the Debtors made such representations to the Court, the Debtors knew that (i) the pumps on the golf course did not work; and (ii) as a result of the Debtors failure to previously repair the pumps, the grass on the golf course had already been damaged to the point that it needed to be replaced.

## BACKGROUND

### *Pre-2013 Litigation Background*

11.     In November 2006, Leventhal-controlled Hampton Island, LLC ("HI LLC") executed a note (the "HI Note") in the amount of $8,200,000 in favor of Leventhal-controlled Liberty Capital, LLC ("Liberty Capital"). *See* Ex. A at 21. To secure its obligations under the HI Note, HI LLC executed a Deed to Secure Debt and Security Agreement in favor of Liberty Capital (the "HI DTSD"). Ex. A at 21-22.

12.     Wayne Lyle ("Lyle") and Charles Cary ("Cary") entered into an agreement with Liberty Capital that resulted in Lyle and Cary transferring certain interests to HI LLC (or its affiliated companies) in return for a cash payment, an ownership interest in HI LLC (the entity that was supposed to develop a substantial residential resort community on Hampton Island, an island off the coast of Georgia), and certain put rights against Liberty Capital (the "Put Rights"). Ex. A at 3. The Put Rights were a contractual right that allowed Lyle and Cary to require Liberty Capital to repurchase their respective interests in HI LLC for $1,250,000 each. Ex. A at 3.

13.     Ultimately, the HI Note was increased to a principal balance of $37,500,000. Ex. A at 22. The HI Note was secured through the HI DTSD by approximately 2600 acres of residential/resort development land on Hampton Island (the "Subject Property"). Ex. A at 23.

14.     In or around October 2008, Lyle and Cary exercised their Put Rights. Ex. A at 3. Liberty Capital refused to honor its obligations. Ex. A at 3. For years Lyle and Cary threatened litigation and sought to resolve the pending dispute.  Ex. A at 3.

15.     From 2006 through 2009, various Leventhal-controlled entities took out loans from various banks and secured such loans with the Subject Property, which ultimately resulted in First Citizens Bank, Ameris Bank, and Synovus Bank (collectively, the "Three Banks") holding senior

security interests (the "Senior Liens") in the Subject Property (with priority over Liberty Capital's lien under the HI DTSD). Ex. A at 23-24.

16.    By late 2011, the various Leventhal-controlled borrowers had defaulted on their loans and the Three Banks had the right to foreclose on the Subject Property. Ex. A at 24.

*The 2013 Litigation (Appointment of Receiver)*

17.    As concluded by the Special Master, Leventhal came up with a scheme that he believed would (a) prevent the Three Banks from foreclosing on the Subject Property (giving him additional time to deal with their debts); (b) avoid the claims of creditors of HI LLC and Liberty Capital (allowing Leventhal to insulate any equity in the Subject Property from those claims); and (c) get the Subject Property into a new "clean" entity that would allow Leventhal to raise additional capital from new investors and/or loans from new lenders. The Special Master Report provides as follows:

> Liberty Capital devised a scheme for transferring the Subject Property (Liberty Capital's collateral) – approximately 2,600 acres of a 4,000-acre residential, resort development on the Coast of Georgia – from [HI LLC] to its "clean" affiliate, Fulcrum, in order to remove it from the reach of Plaintiffs and other creditors. Instead of Liberty Capital foreclosing on its collateral and taking title to the Subject Property, Leventhal orchestrated Fulcrum submitting the winning bid and taking title to the Subject Property, thereby putatively insulating it from Liberty Capital's creditors (other than the Three Banks), including Plaintiffs . . . . As a result, at the time Plaintiffs obtained their judgment, Liberty [Capital] held title to only a few parcels of real estate and other personal property that had been transferred to it under the 2014 Consent Judgment. This collateral swap was a substantial change in the composition of Liberty Capital's Assets.

Ex. A at 68. And, in the end, the Special Master found that "Liberty Capital engaged in a series of transactions that transferred these assets with the requisite 'actual intent to hinder or delay any creditor' for avoiding these transfers." Ex. A at 45.

18.    As noted in the Special Master Report, on September 5, 2013, Leventhal put his plan into motion by causing Liberty Capital (controlled by Leventhal) to file its *Verified Complaint*

*for Injunctive Relief and for Appointment of Receiver* (the "2013 Complaint") against HI LLC

(controlled by Leventhal).[7] As summarized by the Special Master:

> The 2013 Complaint represented to the Court that there was a
> manifest danger that [HI LLC] would collect and not turnover to
> Liberty Capital the rents, accounts, income, and proceeds collected
> by [HI LLC] from the Subject Property, and absent the appointment
> of a receiver, the Subject Property would immediately deteriorate
> due to not being protected from the inevitable loss to occur due to
> lack of proper maintenance and management and diversion of
> Liberty Capital's property and collateral, and that Liberty Capital
> would suffer irreparable injury, loss, and harm unless [HI LLC]
> were enjoined and prevented from continuing to collect the rents,
> accounts, income, profits, and proceeds from the operation of the
> Subject Property.

Ex. A at 29. The 2013 Complaint, and the statements made therein, were verified under oath by

Leventhal.

19.     Missing from the Complaint was any disclosure that Leventhal controlled both

Liberty Capital (plaintiff) and HI LLC (defendant), and that those two entities were affiliates. More

egregiously according to the Special Master, Leventhal took active steps to conceal his common

control over the parties from the court presiding over the 2013 Litigation (the "State Court"). As

later found by the Special Master:

> Prior to filing the 2013 Litigation, Leventhal and counsel
> representing Liberty Capital had the following discussion about
> serving HI LLC, whose registered agent was Leventhal:
>
> **Christy**:  We need to perfect service on someone other than Ron
> [Leventhal]. This judge is suspicious of everything.
>
> **Lavoie**:  Ron [Leventhal] – is there another corporate officer of
> [HI LLC] that we could serve?
>
> **Leventhal**:  Can Hayden Pace acknowledge as attorney.

---

[7] The filing of the 2013 Complaint initiated the case captioned as *Liberty Capital, LLC f/k/a Liberty
Capital Group, LLC v. Hampton Island, LLC*, Superior Court of Fulton County, Civil Action File
No. 2013CV236057 (the "2013 Litigation").

> Hayden Pace accepted service on behalf of HI LLC, instead of Leventhal, the registered agent.

Ex. A at 30 (internal citations omitted).

20.    As found by the Special Master, the State Court, without knowledge of Leventhal's active concealment of the related nature of Liberty Capital and HI LLC, accepted the verified statements of Leventhal and, on that basis, granted the requested relief and appointed a receiver (selected by Leventhal) over HI LLC. *See* Special Master Report at 4, 30

### *The 2013 Litigation (Foreclosure Sale)*

21.    On or around October 1, 2013, Liberty Capital cried out the sale of the Subject Property. Ex. A at 32. The foreclosure sale of the Subject Property (the "Foreclosure Sale") was made subject to the Senior Liens held by the Three Banks.[8]

22.    Fulcrum Loan Holdings LLC ("Fulcrum") – a newly formed company owned and controlled by Leventhal and his son – was the "winning bidder" at the Foreclosure Sale for a total bid of $50,000. Ex. A at 32. Liberty Capital, which had more than $36 million of debt that it could have credit bid, chose to not outbid its affiliate Fulcrum – instead deciding to keep the $36 million debt against a company (HI LLC) that just lost its only asset of significant value (rendering the HI Note almost worthless according to the Special Master).[9] *See* Ex. A at 51. The entire $50,000 "purchase price" was used to pay legal fees. *See* Ex. A at 33.

---

[8] At the time of the Foreclosure Sale, the outstanding debt secured by the Senior Liens totaled $14,847,931.

[9] Bay Point is not suggesting that, at the time of the Foreclosure Sale, the Subject Property was worth more than $50,000. To the contrary, the fact that the Subject Property was subjected to a public foreclosure sale and did not draw a bid greater than the $50,000 (whether from Lyle and Cary or anyone else) strongly supports the conclusion the market value of the Subject Property was in fact $50,000 at the time of the Foreclosure Sale. Indeed, the Special Master did not find that there were any irregularities or issues with the way that the Foreclosure Sale was conducted. But this is an issue for another day – as Bay Point's requested relief does not require a finding with respect to the value of the Subject Property at the time of the Foreclosure Sale. The point that Bay

23.    Leventhal continued his efforts to conceal his control over all of the relevant parties

(i.e., Liberty Capital, HI LLC, and Fulcrum) according to the Special Master:

> On October 2, 2013, the day after the foreclosure is alleged[10] to have
> occurred, Leventhal wrote the following to litigation counsel for
> Liberty Capital:
>
>> Instead of me signing as president of Liberty Capital, LLC the
>> grantee that [sic] foreclose on [HI LLC], can Richard sign as the
>> receiver for Liberty Capital's Security deed on the power of sale
>> line, so my name does not show up.

Ex. A at 33.

24.    There was no noticeable change as a result of the Foreclosure Sale – other than the

elimination of junior debt that could have recovered from any equity in the Subject Property and

the name on the title of the sale post-sale. "Management and control was the same as Leventhal

controlled all three entities." Ex. A at 34. "The ownership structure between Liberty Capital and

Fulcrum was the same at all relevant times, with Leventhal ultimately owning 90% of both and his

son owning 10% of both." Ex. A at 34.

### *The 2013 Litigation (Consent Order)*

25.    To wrap up the 2013 litigation, all of the Leventhal-controlled parties entered into

a consent judgment (the "Consent Judgment").

26.    The Special Master found:

> When discussing the 2013 Litigation internally, Leventhal and a
> lawyer for Liberty Capital had the following email exchange about
> the self-serving nature of the consent order being drafted to end the
> 2013 litigation:

---

Point makes by referencing this history is Leventhal's history of self-dealing and lack of candor
with the courts before which he appears (as found by the Special Master).

[10] The parties to the 2017 Litigation (discussed below) were able to locate a recording of the
foreclosure sale "bidding." Ex. A at 32.

> **Lavoie:**  Dare I ask about the Liberty Capital case before Jackson Bedford [i.e., the 2013 Litigation]?
>
> **Leventhal:**  Double dare! I will go back to find the consent self-serving order I need and get it to you and Hayden Pace [Counsel for HI LLC].
>
> **Lavoie:**  Just remember to cut the "Self-Serving" out of the consent order's heading.

Ex. A at 36-37.

27.     Leventhal specifically focused on how to extract the most value out of the former companies and into his new companies for his own personal benefit and to the detriment of creditors – all while trying to make the workings of his scheme "more resilient to attack":

> On July 21, 2014, Leventhal asked Jim Smith, his lawyer in Hinesville, whether there were other things that [he] should use the 2013 Litigation to transfer out of [HI LLC], in the following exchange:
>
> > **Leventhal:**  Thank you Jim. Can you think of anything else we need transferred out of [HI LLC] by order?
> >
> > **Smith:**  Equipment leases, security deposits for utilities, livestock? . . . ."
>
> One week later, Leventhal and a lawyer for Liberty Capital had the following email exchange about the Consent Judgment Leventhal was proposing for the 2013 Litigation:
>
> > **Lavoie:**  I'm going through this Ron, but it looks like a significant amount of this draft order should instead be part of a settlement agreement between Liberty Capital and [HI LLC] (and any other parties whose rights are affected or required to take some action). The Court can only enter an order disposing of the claims raised in the Verified Complaint, not reach other conclusions or implement other agreements that the parties have reached – for instance, the paragraph requiring [HI LLC] to transfer logos, websites, utilities, permits, patent and trademark rights, etc. to Liberty [Capital]. That relief wasn't requested in the Verified Complaint.
> >
> > **Leventhal:**  Andrew, can we take a position this is wrapping up the receivership without more litigation? Having this stuff in an order, seems more resilient to attack than a private S.A. [i.e., Settlement Agreement].

Ex. A at 37 (internal citations omitted).

28.     As found by the Special Master, the State Court entered the Consent Judgment at a time when the State Court had no idea that Leventhal was controlling every side of the transaction (i.e., the foreclosing creditor, the debtor, and the buyer).

*The 2017 Litigation*

29.     In 2017, Lyle and Cary sued Leventhal, Liberty Capital, HI LLC, and Fulcrum for fraudulent transfer (the "2017 Litigation"). The crux of the claims was that prior to the 2013 Litigation, Lyle and Cary were judgment creditors of Liberty Capital, which itself was owed $37,500,000 secured by the approximately 2,600 acres of residential/resort development land owned by HI LLC. Lyle and Cary argue that, after the fraud orchestrated by Leventhal, Lyle and Cary held that same judgment against Liberty Capital, but that entity now held only a $31 million judgment lien against the remaining property held by HI LLC (i.e., some marshland, some personal property, assorted IP rights, permits, easements, and licenses, a judgment against a property association, and membership interests in another entity). Ex. A at 5.[11]

30.     In a 107-page Report and Recommendation, the Special Master found that Liberty Capital – under the control of Leventhal – "engaged in a series of transactions that transferred these assets with the requisite 'actual intent to hinder or delay any creditor' for avoiding these transfers." Ex. A at 45.

---

[11] Lyle and Cary's position completely ignores the fact that the Subject Property was sold subject to the Senior Liens of the Three Banks (totaling at least 14,847,931 as of the date of the Foreclosure Sale) and the fact that the public Foreclosure Sale – which was properly noticed and did not suffer from any irregularities – did not draw a bid greater than $50,000 (whether from Lyle and Cary or any other third-party). The Special Master did not need to reach those issues in his Report and Recommendation because those issues go to the issue of whether Lyle and Cary suffered any damages as a result of the above-described transfers. The Special Master was not asked to opine on the issue of damages.

Liberty Capital devised a scheme for transferring the Subject Property (Liberty Capital's collateral) – approximately 2,600 acres of a 4,000-acre residential, resort development on the coast of Georgia – from [HI LLC] to its 'clean' affiliate, Fulcrum, in order to remove it from the reach of Plaintiffs and other creditors. Instead of Liberty Capital foreclosing on its collateral and taking title to the Subject Property, Leventhal orchestrated Fulcrum submitting the winning bid and taking title to the Subject Property, thereby putatively insulating it from Liberty Capital's creditors (other than the Three Banks), including Plaintiffs. . . . As a result, at the time Plaintiffs obtained their judgment, Liberty Capital held title to only a few parcels of real estate and other personal property that had been transferred to it under the 2014 Consent Judgement. This collateral swap was a substantial change in the composition of Liberty Capital's assets.

. . .

Leventhal's actual intent in foreclosing the Subject Property and transferring it to Fulcrum is clear from his statements: he wanted to buy more time and delay any senior creditor foreclosure until such time as Leventhal or one of his companies could resolve the senior indebtedness encumbering the Subject Property and the Subject Property could become valuable in the future. Leventhal's own testimony squarely fits the definitions of 'delay' and 'hinder,' so the only reasonable inference to draw is that he wanted to delay or hinder any senior creditor foreclosure by the Three Banks.

. . .

Additionally, Leventhal wanted to transfer the Subject Property from [HI LLC] – which owed approximately $36,671,321.37 to Liberty Capital, over a million dollars to HAOP, LLC pursuant to an outstanding judgment, and various trade payables – to a 'clean entity' (i.e., Fulcrum) that did not owe any of these millions of dollars in debts and might be able to borrow funds or obtain additional investor capital. . . . Leventhal is describing an entity with a 'clean' balance sheet: an entity with little or no liabilities that could raise new funds. Leventhal's clear objective was to use the 2013 Foreclosure Sale to transfer the Subject Property from [HI LLC] (and entity that owed millions to creditors, including to Liberty Capital), to Fulcrum (that had a clean balance sheet) rather than Liberty Capital (who owed millions to Plaintiffs). . . . Leventhal's statements show an intent to 'hinder' Plaintiffs and any other creditors. The effect of Leventhal's scheme was to interfere with the collection efforts of Plaintiffs and other creditors.

. . .

> [T]wo affiliated companies (Liberty Capital and [HI LLC]), owned and controlled by the same individual (Leventhal), were plaintiff and defendant in a lawsuit where substantially all of the assets of one of the entities ([HI LLC]) ended up in the control and possession of a third affiliated company (Fulcrum), owned and controlled by the same individual (Leventhal), at a time when one or more creditors (Plaintiffs) had exercised put rights and threatened litigation against one of the entities (Liberty Capital) and the same entity was not generally paying its debts as they became due.

. . .

> Leventhal's affidavit testimony, together with the present badges of fraud, evince an actual intent to hinder or delay Liberty Capital's creditors in the collection and enforcement of their debts.

. . .

> Leventhal controlled which entity – Liberty Capital or Fulcrum – was the winning bidder at the 2013 Foreclosure Sale. These intentional actions were taken in an attempt to place the Subject Property beyond the reach of creditors, like Plaintiffs. By definition, Leventhal's statements disclose an actual intent to 'hinder or delay' a creditor.

Ex. A at 68, 74, 75, 77, 78, 79 (internal citations omitted).

### *Leventhal Misrepresentations in the Bankruptcy Cases*

31.    On July 11, 2024, Fulcrum filed its *Emergency Motion of the Debtor for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (a) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment* in Case No. 24-56114 (ECF No. 21, the "Utilities Motion"). In support of the Utilities Motion, Fulcrum made the following representation to this Court:

> The Utility Services are essential to the preservation of the Debtor's estate and assets, and therefore, to the success of this case. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's ability to preserve and maximize the value of

its estate could be severely and irreparably harmed. For example, ***inability to run pumps to irrigate the Debtor's golf course may cause grass to die, resulting in significant repair and replacement costs***. It is therefore critical that the Utility Services continue uninterrupted.

Utilities Motion, ¶ 9 (emphasis added).

32.     A similar representation was made in Fulcrum's *Emergency Motion of the Debtor for Expedited Hearing on Utilities Motion* (ECF No. 22, the "Utilities Hearing Motion"):

> The Debtor owns one of several key parcels of real estate comprising the Hampton Island Preserve luxury mixed used development in Riceboro, Georgia, which includes such amenities as a golf course, horse stables, and more. ***In order [to] maintain the value of this property, the Debtor requires use of certain utility services, most notably, electrical services, which are used for such things as pumps to water grass on its golf course, which could be severely damaged if electrical service were to be abruptly interrupted***.

Utilities Hearing Motion, ¶ 2 (emphasis added).

33.     But the truth is that the water pumps used to water the golf course broke long ago. *See* Madson Dec., ¶ 5(a). Bay Point loaned Fulcrum the funds to fix the water pumps in an effort to maintain, protect, and preserve the golf course (which Bay Point has a first-priority lien on). However, the funds loaned to fix the water pumps apparently were not used for that purpose – and, as a result, the water pumps remain inoperable. *See* Madson Dec., ¶ 5(a). As a result of Leventhal's failure to fix the water pumps, and the resulting lack of water to the golf course, the grass on the golf course died and the entire golf course likely needs inspection and repair work completed by a golf course contractor. Madson Dec., ¶ 5(a).

34.     The failure to fix the golf course water pump was not the only negligence exhibited by Leventhal in his failure to properly care for the Debtors' property.

    (a)     There is significant tree overgrowth along the golf course tee boxes and fairways (Madson Dec., ¶ 5(b);

(b) The roads have not been properly maintained and/or do not drain properly (Madson Dec., ¶ 5(d));

(c) The former pro shop has not been maintained and has significant overgrowth from shrubs and brush (Madson Dec., ¶ 5(c));[12]

(d) Several HVAC units have been left on the ground and permitted to rust (Madson Dec., ¶ 5(e));[13] and

(e) There are unfinished and unsecured residences on the Property that have not been maintained and which are (i) deteriorating as a result of exposure to the elements; and (ii) experiencing tree and shrub overgrowth.[14]

35. Moreover, part of the property is being utilized by Leventhal, his friends, and/or his family as an outdoor shooting range. *See* Madson Dec., ¶ 5(f).

<u>*Leventhal Fails to Move the Bankruptcy Cases Forward*</u>

36. The Debtors' filed their bankruptcy petitions on June 11, 2024 (the "<u>Petition Date</u>"). Debtors do not conduct any business operations that generate income. The purpose of Debtors' bankruptcy filings was to permit the orderly liquidation of Debtors' assets.[15]

---

[12] A picture of the unmaintained and overgrown club house is attached to the Madson Dec. as <u>Exhibit A-1</u>.

[13] A picture of the rusting HVAC units that were left on the ground around the Property is attached to the Madson Dec. as <u>Exhibit A-2</u>.

[14] A picture of the unfinished and deteriorating buildings is attached to the Madson Dec. as <u>Exhibit A-3</u>.

[15] The orderly liquidation of assets through bankruptcy is a legitimate use of the Bankruptcy Code. Bay Point does not believe that the Debtors' filed their bankruptcy petitions as part of an overall scheme to hinder, delay, or defraud creditors. But it is clear from the reasons set forth herein that Leventhal cannot be entrusted to lead the Debtors through the liquidation process – as Leventhal's history establishes that he will act in his own interest as the equity holder and not in the best interest of Debtors' estate and its creditors.

37.     In the five months that have passed since the Petition Date, Leventhal has failed to meaningfully move these cases forward. No sale motion has been filed. No bid procedures motion has been filed. Instead, Leventhal has been enjoying the benefit of the automatic stay, and enjoying the continued use of Debtors' property, while he attempts to throw proverbial hail marys to avoid the only reasonably foreseeable exit from bankruptcy – a sale of Debtors' property.[16]

38.     Leventhal's failure to move these cases forward is further evidence that he is continuing to act solely in his own interest as equity owner – and not in the best interest of Debtors' estates and their respective creditors.

### *Bay Point's Role in the Bankruptcy Case*

39.     Bay Point is a creditor of each of the Debtors, each of which is jointly and severally indebted to Bay Point in an amount not less than Thirty-Four Million Seventy-Nine Thousand One Hundred Twenty-Three and 81/100 Dollars ($34,079,123.81)[17] (the "Bay Point Debt"). The Bay Point Debt is secured by a first-priority lien on Debtors' assets.

### **LAW AND ANALYSIS**

**I.      Appointment of a chapter 11 trustee is warranted pursuant to 11 U.S.C. § 1104(a).**

40.     Section 1104(a) provides a flexible standard for the Court's appointment of a trustee:

---

[16] Despite their failure to meaningfully move these Bankruptcy Cases forward, Debtors have now twice sought to extend the Debtors' exclusivity period – a clear attempt to keep Debtors' creditors from moving these cases forward while Leventhal continues to utilize Debtors' Bankruptcy Cases for his own self-interest. *See* ECF Nos. 52 and 75.

[17] The amount stated herein is the amount that was due from Debtors on June 11, 2024 (the "Petition Date"). Since such date, the Bay Point Debt has continued to increase as a result of interest (default and non-default), the incurrence of additional legal fees, and such other charges and/or amounts as are identified in the various loan documents related to the Bay Point Debt (the "Bay Point Loan Documents"). Bay Point reserves all of its rights, claims, and defenses as provided for under the Bay Point Loan Documents and/or applicable law.

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the Court shall order the appointment of a trustee –

(1)   for cause, including fraud, dishonesty, incompetence, or gross mismanagement, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)   if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

41.   The decision to appoint a Chapter 11 trustee is appropriate if the Court finds that cause exists for the appointment, or that the appointment is in the best interests of creditors and the estate. *See generally In Re Deena Packaging Industries, Inc.,* 29 B.R. 705 (Bankr. S.D.N.Y. 1983); *In Re La Sherene,* 3 B.R. 169 (Bankr. N.D. Ga. 1980).

42.   Where the movant demonstrates either of these grounds, the Court should appoint a Chapter 11 trustee. The Court need not engage in a cost-benefit analysis or seek other less intrusive means of managing the estate. *See North v. Desert Hills Bank (In re North)*, 212 Fed. Appx. 626, 627 (9th Cir. 2006) ("[I]n determining whether to appoint a trustee, section 1104 does not require the bankruptcy court to engage in a cost-benefit analysis or to consider less intrusive remedies"). As set forth below, the facts of this case demonstrate both that cause exists for the appointment of a Chapter 11 trustee under subsection 1104(a)(1) and that such an appointment is in the best interests of the creditors.

**A.**   **Cause exists under 11 U.S.C. § 1104(a)(1).**

43.   Cause for appointment of a trustee under § 1104(a)(1) is found when a debtor has evidenced such conduct as "fraud, dishonesty, incompetence, or gross mismanagement . . . either before or after the commencement of the case."

44.     "Cause" obviously includes those matters expressly listed in Section 1104(a)(1),

whether they occurred pre-petition or post-petition. *See In re New Towne Dev., LLC*, 404 B.R.

140, 149 (Bankr. M.D. La. 2009) ("Section 1104(a)(1) requires the court to appoint a chapter 11

trustee if a party in interest proves cause, such as fraud, dishonesty, incompetence, gross

mismanagement or a similar cause"); *In re Tricycle Enters*., 2006 Bankr. LEXIS 4261, at *28

(Bankr. N.D.N.Y. 2006) ("Under Code § 1104(a)(1), pre-petition acts of misconduct, as well as

post-petition acts of misconduct constitute cause for the appointment of a chapter 11 trustee")

(citing *In re V. Savino Oil & Heating Co., Inc*., 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)).

45.     "Cause" is not limited, however, to the grounds enumerated in Section 1104(a)(1),

but, instead, "is within the discretion of the Court and due consideration must be given to the

various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assoc.*, 171 B .R.

615, 623 (Bankr. N.D. Ill. 1994).  Cause includes, among other things, whether the Debtor treated

insiders and affiliated entities better than other creditors and whether the Debtor made pre-petition

voidable transfers.  *See In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013).  Indeed, cause

can cover any myriad of acts and omissions.  *See In re Oklahoma Refining Co.*, 838 F.2d 1133,

1136 (10th Cir. 1988).

46.     "Section 1104 represents a potentially important protection that the court should

not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession."

*See Bellevue Place*, 171 B.R. at 623 (citing *In re Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525

(Bankr. E.D.N.Y. 1989).  Where cause exists, the appointment of a trustee is mandatory.  *See*

*Oklahoma Refining Co.*, 838 F.2d at 1136; *In Re Main Line Motors*, 9 B.R. 782 (Bankr. E.D. Pa.

1981); *In Re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bankr. E.D. Pa. 1981).

47.      Under the circumstances of this case, cause exists for the appointment of Chapter 11 trustee to manage the Debtors' affairs and protect the estates from further mismanagement and dissipation of assets.  As described in paragraphs 5-24 above, Leventhal previously used the State Court to orchestrate a scheme to delay, hinder, and/or defraud the creditors of the entities that he controlled (and in which he held a substantial ownership interest) for his own personal benefit. In addition to Leventhal actively took steps to hide information from the State Court in an effort to conceal his fraud and ultimately accomplish his scheme.

48.      And as described in paragraphs 25-30 above, Leventhal is continuing his pattern of dishonest behavior before this Court. While Fulcrum may have needed to ensure the continuation of utilities for other reasons, and Bay Point does not seek to collaterally attack the relief ultimately granted by the Court, the ease at which Leventhal directs his companies to make knowing misrepresentations to courts is alarming, is continuing, and serves as both an independent and complementary basis for appointing a chapter 11 trustee in the Bankruptcy Cases. Similarly, Leventhal's failure to meaningfully move Debtors' Bankruptcy Cases forward over the last five months establishes that he is not faithfully pursuing an exit from chapter 11, but rather Leventhal is utilizing the protections offered by the Bankruptcy Code solely for his own self-interest.

     B.      <u>Appointment of a Chapter 11 trustee is in the best interest of creditors under Section 1104(a)(2).</u>

49.      The appointment of a Chapter 11 trustee is also in the best interest of creditors. The Court has more discretion under Section 1104(a)(2) and a finding of "cause" is not required. *See Oklahoma Refining Co.*, 838 F.2d at 1136; *see also Bellevue Place*, 171 B.R. at 623; *see also In re Colorado-Ute Electric Assoc., Inc.*, 120 B.R. 164, 176 (Bankr. D.Col. 1990)  It is enough that appointment of a Chapter 11 trustee is in the "interest of the estate generally, which can mean that

there may be competing interests that weigh for and against the appointment." *In re Sanders*, 2000 WL 329574, *5 (Bankr. N.D. Ill 2000).

50.     Under Section 1104(a)(2), a bankruptcy court may exercise its broad equity powers when appointing a trustee to protect the interests of creditors. *See In re Russell*, 60 B.R. 42, 45 (Bankr. W.D. Ark. 1985) (citing *In re Deena Packaging Indus., Inc.*, 29 B.R. 705 (Bankr. S.D.N.Y. 1983)).  Among the factors courts have considered are: (a) the trustworthiness of the debtor, *see In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); (b) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation, *see In re Parker Grande Dev., Inc.*, 64 B.R. 557, 561 (Bankr. S.D. Ind. 1986); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980); (c) the confidence–or lack thereof–of the business community and of creditors in present management, *see In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W.Va. 1981); and (d) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, *see In re Microwave Products of America, Inc.*, 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989). However, "[i]t is clear both from the language of the statue and established case law, that the court need not find any of the enumerated wrongs in order to find cause for appointing a trustee. It is sufficient that the appointment be in the best interest of creditors." *Oklahoma Refining Co.*, *supra*, 838 F.2d at 1136.

51.     The Debtors' lack of trustworthiness and shortcomings as debtors in possession are obvious in light of Leventhal's actions in the 2013 Litigation, with respect to the Utilities Motion, and in Leventhal's failure to meaningfully move these Bankruptcy Cases foward over the last five months. Although there are certainly economic costs involved in appointing a chapter 11 trustee, the potential risks and costs to Debtors' respective estates in terms of allowing current management to continue to oversee the Debtors' estate and business affairs are significant. A chapter 11 trustee

can take immediate action to preserve the value of Debtors' estates, oversee Debtors' conduct and the sale of Debtors' assets, meaningfully investigate prior conduct and potential claims against Debtors' current management, and manage Debtors' estates in a manner that will more quickly and efficiently resolve these proceedings with a greater level of creditor confidence.

## **CONCLUSION**

52.    For the reasons stated above, cause exists for the appointment of a chapter 11 trustee in the Bankruptcy Cases under Section 1104(a)(1). In addition, or alternatively, the appointment of a chapter 11 trustee in the Bankruptcy Cases is in the best interest of creditors and, therefore, warranted pursuant to 11 U.S.C. § 1104(a)(2).

53.    WHEREFORE, Bay Point respectfully requests that the Court enter an Order (i) granting the Motion and the relief requested herein; (ii) appointing a chapter 11 trustee in the Bankruptcy Cases; and (iii) granting such other and further relief as the Court deems just and appropriate.

Dated:  November 14, 2024

Respectfully submitted,

*/s/ John C. Allerding*
John C. Allerding
Georgia Bar No. 952436
Austin Alexander
Georgia Bar No. 926059
THOMSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
T: 404.407.3676 / F: 404.541.2905
*John.Allerding@ThompsonHine.com*
*Austin.Alexander@ThompsonHine.com*

*-and-*

*/s/ John F. Isbell*
John F. Isbell
Georgia Bar No. 384883
LAW OFFICES OF JOHN F. ISBELL, LLC
3050 Peachtree Road NE, Suite 740
Atlanta, Georgia 30305
T: 404.849.6665
*John@JFI-Law.com*

*Counsel to Bay Point Capital Partners II, LP*