# **Exhibit C**

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **WAYNE LYLE and CHARLES CARY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **LIBERTY CAPITAL, LLC, HAMPTON** | ) | |
| **ISLAND, LLC, FULCRUM LOAN HOLDINGS,** | ) | **2017CV295620** |
| **LLC, and RONALD S. LEVENTHAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## REPORT AND RECOMMENDATION ON (I) PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT, (II) PLAINTIFFS' OBJECTION TO INADMISSIBLE EVIDENCE AND REQUEST TO STRIKE, AND (III) DEFENDANT LEVENTHAL'S EXPEDITED MOTION TO CANCEL LIS PENDENS

**TO THE PARTIES: PURSUANT TO UNIFORM SUPERIOR COURT RULE 46(G)(2), THE PARTIES HAVE 20 DAYS FROM SERVICE OF THE SPECIAL MASTER'S REPORT AND RECOMMENDATION TO FILE A MOTION TO REJECT OR MODIFY THIS REPORT AND RECOMMENDATION. IF NO PARTY TIMELY FILES A MOTION TO REJECT OR MODIFY THIS REPORT AND RECOMMENDATION, THIS REPORT AND RECOMMENDATION SHALL HAVE THE FORCE AND EFFECT OF AN ORDER OF THE COURT.**

This matter comes before the Special Master on (I) *Defendants' Motion for Summary Judgment and Integrated Brief in Support* and *Plaintiffs' Cross-Motion for Partial Summary Judgment and Brief in Support*, together with the related responses, sur-responses, and replies, (II) *Plaintiffs' Objection to Inadmissible Evidence and Request to Strike*, together with the related responses and reply, and (III) *Defendant Leventhal's Expedited Motion to Cancel Lis Pendens and Brief in Support*, together with the related response and reply.

The parties appeared before the Special Master and presented oral arguments regarding the cross-motions for summary judgment on October 27, 2023. The parties filed and briefed Plaintiffs' Objection and Request to Strike and Defendant Leventhal's Expedited Motion to Cancel Lis

Pendens after the October 27th hearing. The Special Master denied Defendant Leventhal's request for an expedited hearing on his Motion to Cancel Lis Pendens. Both Plaintiffs' Objection and Request to Strike and Defendant Leventhal's Motion to Cancel Lis Pendens will be decided on the filed papers pursuant to Uniform Superior Court Rule 6.3.

Upon consideration of the motions, the evidence presented and other good cause shown, the Special Master submits this Report and Recommendation (this "Report & Recommendation"), recommending the following rulings on the pending motions: (I) (A) Plaintiffs' cross-motion for summary judgment is **GRANTED** on Count II (Fraudulent/Voidable Transfer) and Count VI (Continuation/Successor/Partnership/Joint Venture Liability) of Plaintiffs' Complaint; (B) Defendants' cross-motion for summary judgment is **DENIED** on Count I (Set Aside Consent Judgment), Count II (Fraudulent/Voidable Transfer), Count III (Constructive Trust), Count VI (Continuation/Successor/Partnership/Joint Venture Liability), Count VII (Conspiracy), and Count VIII (Punitive Damages) of Plaintiffs' Complaint; and (C) Count I (Set Aside Consent Judgment), Count III (Constructive Trust), Count IV (Piercing the Corporate Veil), Count V (Bad Faith), Count VII (Conspiracy), and Count VIII (Punitive Damages) will proceed to trial; (II) Plaintiffs' Objection to Inadmissible Evidence and Request to Strike is **DENIED** and Defendants Liberty Capital, Hampton Island, and Leventhal are permitted to amend their Answers and Defendants may introduce the Subject Evidence (as defined in Section IV.C *infra*) in support of Defendants' motion for summary judgment and in response to Plaintiffs' cross-motion for summary judgment; *provided that*, the Court may draw all reasonable inferences from Defendants' prior admissions and Defendants' subsequent amendment to the same; and, (III) Defendants' Motion to Cancel Lis Pendens is **DENIED**.

## I.      Background

In September of 2007, Plaintiffs Wayne Lyle ("Lyle") and Charles Cary ("Cary") entered into an agreement with Liberty Capital, LLC ("Liberty Capital") to sell Plaintiffs' ownership interest in certain entities involved in the development of Hampton Island, which is an island off the coast of Georgia being developed, in part, into a residential development called the "Hampton Island Preserve," in exchange for a cash payment and an interest in Hampton Island, LLC ("Hampton Island") (the "Purchase Agreement").  Plaintiffs' Complaint ¶¶ 10-11; Liberty Capital Answer, ¶¶ 10-11.  As part of the Purchase Agreement, Lyle and Cary each received a contractual "Put Right" that allowed them to require Liberty Capital to repurchase their respective interests in Hampton Island for $1,250,000 each.  Plaintiffs' Complaint, ¶ 12; Liberty Capital Answer, ¶ 12. In or about October 2008, Lyle and Cary exercised their Put Rights.  Plaintiffs' Complaint ¶ 13; Liberty Capital Answer, ¶ 13.

Between October 2008 and October 2014, Lyle and Cary made demands upon Liberty Capital to honor the Put Rights, threatened litigation, and engaged in unsuccessful efforts to mediate the dispute.  Plaintiffs' Complaint, ¶ 15; Liberty Capital Answer, ¶ 15.  In October 2014, Lyle and Cary filed suit against Liberty Judgment.  Plaintiffs' Complaint, ¶ 17; Liberty Capital Answer, ¶ 17.  On or about July 9, 2015, Lyle and Cary  obtained a judgment against Liberty Capital in the amount of $3,286,048.61.  Plaintiffs' Complaint ¶ 18; Liberty Capital Answer, ¶ 18.

On September 22, 2017, Lyle and Cary ("Plaintiffs") filed the instant case against defendants Liberty Capital, Hampton Island, Fulcrum Loan Holdings, LLC ("Fulcrum"), and Ronald S. Leventhal ("Leventhal" and together with Liberty Capital, Hampton Island, and Fulcrum, "Defendants"), seeking the following relief: (1) to set aside a 2013 consent judgment approving the transfer of assets by Liberty Capital and Hampton Island to Fulcrum, alleging that

the 2013 lawsuit was collusive, fraudulent, and intended to shelter the assets from a separate judgment later obtained by the Plaintiffs against Liberty Capital; (2) to avoid as fraudulent or voidable transfers the transfer of assets from Liberty Capital and Hampton Island to Fulcrum and others and the release of Liberty Capital's security interest in such assets; (3) to attach a constructive trust upon the transferred assets; (4) to pierce the corporate veil separating Leventhal from his entities; and (5) to find the defendants acted in bad faith with respect to these matters. Plaintiffs' Complaint ¶¶ 49-83. Plaintiffs subsequently amended their complaint to add three more counts: (6) successor liability, (7) conspiracy, and (8) punitive damages. Plaintiffs' First Amendment to Complaint, ¶¶ 84-97.

The Georgia Court of Appeals has succinctly summarized Plaintiffs' allegations, which we will borrow and restate for the sake of brevity:

> the allegations in the complaint stated that the plaintiffs are judgment creditors of Liberty [Capital]. Before the plaintiffs obtained their judgment, Liberty's sole owner, Leventhal, took steps to transfer Liberty's assets away from that entity and into Fulcrum, another entity that he owned and controlled. Leventhal did so with the purpose of defeating Liberty's creditors, including the plaintiffs.
>
> To that end, Leventhal had Liberty file a complaint in the Superior Court of Fulton County against HI [Hampton Island], another entity that he owned and controlled. Leventhal verified that complaint, which contained material allegations that were untrue, and concealed the fact that he owned and controlled both the plaintiff and defendant entities. Among other things, Liberty's complaint alleged that HI was in default on notes in favor of Liberty, was likely to refuse to pay rents to Liberty, and was likely to waste Liberty's collateral on the notes, real property in which Liberty had a secured interest.
>
> Liberty convinced the Fulton County court to appoint a receiver, which Leventhal or his representatives selected and engaged. Leventhal or his representatives also served as the receiver's sole source of information and provided the receiver with untrue information about HI's alleged default and likely wasting of Liberty's collateral. To satisfy HI's debt to Liberty, the receiver

> authorized a foreclosure and sale of the collateral, which was sold
> to Fulcrum for $50,000, a "fraction of its worth" and an amount
> significantly less than the amount Liberty owed to the plaintiffs
> pursuant to their judgment against Liberty. Liberty and HI obtained
> a consent judgment from the Fulton County court approving this
> transfer.

*Lyle v. Fulcrum Loan Holdings, LLC*, 354 Ga. App. 742, 743, 851 S.E.2d 182, 185-86 (2020).

In short, Plaintiffs complain that they went from (a) holding a judgment against Liberty Capital, which was owed a $37.5 million note obligation by Hampton Island secured by a security title and lien in and to Hampton Island's extensive real estate holdings (approximately 2,600 acres of a 4,000 acre residential resort development off the coast of Georgia) to (b) holding a judgment against Liberty Capital, which now holds a $31 million judgment lien against Hampton Island that is secured by Hampton Island's remaining real property (some marshland), personal property (furniture, fixtures, and equipment, and vehicles, including without limitation, a 2004 31-foot Contender vessel), assorted intellectual property rights, permits, easements, and licenses, a six-figure judgment against a property association, and membership interests in another entity. Plaintiffs allege they have been harmed by this transmutation of Liberty Capital's debt and lien rights, which dissipated Liberty Capital's assets available for the satisfaction of Plaintiffs' judgment, and that it was done with the express intention of putting these assets out of Plaintiffs' reach.

Defendants counter that there was nothing nefarious in the prior litigation between Liberty Capital and Hampton Island or the foreclosure sale of the Hampton Island Preserve and, regardless, Liberty Capital only held a security title and lien in the Hampton Island Preserve that had been assigned years earlier by Liberty Capital to one of its lenders.[1]  Additionally, Defendants assert

---

[1] This prior assignment of the Liberty Capital / Hampton Island Note and Liberty Capital / Hampton Island Security Deed made its debut in this case as a key argument supporting Defendants' motion for summary judgment, which was filed approximately two and half weeks after the formal close of discovery on April 13, 2023. *See Consent*

the Hampton Island Preserve was heavily encumbered with liens to three banks and there was no dissipation of assets that would be available for satisfaction of Plaintiffs' judgment. In fact, Defendants counter than their actions increased the available pool of asset for the satisfaction of Plaintiffs' judgment against Liberty Capital.

For the reasons that follow, the Special Master recommends that the Court grant Plaintiffs' cross-motion for summary judgment and deny Defendants' cross-motion for summary judgment. The Special Master also recommends the Court deny Plaintiffs' objection and request to strike and Defendant Leventhal's motion to cancel lis pendens. These rulings will not fully adjudicate this case, however, because Plaintiffs only moved for summary judgment on two of the eight counts and Defendants only moved for summary judgment on six of the eight counts (none of the parties moved for summary judgment on Count IV (Piercing the Corporate Veil) and Count V (Bad Faith)). This matter will need to proceed to trial on the remaining counts.

## II.    Procedural History

The parties have been engaged in various forms of litigation for over a decade. The present action was commenced on September 22, 2017. Given the importance of the various lawsuits to the cross-motions for summary judgment presently before the Court, an overview of the procedural history of the three lawsuits is in order to provide context to the findings of fact and conclusions of law.

---

*Order on Plaintiffs' Motion to Extend the Deadline to Complete Fact Discovery* filed on January 19, 2023. The parties subsequently agreed that Plaintiffs would have until June 13, 2023 to complete the final hour of Leventhal's deposition as well as the depositions of Liberty Capital, Hampton Island, and Fulcrum. *See Interim Scheduling Order* entered May 31, 2023. The prior assignment is discussed further below, but the timing of its appearance is curious since the parties had previously litigated the pivotal "asset" issue as part of a motion to dismiss at the start of the case. The prior assignment is not mentioned in the motion to dismiss pleadings. The trial court's initial granting of the motion to dismiss was overturned by the Georgia Court of Appeal and certiorari was denied by the Georgia Supreme Court.

### A.    Case No. 2013-CV-236057, Fulton County Superior Court (the "2013 Litigation")[2]

On September 5, 2013, Liberty Capital, LLC ("Liberty Capital") filed its *Verified Complaint for Injunctive Relief and for Appointment of Receiver* (the "2013 Complaint") against Hampton Island, LLC ("Hampton Island") seeking the appointment of a receiver to take custody and control of the "Property, the Additional Property, and the Second Additional Property, and the rents, accounts and income collected and derived therefrom" pending Liberty Capital's foreclosure of its collateral.  2013 Complaint, ¶¶ 32, 34.  Liberty Capital asserted it was the "legal owner" of the rents and incomes from the Initial Property and the Additional Property, subject to a license in favor Hampton Island to collect the same as long as Hampton Island was not in default under the Security Deed given to Liberty Capital.  *Id.* at ¶¶ 9, 17.  Notably, Liberty Capital did not mention any prior assignment of the Hampton Notes and Hampton Security Deed to Georgian Bank (now First Citizens Bank).

On September 5, 2013, Liberty Capital filed its *Emergency Motion for Temporary Restraining Order, Appointment of Receiver, and Injunctive Relief* (the "Emergency Motion").

On September 19, 2013, the Court entered an *Unopposed Order Appointing Receiver* that had been prepared and presented by Liberty Capital's counsel in the action.

On October 1, 2013 (during the 2013 Litigation), Liberty Capital exercised its power of sale under the Hampton Security Deed and sold the "Foreclosed Property" to Fulcrum Loan Holdings, LLC ("Fulcrum") for $50,000.00 (the "2013 Foreclosure Sale").  The Property was sold subject to the senior liens existing in favor of Georgian Bank (now First Citizens Bank), Darby Bank (now Ameris Bank), and Bank of North Georgia (now Synovus Bank).

---

[2]  The entire record of the 2013 Litigation was filed with this Court on September 28, 2018.  *See Defendants' Notice of Filing the Certified Record of Fulton County Action No. 2013CV236057*.

On October 31, 2013, Hampton Island filed its *Defendant's Verified Answer and Defenses* in response to the 2013 Complaint (the "2013 Answer").

On February 20, 2014, Hampton Island's counsel filed the *Affidavit of Ronald S. Leventhal* dated February 19, 2014 (Defendants' Response to Plaintiffs' MSJ, Ex. 2 )(the "2014 Leventhal Affidavit").[3]  The 2014 Leventhal Affidavit references an *Absolute Assignment of Deeds to Secure Debt and Related Loan Documents* given by Liberty Capital to Georgian Bank (now First Citizens Bank) dated January 4, 2007 and recorded in Deed Book 1443, Page 522, Liberty County, Georgia official records (Defendants' MSJ, Ex. 25)(the "Assignment Agreement").  *See* 2014 Leventhal Affidavit, ¶ 8 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).  The 2014 Leventhal Affidavit also states that "Liberty has never received a written notification from Georgian Bank or from First Citizens that either was exercising its rights under the Assignment revoking Liberty's license to exercise its rights as Grantee under the Security Deed."  *Id.* at ¶ 12.

On September 8, 2014, the Court entered a *Consent Final Order and Judgment* that was jointly submitted by Liberty Capital and Hampton Island's counsel in the action (Plaintiffs' MSJ, Ex. 42)(the "2014 Consent Judgment").  Among other findings, the 2014 Consent Judgment contained these two findings: (1) as of September 30, 2013, Hampton Island was indebted to Liberty Capital in the amount of $36,671,321.37 (2014 Consent Judgment, pp. 2-3) and (2) "the market value of the Foreclosed Property does not exceed the Senior Debt." (*Id.* at p. 4)  Pursuant to the 2014 Consent Judgment, Liberty Capital agreed to withdraw or otherwise dismiss its report of foreclosure sale and not seek confirmation of such sale; Hampton Island agreed to transfer the declarant rights for Hampton Island Preserve to Fulcrum, including without limitation, any and all

---

[3]  The Special Master does not know Hampton Island's reason for filing the 2014 Leventhal Affidavit in the 2013 Litigation.  The 2014 Leventhal Affidavit does not appear to have been filed in connection with a motion or other filing.

rights, claims, and choses in action held by the declarant in connection with any unauthorized transfers of units or lots; Hampton Island transferred and conveyed to Liberty Capital any and all personal property on the Property (as defined in the 2014 Consent Judgment), including without limitation, any and all equipment, furniture, fixtures, and vehicles, including a 2004 31-foot Contender; Hampton Island transferred and conveyed to Liberty Capital certain intellectual property, zoning, and land use rights; Hampton Island transferred and conveyed to Liberty Capital any and all easements and licenses related to the Property (as defined in the 2014 Consent Judgment) but not referenced in the "Liberty Foreclosure Deed"; Hampton Island transferred and conveyed to Liberty Capital that certain promissory note given by Hampton Island Owner's Association to Hampton Island in the amount of $812,363.32; Hampton Island transferred and conveyed to Liberty Capital any and all membership interests held by Hampton Island in Retreat Living, LLC; and, Liberty Capital was awarded a final judgment against Hampton Island in the amount of $31,621,321,37.[4]

**B.    Case No. 1:14-cv-03375-ELR, United States District Court, Northern District of Georgia (the "2014 Litigation")**

On October 21, 2014, Plaintiffs filed their *Complaint* against Liberty Capital seeking money damages for Liberty Capital's breach of its contractual obligation to pay each Plaintiff $1,125,000 upon the timely exercise of the "Put Rights" granted to each Plaintiff pursuant to separate written agreements with Liberty Capital.  Pursuant to the agreements, Plaintiffs had the contractual right to "put" their membership interests in Hampton Island to Liberty Capital for the "Put Price" of $1,250,000.00.  Plaintiffs asserted they timely exercised their "Put Rights" on or about October 2, 2008, but Liberty Capital failed to pay Put Price.

---

[4]    As of September 30, 2013, Hampton Island was indebted to Liberty Capital in the amount of $36,671,321.37.  *See* 2014 Consent Judgment, pp. 2-3.

On July 9, 2015, the Court entered its *Amended Judgment* awarding Plaintiffs the amount of $2,250,000.00, plus prejudgment interest in the amount of $1,036,048.61 (the "<u>Plaintiffs' Judgment</u>").

### C.    Case No. 2017-CV-295620, Fulton County Superior Court (the "<u>2017 Litigation</u>")

On September 22, 2017, Plaintiffs filed their *Complaint* (the "<u>2017 Original Complaint</u>") against Defendants seeking to unwind the 2013 Foreclosure Sale and set aside the 2014 Consent Judgment. Plaintiffs asserted five counts in the 2017 Original Complaint: Count I (Setting Aside the Consent Judgment), Count II (Fraudulent/Voidable Transfer), Count III (Constructive Trust/Attachment), County IV (Piercing the Corporate Veil), and Count V (Bad Faith).

On September 27, 2017, each Defendant filed its Answer to the 2017 Original Complaint. Defendant Leventhal filed his *Affirmative Defenses and Answer of Defendant Ronald S. Leventhal* ("<u>Leventhal's 2017 Original Answer</u>"). Defendant Liberty Capital filed its *Defendant Liberty Capital, LLC's Answer to the Complaint* ("<u>Liberty Capital's 2017 Original Answer</u>"). Defendant Hampton Island filed its *Defendant Hampton Island, LLC's Answer to the Complaint* ("<u>Hampton Island's 2017 Original Answer</u>"). Defendant Fulcrum filed its *Defendant Fulcrum Loan Holding, LLC's Answer to the Complaint* ("<u>Fulcrum's 2017 Answer</u>").

On January 10, 2018, Plaintiffs filed their *Plaintiffs' Notice of Filing Lis Pendens*. On January 11, 2018, Plaintiffs filed their *Plaintiffs' Notice of Filing Corrected Lis Pendens*.

On February 8, 2018, Defendants Liberty Capital, Hampton Island, and Fulcrum filed their *Motion to Dismiss on Behalf of Defendants Liberty Capital, LLC, Hampton Island, LLC, and Fulcrum Loan Holdings, LLC* and supporting brief ("<u>Defendants' Motion to Dismiss</u>"). Defendants Liberty Capital, Hampton Island, and Fulcrum argued that the 2017 Original Complaint should be dismissed on several grounds, including most relevant to this Report &

Recommendation, because there was not a "transfer" of an "asset" in the 2013 Foreclosure Sale. Specifically, Defendants argued that foreclosed property was not an "asset" under Georgia's Uniform Fraudulent Transfers Act, O.C.G.A. § 18–2–70, *et seq.* ("GA UFTA") because it was over-encumbered by senior liens at the time of Liberty Capital's foreclosure of the Hampton Security Deed.  Notably, Defendants did not argue that the Hampton Security Deed was not an "asset" under GA UFTA due to Liberty Capital's prior assignment of the Hampton Notes and Hampton Security Deed to Georgian Bank (now First Citizens Bank).[5]

On February 8, 2018, Defendant Fulcrum also filed its *Motion to Cancel Lis Pendens on Behalf of Defendant Fulcrum Loan Holdings, LLC* and supporting brief ("Fulcrum's Motion to Cancel Lis Pendens").

On February 12, 2018, Defendant Leventhal filed his *Defendant Ronald S. Leventhal's Adoption of Defendants' Motion to Dismiss* in which he adopted Defendants' Motion to Dismiss and further adopted "every position, assertion, argument and prayer for relief as set forth in the foregoing, as if also by Leventhal."

On March 9, 2018, Plaintiffs filed their *Plaintiffs' Response to Defendants' Motion to Dismiss and Request for Sanctions*.

On March 9, 2018, Plaintiffs filed their *Plaintiffs' Response to Defendant Fulcrum's Motion to Cancel Lis Pendens*.

On March 23, 2018, Defendants Liberty Capital, Hampton Island, and Fulcrum filed their *Reply Brief in Support of Motion to Dismiss on Behalf of Defendants Liberty Capital, LLC,*

---

[5] Defendants did not raise this argument until filing their motion for summary judgment, which was roughly 6 years later.

*Hampton Island, LLC, and Fulcrum Loan Holdings, LLC and Response to Plaintiffs' Request for Sanctions*.

On April 18, 2018, Plaintiffs filed their *Plaintiffs' Sur-Response in Opposition to Defendants' Motion to Dismiss*.

On August 16, 2018, the Court entered its *Order Granting Motion to Dismiss Filed by Defendants Liberty Capital, LLC, Hampton Island, LLC, and Fulcrum Loan Holdings, LLC, and Adopted by Ronald S. Leventhal* (the "Dismissal Order"). The Court granted Defendants' Motion to Dismiss, including without limitation, the dismissal of Count II (Fraudulent/Voidable Transfer), based on, among other grounds, there had not been a transfer of an "asset" under GA UFTA because the foreclosed property was over-encumbered by the valid liens of senior lenders at the time of Liberty Capital's foreclosure of the Liberty/Hampton Security Deed (as defined herein). The Court held Plaintiffs may not proceed under GA UFTA because there was no "transfer" of an "asset." The Dismissal Order did not reference Liberty Capital's prior assignment of the Liberty/Hampton Note (as defined herein) and the Liberty/Hampton Security Deed (as defined herein) to Georgian Bank (now First Citizens Bank).

On August 17, 2018, Plaintiffs filed their *Notice of Appeal* with the Georgia Court of Appeals (the "Court of Appeals") regarding the Dismissal Order.

On August 22, 2018, the Court entered its *Order Granting Motion to Cancel Lis Pendens on Behalf of Defendant Fulcrum Loan Holdings, LLC* (the "Lis Pendens Cancellation Order"). The Court granted Fulcrum's Motion to Cancel Lis Pendens based on the Dismissal Order, which expressly dismissed Count II (Fraudulent/Voidable Transfer) of the 2017 Original Complaint.

On August 22, 2018, Plaintiffs filed their *Second Notice of Appeal* with the Court of Appeals regarding the Lis Pendens Cancellation Order.

On August 24, 2018, Plaintiffs filed their *Emergency Motion to Stay Order Canceling Lis Pendens* (the "Emergency Stay Motion") with the Court of Appeals to stay the effect of the Lis Pendens Cancellation Order.

On August 27, 2018, Plaintiffs filed their *Amended Notice of Appeal* with the Court of Appeals regarding both the Dismissal Order and the Lis Pendens Cancellation Order.

On August 27, 2018, the Court of Appeals granted the Emergency Stay Motion (the "Court of Appeals Order Granting the Emergency Stay Motion") and ruled that "any further action by the trial court with respect to the notice of lis pendens is hereby stayed during the pendency of the appeal of the dismissal of the underlying lawsuit, with the exception that the trial court may issue such orders as are necessary to effectuate the ruling on this emergency motion." Court of Appeals Order Granting Emergency Stay Motion, pp. 1-2.

On September 6, 2018, the Court entered its *Order Staying Order Granting Motion to Cancel Lis Pendens* ("Order Staying Lis Pendens Cancellation Order"). The Court ruled that "[t]herefore, consistent with the directive from the Court of Appeals, it is hereby ORDERED that the [Lis Pendens] Cancelation Order is STAYED pending final resolution of this dispute and exhaustion of all appellate rights." Order Staying Lis Pendens Cancellation Order, p. 2.

On September 28, 2018, Defendants filed their *Defendants' Notice of Filing the Certified Record of Fulton County Action No. 2013CV236057*.

On March 13, 2020, the Court of Appeals reversed this Court's dismissal of the 2017 Original Complaint and overruled the Dismissal Order (the "Court of Appeals Order Overruling the Dismissal Order"). The Court of Appeals ruled, in part:

> We are also unpersuaded by their argument that Liberty's security interest in the real property, as described in the complaint allegations, is excluded from the statute's definition of "asset." It is simply too soon in this case to conclude, as a

matter of law, that the plaintiffs cannot present evidence satisfying these statutory elements.

*Lyle, et al. v. Fulcrum Loan Holdings, LLC, et al.*, 358 Ga. App. 742, 746, 841 S.E.2d 182 (2020)(internal citation omitted).

On September 21, 2021, the Court entered its *Order of Appointment of Special Master* appointing Erich N. Durlacher as the Special Master in this case.

On April 25, 2022, Plaintiffs filed their *Plaintiffs' Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged and Brief in Support*.

On May 27, 2022, Defendants filed their *Response to Plaintiffs' Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged and Brief in Support*¸ which attached, among other things, the *Affidavit of Ronald S. Leventhal* dated May 26, 2022 (Plaintiffs' MSJ, Ex. 2)(the "2022 Leventhal Affidavit").  Among other things, Leventhal testified that "Liberty Capital, LLC had a valid security deed, and its rights were clear.  *These facts were not in question.*"  *Id.* at ¶ 29 (emphasis added).

 On June 6, 2022, Plaintiffs filed their *Plaintiffs' Reply in Support of Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged and Brief in Support*.

A hearing on Plaintiffs' Motion to Compel was held on July 27, 2022.

On August 8, 2022, Plaintiffs filed their *Plaintiffs' Supplemental Brief in Support of Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged.*

On August 9, 2022, Defendants filed their *Post-Hearing Brief in Opposition to Plaintiffs' Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged.*

On August 12, 2022, Plaintiffs filed their *Plaintiffs' Response to Defendants' Post-Hearing Briefs on Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged.*

On August 12, 2022, Defendants filed their *Defendants' Response to Plaintiffs' Post-Hearing Brief in Support of Their Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged and Brief in Support*.

On September 2, 2022, the Special Master entered his *Order on Plaintiffs' Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged* ("Special Master's Motion to Compel Order").

On September 12, 2022, Defendants filed their *Defendants' Objection to Special Master's Order on Plaintiffs' Motion to Compel Regarding Documents and Testimony Improperly Designated as Privileged* ("Defendants' Objection to Special Master's Order"). Among other objections, Defendants asserted,

> In this case, there has not been "a 'transfer' of an 'asset' sufficient to trigger the UVTA because the property foreclosed upon by Liberty Capital was encumbered by several 'valid liens' at the time of transfer, and it otherwise had a negative asset value. Because of the 'valid liens,' the subject property could not be an 'asset' of either Liberty or Hampton pursuant to O.C.G.A. § 18-2-71(2)(A)."

Defendants' Objection to Special Master's Order, pp. 6-7 (internal citations omitted).

Defendants did not argue that the Hampton Security Deed was not an "asset" under UVTA (or, GA UFTA) due to Liberty Capital's prior assignment of the Hampton Notes and Hampton Security Deed to Georgian Bank (now First Citizens Bank).[6]

On December 13, 2022, the Court entered its *Order Fully Adopting the Special Master's Order on Motion to Compel* (the "Order Adopting Special Master's Motion to Compel Order").

In fully adopting the Special Master's Motion to Compel Order, the trial court ruled

> . . . In addition to the property, Plaintiffs claim that was transferred was more than $30 million in notes [Hampton Island] issued to [Liberty Capital], the security

---

[6] Defendants did not raise this argument until filing their motion for summary judgment, which was roughly 4 years later.

interest accompanying the notes, and valuable personal property. All of these have value. Indeed, even unsecured notes generally have some value.

Second, there is clear evidence that what was transferred to [Fulcrum] through the alleged fraudulent transfer did have value. The record shows that Fulcrum, another entity affiliated with Mr. Leventhal, paid $50,000.00 to acquire the property subject to the liens that Defendants now claim rendered the property valueless. Evidence that an entity was willing to pay $50,000.00 to acquire the real estate at Hampton Island subject to all the third-party liens addressed by Defendant establishes *prima facie* evidence of the transfer of an asset that had value.

. . . Here, the undisputed evidence of the badges of fraud, coupled with the undisputed evidence that Fulcrum paid $50,000.00 for the property at Hampton Island and the security interest held by Liberty Capital was canceled, establishes a *prima facie* case of fraudulent conveyance.

Order Adopting Special Master's Motion to Compel Order, pp. 4-5 (internal citation omitted).

On January 19, 2023, the Special Master entered his *Consent Order on Plaintiffs' Motion to Extend the Deadline to Complete Fact Discovery* that extended the discovery period in this case through and including April 13, 2023.

On April 14, 2023, Plaintiffs filed their First Amendment to Complaint (the "First Amendment to 2017 Original Complaint" and together with the 2017 Original Complaint, the "2017 Complaint") to add three more counts to the 2017 Original Complaint: Count VI (Continuation/Successor/Partnership/Joint Venture Liability), Count VII (Conspiracy), and Count VIII (Punitive Damages).

On May 2, 2023, Defendants filed their *Defendants' Motion for Summary Judgment and Integrated Brief in Support* ("Defendants' MSJ") and *Defendants' Statement of Material Facts as to Which There are no Genuine Issues to be Tried and Theories of Recovery* ("Defendants' SMF"). Defendants requested summary judgment on Count I (Setting Aside the Consent Judgment), Count II (Fraudulent/Voidable Transfer), Count III (Constructive Trust/Attachment), Count VI

(Continuation/Successor/Partnership/Joint Venture Liability), Count VII (Conspiracy), and Count VIII (Punitive Damages) of the 2017 Complaint.

For the first time in the 2017 Litigation, Defendants assert there has not be a "transfer" of an "asset" under GA UFTA because the Liberty/Hampton Note (as defined herein) and the Liberty/Hampton Security Deed (as defined herein) had been assigned to Georgian Bank (now First Citizens Bank) in 2007, prior to Plaintiffs' exercise of their "Put Rights."  Among other things,  Defendants filed the Affidavit of *Ronald S. Leventhal* dated April 28, 2023 (Defendants' MSJ, Ex. 110) (the "April 2023 Leventhal Affidavit") in support of Defendants' MSJ.

On May 31, 2023, the Special Master entered his *Interim Scheduling Order* that ordered (1) the parties would cooperate in scheduling the final hour of Leventhal's deposition as well as the depositions of Liberty Capital, Hampton Island, and Fulcrum by June 13, 2023, (2) Plaintiffs' response to Defendants' motion for summary judgment would be due on or before July 10, 2023, and (3) Plaintiffs may file a motion for summary judgment on or before July 10, 2023.

On July 10, 2023, the Special Master entered his *Consent Order Extending the Time for Plaintiffs to File Their Response to Defendants' Motion for Summary Judgment and for Plaintiffs to File Their Motion for Summary Judgment* that extended  (1) Plaintiffs deadline to file a response to Defendants' motion for summary judgment through July 12, 2023 and (2) Plaintiffs deadline to file a motion for summary judgment through July 24, 2023.

On July 12, 2023, Plaintiffs filed their *Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment* ("Plaintiffs' Response to Defendants' MSJ") and *Plaintiffs' Statement of Facts Showing Genuine Issue for Trial* ("Plaintiffs' Response to Defendants' SMF").

On July 24, 2023, Plaintiffs filed their *Plaintiffs' Cross-Motion for Partial Summary Judgment and Brief in Support* ("Plaintiffs' MSJ") and *Plaintiffs' Statement of Theories of*

*Recovery and Material Facts Showing No Genuine Issue for Trial* ("<u>Plaintiffs' SMF</u>").  Plaintiffs requested summary judgment on Count II (Fraudulent/Voidable Transfer) and Count VI (Continuation/Successor/Partnership/Joint Venture Liability) of the 2017 Complaint.

On September 5, 2023, Defendants filed their *Defendants' Response in Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment* ("<u>Defendants' Response to Plaintiffs' MSJ</u>") and *Defendants' Response to Plaintiffs' Statement of Theories of Recovery and Material Facts Showing No Genuine Issue for Trial* ("<u>Defendants' Response to Plaintiffs' SMF</u>").  Among other things, Defendants filed the Affidavit of *Ronald S. Leventhal* dated August 18, 2023 (Defendants' Response to Plaintiffs' MSJ, Ex. 1 )(the "<u>August 2023 Leventhal Affidavit</u>") and the 2014 Leventhal Affidavit in response to Plaintiffs' MSJ and Plaintiffs' SMF.

On October 13, 2023, Defendants filed their *Defendants' Reply in Support of Defendants' Motion for Partial Summary Judgment*.

On October 13, 2023, Plaintiffs filed their *Plaintiffs' Reply in Support of Cross-Motion for Partial Summary Judgment*.

On October 25, 2023, Plaintiffs filed their *Plaintiffs Sur-Response to Defendants' Motion for Partial Summary Judgment*.

On October 27, 2023, the Special Master conducted a hearing on Plaintiffs and Defendants' cross-motions for partial summary judgment.

On October 31, 2023, Plaintiffs filed their *Plaintiffs Wayne Lyle and Charles Cary's Notice of Filing Exhibits in Hearing on Cross-Motions for Summary Judgment*.

On November 9, 2023, Plaintiffs filed their *Plaintiffs' Objection to Inadmissible Evidence and Request to Strike*.

On November 16, 2023, Defendant Leventhal filed his *Expedited Motion to Cancel Lis Pendens and Brief in Support*.

On December 6, 2023, The Special Master entered his *Order Denying Defendant Leventhal's Request for Expedited Briefing Schedule and Expedited Hearing*.

On December 7, 2023, Plaintiffs filed their *Plaintiffs' Response to Expedited Motion to Cancel Lis Pendens and Request for Fees Under O.C.G.A. § 9-15-14*.

On December 15, 2023, Defendant Liberty Capital filed its *Defendant Liberty Capital, LLC's Amendment to its Answer to the Complaint* ("Liberty Capital's Amendment to Answer"). Liberty Capital amended its October 27, 2017 answers to Paragraphs 20 & 22 of the 2017 Original Complaint to "clarify" its prior statements regarding the Liberty/Hampton Note and Liberty/Hampton Security Deed being "assets" of Liberty Capital and to reference the Assignment Agreement between Liberty Capital and Georgia Bank (now First Citizens Bank). *See* Liberty Capital's Amendment to Answer, ¶¶ 20 & 22.

On December 15, 2023, Defendant Hampton Island filed its *Defendant Liberty Capital, LLC's[7] Amendment to its Answer to the Complaint* ("Hampton Island's Amendment to Answer"). Liberty Capital amended its October 27, 2017 answer to Paragraphs 22 of the 2017 Original Complaint to "Hampton [Island] is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 22 of the Complaint, and the allegations therefor stand denied." Hampton Island's Amendment to Answer, ¶ 22.

---

[7] Hampton Island did not update the caption of this pleading to reflect it was being filed by Hampton Island, not Liberty Capital.

On December 15, 2023, Defendant Liberty Capital, Hampton Island, and Fulcrum filed their *Defendant Liberty Capital, LLC, Hampton Island, LLC, and Fulcrum Loan Holdings, LLC's Response to Plaintiffs' Objection to [Allegedly] Inadmissible Evidence and Request to Strike*.

On December 18, 2023, Defendant Leventhal filed his *Ronald S. Leventhal's Amendment to the Affirmative Defenses and Answers of Defendant Ronald S. Leventhal* ("Leventhal's Amendment to Answer"). Defendant Leventhal amended his October 27, 2017 answers to Paragraphs 20 & 22 of the 2017 Original Complaint in substantially the same form and substance as Liberty Capital. *See* Leventhal's Amendment to Answer, ¶¶ 20 & 22.

On December 18, 2023, Defendant Leventhal filed his *Defendant's Response to Plaintiffs' Objection to Evidence and Request to Strike*.

On January 4, 2024, Plaintiffs filed their *Plaintiffs' Reply in Support of Objection to Inadmissible Evidence and Motion to Strike*.

On January 8, 2024, Defendant Liberty Capital, Hampton Island, and Fulcrum filed their *Defendant Liberty Capital, LLC, Hampton Island, LLC, and Fulcrum Loan Holdings, LLC's Sur-Reply to Plaintiffs' Objection to [Allegedly] Inadmissible Evidence and Request to Strike.*

On January 10, 2024, Plaintiffs filed their *Plaintiffs' Sur-Reply in Support of Objection to Inadmissible Evidence and Motion to Strike*.

On February 22, 2024, Defendant Leventhal filed his *Defendant's Reply to Plaintiffs' Response to Expedited Motion to Cancel Lis Pendens and Response in Opposition to Plaintiffs' Request for Fees Under O.C.G.A. § 9-15-14*.

For the moment, the foregoing appears to conclude the substantive briefing relevant to the pending cross-motions for summary judgment and the related objections to evidence and request to strike, and motion to cancel lis pendens.

### III.    Findings of Fact[8]

The Special Master finds the following material facts are undisputed based on the testimony and exhibits submitted by the parties in support of their cross-motions for summary judgment.  Although the parties dispute the legal conclusions to draw from these facts, the facts themselves are largely undisputed.

### A.    Plaintiffs' Judgment Against Liberty Capital

Plaintiffs Lyle and Cary are judgment creditors of Liberty Capital.  Plaintiffs' SMF ¶ 1; Defendants' Response to Plaintiffs' SMF ¶ 1.

On or about July 9, 2015, Plaintiffs Lyle and Cary obtained a judgment against Liberty Capital in the amount of Three Million Two Hundred Eighty-Six Thousand Forty Eight and 61/100 Dollars($3,286,048.61).  Plaintiffs' SMF ¶ 94 & Plaintiffs' MSJ, Ex. 1; Defendants' Response to Plaintiffs' SMF ¶ 94.

### B.    The Liberty/Hampton Loan Documents

On or about November 14, 2006, Hampton Island executed and delivered a Commercial Loan Agreement in the original amount of $8,200,000.00 made payable to Liberty Capital (as amended, restated, supplemented, and modified, the "Liberty/Hampton Loan Agreement"). Defendants' SMF ¶ 24 & Defendants' MSJ, Ex. 8.

Concurrently, Hampton Island executed and delivered a promissory note in the original principal amount of $8,200,000.00 (the "Liberty/Hampton Loan") made payable to Liberty Capital (the "Liberty/Hampton Note").  Defendants' SMF ¶ 25 & Defendants' MSJ, Ex. 9.

To secure repayment of the Liberty/Hampton Note, Hampton Island executed a Deed to Secure Debt and Security Agreement in favor of Liberty Capital dated November 14, 2006 and

---

[8]  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

recorded November 15, 2006 in Deed Book 1431, Page 252, Liberty County, Georgia official records (the "Liberty/Hampton Security Deed").  Defendants' SMF ¶ 28 & Defendants' MSJ, Ex. 10.

The Liberty/Hampton Security Deed granted Liberty Capital a security interest encumbering certain real property in the Hampton Island Preserve subdivision, described more particularly in Exhibit "A" to the Liberty/Hampton Security Deed (the "Subject Property"). Defendants' SMF ¶ 29 & Defendants' MSJ, Ex. 10.

Liberty Capital entered into an *Absolute Assignment of Deeds to Secure and Related Loan Documents* dated January 4, 2007 and recorded January 12, 2007 in Deed Book 1443, Page 522, Liberty County, Georgia official records (Defendants' MSJ,  Ex. 25)(the "Assignment Agreement").[9]

The Liberty/Hampton loan was subsequently increased to a principal amount of $37,500,000.  Defendants' SMF ¶ 35 & Defendants' MSJ, Ex. 13.

Defendants Liberty Capital, Hampton Island, and Leventhal initially admitted the Liberty/Hampton Note and the Liberty/Hampton Security Deed in the Subject Property were "valuable assets held by Liberty [Capital]."  2017 Complaint, ¶ 22; Liberty Capital Answer, ¶ 22; Hampton Island Answer, ¶ 22; Leventhal Answer ¶ 22.

Defendants Liberty Capital, Hampton Island, and Leventhal filed amendments to these prior admissions over 6 years later.  Liberty Capital's Amendment to Answer, ¶ 22; Hampton Island' Amendment to Answer, ¶ 22; Leventhal's Amendment to Answer ¶ 22.

_____

[9]  The Special Master takes judicial notice of the fact that First Citizens Bank filed a *Satisfaction and Termination of Assignment* with respect to the Assignment Agreement on March 3, 2017 in Deed Book 1939, Page 771, Liberty County, Georgia official records, pursuant to O.C.G.A. § 24-2-201.  *See Amberfield Homeowners Ass'n, Inc. v. Young*, 346 Ga. App. 29, 31 n.4, 813 S.E.2d 618, 620 (2018)(noting trial court took judicial notice of documents filed in the real property records).

At the time of the 2013 Foreclosure Sale, Liberty Capital possessed, at a minimum, a license in the Liberty/Hampton Note and the Liberty/Hampton Security Deed (collectively, the "Liberty/Hampton Loan Documents") that permitted Liberty Capital to foreclose on the Subject Property. Defendants' MSJ, Ex. 25; 2014 Leventhal Affidavit, ¶¶ 11-12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).

### C. Hampton Island Preserve Subdivision / The Subject Property

The Hampton Island Preserve subdivision is a 4,000-acre residential, resort development on the coast of Georgia. Plaintiffs' SMF ¶ 4 & Plaintiffs' MSJ, Ex. 3, p. 46; Defendants' SMF ¶ 4.

The Subject Property is made up of 41 parcels of real property within the Hampton Island Preserve subdivision that comprise approximately 2, 600 acres. Defendants' SMF ¶ 3 & Defendants' MSJ, Ex. 109, ¶ 5; August 2023 Leventhal Affidavit, ¶ 4 (Defendants' Response to Plaintiffs' MSJ, Ex. 1).

### D. The Three Banks / The Senior Debt

Three banks, Georgian Bank (later First Citizens Bank), Darby Bank (later Ameris Bank), and the Bank of North Georgia (later Synovus Bank) (collectively, the "Three Banks")[10], were the holders of several loans secured by the different portions of the Subject Property. Defendants' SMF ¶ 6 & Defendants' MSJ, Exs. 54-56.

The Three Banks acquired their senior security interests encumbering the Subject Property in connection with the following loans:

---

[10] This Report & Recommendation will refer interchangeably to each of the Three Banks by their predecessor or successor names, to wit: (a) Georgian Bank or First Citizens Bank, (b) Darby Bank or Ameris Bank, and (c) Bank of North Georgia or Synovus Bank.

i.   A loan originally made from Georgian Bank to South Hampton Island Preservation, LLC ("SHIP, LLC") on or around March 10, 2006, in the original principal amount of $5,500,00.00 (the "Georgian Bank/SHIP Loan"), which, through a series of modifications and amendments, was ultimately increased to $12,500,000.00.

ii.  A loan originally made from Georgian Bank to Liberty Capital on or around January 4, 2007, in the original principal amount of $12,500,00.00 (the "Georgian Bank/Liberty Loan"), which, through a series of modifications and amendments, was ultimately increased to $27,900,000.00.

iii. A loan originally made from Georgian Bank to Turtle Lake Holdings, LLC on or around April 7, 2008, in the original principal amount of $2,000,000.00 (the "Georgian/Turtle Lake Loan") (the Georgian Bank/SHIP Loan, the Georgian Bank/Liberty Loan, and the Georgian Bank/Turtle Lake Loan, collectively, the "Georgian Bank Loans").

iv.  A loan originally made from Darby Bank to Hampton on or around May 1, 2009, in the original principal amount of $8,000,000.00 (the "Darby Bank Loan").

v.   A loan originally made from the Bank of North Georgia to Blue Heron Investments, LLC ("Blue Heron"), on or around November 29, 2007, in the original principal amount of $20,003,000.00 (the "BNG Loan").

Defendants' SMF ¶ 6.

By late 2011, the Georgian Bank Loans, the Darby Bank Loan, and the BNG Loan (the "Senior Loans") were all overdue, and each of the Three Banks had the right to declare the Senior Loans in default and foreclose on the Subject Property.  Defendants' SMF ¶ 93 & April 2023 Leventhal Affidavit, ¶ 24 (Defendants' MSJ, Ex. 110).

At the time, Hampton Island and Liberty Capital did not have the means to pay down the Senior Loans secured by the Subject Property. Defendants' SMF ¶ 94.

Hampton Island and Liberty Capital did not have the ability to borrow additional funds to continue development of the Subject Property to improve its value for sale. Defendants' SMF ¶ 95 & April 2023 Leventhal Affidavit, ¶ 25 (Defendants' MSJ, Ex. 110).

Despite significant effort, Hampton Island and Liberty Capital could not find outside investors willing to invest capital to pay down the Senior Loans or continue the development of the Subject Property. Defendants' SMF ¶ 96 & April 2023 Leventhal Affidavit, ¶ 27 (Defendants' MSJ, Ex. 110).

Hampton Island was unable to identify any buyer willing and able to purchase the Subject Property. Defendants' SMF ¶ 97 & Defendants' MSJ, Ex. 28.

Liberty Capital, through Leventhal, attempted to negotiate further agreements with the Three Banks to extend the deadline to repay the Senior Loans or renegotiate the debt, but no such agreements were reached or executed. Defendants' SMF ¶ 98 & April 2023 Leventhal Affidavit, ¶ 29 (Defendants' MSJ, Ex. 110).

By the third quarter of 2013, Liberty Capital was not making payments on the Senior Loans to the Three Banks. Plaintiffs' SMF ¶ 24 & Plaintiffs' MSJ, Ex. 14, pp. 12-14; Defendants' Response to Plaintiffs' SMF ¶ 24.

Similarly, while it may have had some ability to pay day-to-day trade debt, Hampton Island was not paying the Senior Debts to the Three Banks. Plaintiffs' SMF ¶ 25 & Plaintiffs' MSJ, Ex. 14, pp. 12-13; Defendants' Response to Plaintiffs' SMF ¶ 25.

With no agreement in place to extend Hampton Island's and Liberty Capital's time to repay the Senior Loans, Liberty Capital could not prevent the Three Banks from foreclosing on the

Subject Property if they chose to exercise their rights and remedies.  Defendants' SMF ¶ 99 &

April 2023 Leventhal Affidavit, ¶ 30 (Defendants' MSJ, Ex. 110).

> **E.    Hampton Island's Default on the Liberty/Hampton Loan; Events Leading up to the 2013 Litigation and 2013 Foreclosure Sale**

After Hampton Island failed to repay the Liberty/Hampton Loan by its maturity date, a

default and Event of Default existed under the Liberty/Hampton Loan Documents, giving Liberty

Capital the right to declare a default and foreclose on the Subject Property based on its interest

under the Assignment Agreement.  Defendants' SMF ¶ 103 & Defendants' MSJ, Ex. 8 ¶¶ 6.01 &

6.02(a)(1); Defendants' MSJ, Ex. 9 ¶ 1; and, Defendants' MSJ, Ex. 25, ¶ 3.

Leventhal believed it might be possible to resolve the debts if the Subject Property was

controlled by a "clean" entity that was capable of borrowing or courting investors to infuse

additional capital to pay down the Senior Loans.  Defendants' SMF ¶ 107 & April 2023 Leventhal

Affidavit, ¶ 34 (Defendants' MSJ, Ex. 110).

Liberty Capital decided to foreclose on the Subject Property as a last-ditch effort to obtain

some value from Liberty Capital's license to exercise its junior security interest in the Subject

Property before a senior creditor foreclosed and rendered it worthless.  Defendants' SMF ¶ 109 &

April 2023 Leventhal Affidavit, ¶ 36 (Defendants' MSJ, Ex. 110).

Both Liberty Capital and Hampton Island both owed certain junior debts at the time of the

foreclosure, including the "Put Rights" being demanded by Plaintiffs.  Plaintiffs' SMF ¶¶ 20-21 &

Plaintiffs' MSJ, Ex. 14, pp. 20-23, 26 & 19; Defendants' Response to Plaintiffs' SMF ¶¶ 20-21.

Leventhal hoped Liberty or another entity controlled by Leventhal would be the "clean

entity" to purchase the Subject Property.  Plaintiffs' MSJ, Ex. 3, p. 183.

Leventhal's understanding was that a receiver being appointed might temporarily block the

Three Bank from being able to foreclose on the Subject Property.  Plaintiffs' MSJ, Ex. 14, p. 99.

On or about March 13, 2013, Liberty Capital's counsel notified Hampton Island of Liberty Capital's exercise of its contractual right, set forth in the Liberty/Hampton Security Deed, to become Mortgagee-in-Possession by filing a *Notice of Exercise of Rights of Mortgagee-in-Possession as to Hampton Island, LLC* dated as of March 1, 2013 and recorded March 13, 2013 in Deed Book 1765, Page 555, Liberty County, Georgia official records (the "Notice of Exercise"). Defendants' SMF ¶ 112 & Defendants' MSJ, Ex. 50. In the Notice of Exercise, Liberty Capital asserted its rights as a "mortgagee-in-possession" of the Property encumbered by the Hampton Security Deed, including Hampton Island's declarant rights under the recorded covenants. *Id*.

On August 30, 2013, Leventhal sent the following email to one of the lawyers who represented Liberty Capital:

> From: Ronald S. Leventhal [emailto:rsl@tivoli-properties.com] Sent: Friday, August 30, 2013 12:08 PM
> To: Christy, John
> Cc: Ronald S. Leventhal; Walter H. Curchack
> Subject: Liberty Capital, LLC II Security Deed - Receiver Action
> Importance: High
>
> John –
>
> The cutoff to run the foreclosure ad in Liberty County is next Wednesday, noon. I am not certain we must have the receiver in place prior, but it would be beneficial that he is in place so the ad refers to the fact that there is a receiver. The security deed holder is Liberty Capital, LLC, acting as attorney-in-fact for Hampton Island, LLC, the debtor. I control both. The loan originated in 2006.
>
> There is one entity who would challenge this: HAOP, LLC, et al., has a $1,050,000 judgment solely against Hampton Island, LLC . . .

Plaintiffs' MSJ, Ex. 19.

### F.    The 2013 Litigation

On September 5, 2013, Liberty filed its Verified Complaint for Injunctive Relief and for Appointment of Receiver (the "2013 Complaint") in the case of *Liberty Capital, LLC f/k/a Liberty*

*Capital Group, LLC v. Hampton Island, LLC,* Superior Court of Fulton County, Civil Action File No. 2013CV236057 (the "2013 Litigation").  Defendants' SMF ¶ 113 & Defendants' MSJ, Ex. 49.

Leventhal verified the following allegations in the 2013 Complaint:

33.

Due to the delay occasioned by advertising the Property, the Additional Property, and the Second Additional Property for foreclosure sale, there is manifest danger that Defendant [Hampton Island] will collect and not turn over to Plaintiff [Liberty Capital] the rents, accounts, income, and proceeds collected by Defendant prior to the foreclosure sale of the Property, Additional Property, and Second Additional Property, and there is no incentive for Defendant to properly maintain and manage the Property, the Additional Property, or the Second Additional Property in the interim time period. Absent the appointment of a receiver, the Property, Additional Property, and Second Additional Property will immediately deteriorate due to not being protected from the inevitable loss to occur due to lack of proper maintenance and management and the diversion of Plaintiffs property and collateral in the form of the rents, income and accounts of the Property, Additional Property, and Second Additional Property.

34.

In addition, in accordance with O.C.G.A. § 9-8-3, Plaintiff is also entitled to the appointment of a receiver to preserve and protect its collateral pending a foreclosure of the Property, the Additional Property, and the Second Additional Property.

35.

Plaintiff will also suffer irreparable injury, loss and harm unless Defendant, its agents, representatives, attorneys, and assigns are enjoined and prevented from continuing to collect the rents, accounts, income, profits and proceeds from the operation of the Property the Additional Property, and the Second Additional Property.

36.

Unless restrained, Defendant and its agents, representatives, attorneys, and assigns will continue to collect the rents, accounts and income from the Property, the Additional Property, and the Second Additional Property in violation of the terns of the Security Documents.

Defendants' MSJ, Ex. 49, ¶¶ 33-36.

The 2013 Complaint represented to the Court that there was a manifest danger that Hampton Island would collect and not turn over to Liberty Capital the rents, accounts, income, and proceeds collected by Hampton Island from the Subject Property, and absent the appointment of a receiver, the Subject Property would immediately deteriorate due to not being protected from the inevitable loss to occur due to lack of proper maintenance and management and diversion of Liberty Capital's property and collateral, and that Liberty Capital would suffer irreparable injury, loss, and harm unless Hampton Island were enjoined and prevented from continuing to collect the rents, accounts, income, profits, and proceeds from the operation of the Subject Property. Defendants' MSJ, Ex. 49, ¶¶ 33-35.

On or about May 26, 2022, Leventhal filed an Affidavit in the 2017 Litigation testifying that:

> . . . Because of my controlling position in both parties, I was sensitive about being accused of transferring property in secret. Thus, I directed Liberty Capital to file the 2013 Litigation to initiate a public foreclosure sale. The purpose of the litigation was to secure the presence of a Superior Court Judge and a court-appointed receiver to oversee the process. Although Liberty Capital, LLC had the right under the security deed to foreclose with the involvement of the Court or receiver, I believed that, by including a separate counsel for each party, along with a judge and a receiver, there would be overwhelming oversight and the Court, Receiver, or attorneys would tell me if anything was improper.

2022 Leventhal Affidavit, ¶ 19 (Plaintiffs' MSJ, Ex. 2).

Later in the same Affidavit, Leventhal testified that:

> . . . Respectfully, I never planned to direct Hampton Island, LLC to waste assets, but I could not (after nearly five years of delay) control other lenders that were in a position to take action to seize the same collateral to which Liberty Capital, LLC had junior rights. If one of Hampton Island, LLC's lenders had initiated foreclosure, Hampton Island, LLC had no ability to oppose it. That was the emergency. Plaintiffs' effort to twist this into a situation where I needed an injunction to stop myself from acting reflects a misunderstanding and perversion of the situation.

2022 Leventhal Affidavit, ¶ 28 (Plaintiffs' MSJ Ex. 2).

Prior to filing the 2013 Litigation, Leventhal and counsel representing Liberty Capital had the following discussion about serving HI, LLC, whose registered agent was Leventhal:

> **Christy:**    We need to perfect service on someone other than Ron [Leventhal]. This judge is suspicious of everything.
> **Lavoie:**    Ron [Leventhal] — is there another corporate officer of Hampton Island that we could serve?
> **Leventhal:** Can Hayden Pace acknowledge as attorney?

Plaintiffs' SMF ¶ 41 & 22; Defendants' Response to Plaintiffs' SMF ¶ 41.

Hayden Pace accepted service on behalf of HI, LLC, instead of Leventhal, the registered agent. Plaintiffs' SMF ¶ 42 & Plaintiffs' MSJ, Ex. 23; Defendants' Response to Plaintiffs' SMF ¶ 42.

On September 19, 2013, Liberty Capital, HI, LLC and Leventhal appeared before the Court with counsel to enter an Unopposed Order Appointing Receiver. Plaintiffs' SMF ¶ 43 & Plaintiffs' MSJ, Ex. 24; Defendants' Response to Plaintiffs' SMF ¶ 43.

The Emergency Order states that relief is being granted based on the written allegations about the manifest danger represented by HI, LLC set forth in the 2013 Complaint:

> It appearing to the Court from the *Verified Complaint for Injunctive Relief and for Appointment of a Receiver* (the "Complaint") filed by Plaintiff Liberty Capital . . .
>
> It further appearing that Plaintiff [Liberty Capital] would be subject to risk of irreparable injury, loss and/or damages unless Defendant [Hampton Island] and its managers . . . are enjoined as set forth herein . . .

Plaintiffs' MSJ, Ex. 24.

The Emergency Order makes no mention of the need for transparency and oversight, the need for protection from third-party banks, the need for a receiver in order to have flexibility in acting for the benefit of Hampton Island, and no mention that Leventhal owns and controls both litigants. Plaintiffs' MSJ, Ex. 24.

### G.    The 2013 Foreclosure Sale

During the course of the 2013 Litigation, Liberty Capital advertised the Subject Property for foreclosure in the legal paper of Liberty County.  Defendants' SMF ¶ 116 & Defendants' MSJ, Ex. 99.  The Subject Property was to be sold at public outcry to the highest bidder for cash before the courthouse door of Liberty County, Georgia on October 1, 2013.  *Id.*

The published Notice of Sale Under Power stated that "[s]pecifically, but without limitation, said property or portions thereof will be sold subject to the following security instruments (as the same may have been modified and/or assigned from time to time, which have priority over [the Liberty/Hampton Security Deed]," and listed five security deeds and five (5) UCC Financing Statements recorded in favor of the Three Banks.  Defendants' SMF ¶ 117 & Defendants' MSJ, Ex. 99.

Liberty Capital foreclosed on the Subject Property on October 1, 2023 (the "2013 Foreclosure Sale").  Defendants' SMF ¶ 1 & Defendants' MSJ, Exs. 52 & 99.

Pursuant to Section 3 of the Assignment Agreement, Liberty retained a license to enforce Georgian Bank's junior security interests in the Subject Property unless and until such time as Liberty Capital received written notification from Georgian Bank that an Event of Default existed and Georgian Bank was exercising its rights under  the Assignment Agreement.  Assignment Agreement, § 3 (Defendants MSJ, Ex. 25).

Leventhal provided affidavit testimony in February 2014 that "Liberty [Capital] has never received a written notification from Georgian Bank or from First Citizens that either was exercising its rights under the Assignment [Agreement] revoking Liberty's license to exercise its rights as Grantee under the Security Deed."  2022 Leventhal Affidavit, ¶ 12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).

Leventhal hoped that an entity he controlled would place the highest bid at the public foreclosure sale. Plaintiffs' SMF ¶ 50; Defendants' Response to Plaintiffs SMF ¶ 50.

Liberty Capital, acting solely in its capacity as attorney in fact for Hampton Island, through separate counsel, cried out and sold the Subject Property at a public sale on October 1, 2013. Defendants' SMF ¶ 118.

The foreclosure sale was conducted by Jim Smith, a lawyer in Hinesville, Georgia. Plaintiffs' SMF ¶ 51; Defendants' Response to Plaintiffs' SMF ¶ 51.

Although Defendants made a recording of the foreclosure sale "bidding," no one has been able to locate the recording. Plaintiff's SMF ¶ 56; Defendants' Response to Plaintiffs' SMF ¶ 56.

Fulcrum was the successful purchaser at the foreclosure sale. Defendants' SMF ¶¶ 119-120; Defendants' MSJ, Ex. 108, ¶ 9; and, Defendants' MSJ, Ex. 109, ¶ 8.

Leventhal, through other entities he owned, was a member in Fulcrum and directed its actions at the time of the foreclosure sale. Fulcrum, Liberty Capital, and Hampton Island were "affiliates." Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110).

For all practical purposes, Leventhal owned and controlled Liberty Capital, Hampton Island, and Fulcrum at the time of the foreclosure sale. Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15, 36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62; and, Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110).

Fulcrum bid $50,000.00 to obtain the Subject Property subject to the Senior Debt, which was the best and highest bid. Defendants' SMF ¶ 120; Defendants' MSJ, Exs. 108, ¶ 9; and, Defendants' MSJ, Ex. 109, ¶ 8.

Fulcrum was aware of the Senior Debt encumbering the Subject Property and paid $50,000 to acquire the Subject Property subject to the Senior Debt.  Plaintiffs' MSJ, Ex. 3, p. 217.

Fulcrum paid the $50,000.00 to Liberty by wire transfer.  Defendants' SMF ¶ 121 & Defendants' MSJ, Ex. 102.

The foreclosure purchase price of $50,000 was deposited into Liberty Capital's bank account, where Leventhal believes it was used to pay legal fees.  Plaintiffs' SMF ¶ 60 & Plaintiffs' MSJ, Ex. 6, p. 202; and, Defendants' Response to Plaintiff's SMF ¶ 60.

On October 2, 2013, the day after the foreclosure is alleged to have occurred, Leventhal wrote the following to litigation counsel for Liberty Capital:

> Instead of me signing as president of Liberty Capital, LLC the grantee that foreclose on Hampton Island, LLC, can Richard sign as the receiver for Liberty Capital's Security deed on the power of sale line, so my name does not show up.

Plaintiffs' MSJ, Ex. 32.

A Corrective Deed Under Power (the **"Deed Under Power")** was executed and subsequently recorded in Deed Book 1802, Pages 100-104 of the Records of the Clerk of the Superior Court of Liberty County.  Defendants' SMF ¶ 122 & Defendants' MSJ, Ex. 52.

 The Deed Under Power explicitly recognized that the Subject Property was being conveyed "subject to the following security instruments (as the same may have been modified and/or assigned from time to time)," and listed the same five (5) security deeds and five (5) UCC Financing Statements recorded in favor of the Three Banks.   Defendants' SMF ¶ 123 & Defendants' MSJ, Ex. 52.

After the foreclosure sale, Leventhal wrote a memo to his lawyers stating that the Subject Property had been sold subject to $14,847,931 of Senior Debt:

I met with the Receiver, Richard Gaudet, and Hampton Island, LLC attorney, Hayden Pace, at our offices on October 17, 2013. The discussion involved all of the points I have raised in prior emails. Succinctly, they are:

1. Sold the property at sale for $50,000 subject to the senior debt of $12,292,023 principle; $2,507,846 interest; $48,062 late fee for a total of $14,847,931.

Plaintiffs' MSJ, Ex. 33; Defendants' MSJ, Ex. 104.

Fulcrum took over the Subject Property with the intention to bring the development that had already been underway to fruition. Plaintiffs' SMF ¶ 64; Plaintiffs' MSJ, Ex. 3, p. 135, 185; Plaintiffs' MSJ, Ex. 14, p. 86; and, Defendants' Response to Plaintiffs' SMF ¶ 64.

As a result of the foreclosure sale, there was no noticeable change other than the change in title to the Subject Property:

Q:    There was really -- other than the change in title to the property from Hampton Island, LLC, to Fulcrum, being out there on the ground, there was no other change that anyone would notice?

A:    For the most part, no. I mean except for they changed the title to thousands of acres. No.

Plaintiffs' MSJ, Ex. 3, p. 203.

Leventhal's intention was to rekindle and continue the development started by Liberty Capital and Hampton Island. Plaintiffs' MSJ, Ex. 3, p. 185.

The ownership structure between Liberty Capital and Fulcrum was the same at all relevant times, with Leventhal ultimately owning 90% of both and his son owning 10% of both. Plaintiffs' MSJ, Ex. 3, pp. 201 & 213; Plaintiffs' MSJ, Ex. 49; and, Plaintiffs' MSJ, Ex. 50.

Management and control was the same as Leventhal controlled all three entities, Liberty Capital, Hampton Island, and Fulcrum. Plaintiffs' MSJ, Ex. 3,  p. 201; Plaintiffs' MSJ, Ex. 14, p. 46.

Fulcrum got its income from the same sources as Liberty Capital and Hampton Island did before the foreclosure.  Plaintiffs' MSJ, Ex. 3, pp. 61-62.

The staff that was used at the in-island club stayed the same after the foreclosure. Plaintiffs' MSJ, Ex. 3, pp. 201-202.

The equipment being used stayed the same after the foreclosure.  Plaintiffs' MSJ Ex. 3, p. 202.

The club facilities stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

The back-office staff stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

The back-office staff performed similar services after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 203.

The "Hampton Island" branding remained the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 204.

The facilities for members stayed the same after the foreclosure.   Plaintiffs' MSJ, Ex. 3, p. 204.

The fees being charged to members stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 205.

The horses on the farm stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

Although it had not borrowed the money from First Citizens Bank (formerly Georgian Bank), Fulcrum signed on to take responsibility for the debt.  Plaintiffs' MSJ, Ex. 3, pp. 126, 131, & 134.

Fulcrum made payments towards the debt owed to First Citizens Bank, which were credited against the debt incurred by Liberty Capital and Hampton Island.  Plaintiffs' MSJ, Ex. 3, pp. 126, 131, & 134

Fulcrum ultimately paid off the Senior Debt.  Plaintiffs' MSJ, Ex. 3, p. 193.

Leventhal hoped the transfer would be to a company he owned.  Plaintiffs' MSJ, Ex. 3, p. 183.

The transfer to Fulcrum allowed Leventhal to restart the development.  Plaintiffs' MSJ, Ex. 3, p. 179.

Hampton Island gave Fulcrum the trademark rights to the development because it would benefit Fulcrum.  Plaintiffs' MSJ, Ex. 3, p. 220-223 & 44.

Hampton Island transferred the declarant's (developers) rights to Fulcrum.  Plaintiffs' MSJ, Ex. 3, p. 179.

Hampton Island was the owner of the Subject Property prior to the foreclosure. Defendants' Response to Plaintiffs' MSJ, Ex. 1, ¶ 3.  Fulcrum was the owner of the Subject Property following the foreclosure.  *Id*.  Liberty Capital was a lender that lent money to Hampton Island and thereby obtained a security interest in the Subject Property, but never directly owned the Subject Property.  *Id*.

From December 31, 2013 to January 1, 2015, Fulcrum booked $1.392 million in revenue from its ownership of the Subject Property.  Plaintiffs' MSJ, Ex. 3, pp. 190-191.

## H.    The 2014 Consent Judgment

When discussing the 2013 Litigation internally, Leventhal and a lawyer for Liberty Capital had the following email exchange about the self-serving nature of the consent order being drafted to end the 2013 Litigation:

> **Lavoie:**      Dare I ask about the Liberty Capital case before Jackson Bedford [the 2013 litigation]?
> **Leventhal:**    Double dare! I will go back to find the consent self-serving order I need and get it to you and Hayden Pace [Counsel for Hampton Island].
> **Lavoie:**      Just remember to cut the "Self-Serving" out of the consent order's heading.

Plaintiffs' MSJ, Ex. 38.

Leventhal and a lawyer Liberty Capital exchanged emails about getting a final judgment against Hampton Island that would be more resilient to attack than a settlement agreement. Plaintiffs' MSJ, Ex. 40.

On July 21, 2014, Leventhal asked Jim Smith, his lawyer in Hinesville, whether there were other things that should use the 2013 Litigation to transfer out of HI, LLC, in the following exchange:

> **Leventhal:**    Thank you Jim. Can you think of anything else we need transferred out of Hampton by order?
> **Smith:**        Equipment leases, security deposits for utilities, livestock?
> I also note that the second paragraph on Page 6 of the proposed Order references Deed Book 1431, page 252, which is the security deed foreclosed upon. Is this the intended reference?

Plaintiffs' MSJ, Ex. 39.

One week later, Leventhal and a lawyer for Liberty Capital had the following email exchange about the Consent Judgment Leventhal was proposing for the 2013 Litigation:

> **Lavoie:**      I'm going through this Ron, but it looks like a significant amount of this draft order should instead be part of a settlement agreement between Liberty Capital and Hampton Island (and any other parties whose rights are affected or are required to take some action). The Court can only enter an order disposing of the claims raised in the Verified Complaint, not reach other conclusions or implement other agreements that the parties have reached — for instance, the paragraph requiring Hampton to transfer logos, websites, utilities, permits, patent and trademark rights, etc. to Liberty. That relief wasn't requested in the Verified Complaint . . .
> **Leventhal:**    Andrew, can we take a position this is wrapping up the receivership without more litigation? Having this stuff in an order, seems more resilient to attack than a private S.A. [Settlement Agreement].

Plaintiffs' MSJ, Ex. 40.

A month later, Leventhal and Hayden Pace, counsel for Hampton Island, addressed the

proposed consent order to resolve the 2013 Litigation in the following exchange:

> **Pace:**      Ron, I've reviewed the proposed order. Have you reviewed and approved
> it?
> **Leventhal:**    Yes; gets a lot of stuff cleaned up for us; also transfer rights against
> [Hampton Island] to new Managing Declarant on the two prime lots transferred to it for
> next to free by two banks that we need to recover....
> **Leventhal:**    Hi Hayden, Jim Smith who knows the island and the assets and declarant
> issues has combed through the things we need to transfer and the fair discount off of the
> debt to have a bona fide settlement. I am sad Hampton loses out, but it has a few lots left
> and the Larner [HAOP] issues to resolve, but these are interesting times. If acceptable to
> you, I am authorized to have the order entered for Hampton through you.

Plaintiffs' MSJ, Ex. 41.

The Consent Judgment was presented to Judge Bedford and signed by him on September

8, 2014.  Plaintiffs' MSJ, Ex. 42.

The Consent Judgment: (1) found that Fulcrum paid $50,000 to Liberty Capital which was

used to pay down the debt that Hampton Island owed to Liberty Capital (Plaintiffs' MSJ, Ex. 42,

p. 3); (2) although Fulcrum was not a party to the 2013 Litigation and had ostensibly purchased

the property almost a year before, required Hampton Island to transfer its rights as managing

declarant of the Subject Property to Fulcrum (*Id*. at pp. 4-5); (3) required Hampton Island to

transfer all personal property on the Subject Property to Liberty Capital (*Id.* at p. 6); (4) required

Hampton Island to transfer all trademark rights to Liberty Capital (*Id.* at p. 5); (5) required

Hampton Island to transfer all easements and licenses related to the Subject Property to Liberty

Capital (*Id.* at p. 6); and (5) required Hampton Island to transfer and assign a promissory note from

the Hampton Island Owner's Association, Inc. to Liberty Capital (*Id.* at p. 6).

Defendants included the below language in the Consent Order finding that the value of

the Subject Property was lower than the Senior Debt:

The Parties stipulate and the Court hereby finds, that the recorded Liberty Foreclosure Deed was subordinate to (1) a security deed securing repayment of amounts due and owing pursuant to a loan in the original amount of $12,500,000 held by First Citizens Bank and Trust, as successor-in- interest to Georgian Bank; (2) a security deed seeking repayment of amounts due and owing pursuant to a loan in the principal amount of $8,000,000 held by Ameris Bank, as successor in interest to Darby Bank of Pooler; and (3) a security deed securing a loan with a required release payment of $7,500,000 held by Synovus Bank and Trust Company, as successor in interest to Bank of north Georgia, on property owned by Retreat Living, LLC ("Collectively the "Senior Debt"). The Parties further stipulate and  agree, and the Court hereby finds, that the market value of the Foreclosed property does not exceed the Senior Debt.

Plaintiffs' MSJ, Ex. 42, pp. 3-4.

The Court awarded Liberty Capital a $31,621,321.37 million final judgment against

Hampton Island:

It is further hereby **ORDERED AND ADJUDGED** that, in consideration of Plaintiff's dismissal of its report of the foreclosure sale of the Foreclosed Property, Defendant consents to, and Plaintiff [Liberty Capital] shall have, final judgment against Defendant in the amount of Thirty-One Million, Six Hundred Twenty-One Thousand, Three Hundred twenty-One dollars and thirty seven cents ($31,621,321.37).

Plaintiffs' SMF ¶¶ 86 & 89 & Plaintiffs' MSJ, Ex. 42, p. 6; Defendants' Response to Plaintiffs' SMF ¶¶ 86 & 89; and, Defendants' SMF ¶ 131 & Defendants' MSJ, Ex. 53, p. 6.

The Consent Judgment awarded a money judgment to Liberty Capital against Hampton

Island, even though the sole claims in the 2013 Complaint were for interim relief.  Plaintiffs' MSJ,

Exs. 20 & 42.

Following the foreclosure sale and the entry of the Consent Judgment, Liberty Capital

received: (1) $50,000; (2) a money judgment of $31,621,321.37 against Hampton Island, which

was properly recorded as a lien against Hampton Island's remaining, valuable, real property; (3) a

Consent Judgment conveying to Liberty Capital all of Hampton Island's personal property,

equipment, furniture, fixtures, and vehicles located on the Subject Property, including without

limitation, a 2004 31-foot Contender boat; (4) certain intellectual property and land use rights; (5)

Hampton Island's interest in a promissory note originally made in favor of Hampton Island by Hampton Island Owner's Association, Inc. in the amount of $812,363.32; and (6) Hampton Island's membership interest in Retreat Living, LLC. Plaintiffs' MSJ, Ex. 42; Defendants' MSJ, Ex. 53.

Liberty Capital recorded the Consent Judgment as a lien on the remaining real and personal property owned by Hampton Island. Defendants' SMF ¶ 132. A copy of the Writ of Fieri Facias recording Liberty Capital's lien based on the Consent Judgment was recorded on August 3, 2015 in the Records of the Clerk of the Superior Court of Liberty County, Georgia at Book 901, Page 807. Defendants' MSJ, Ex. 103.

On September 29, 2014, Hampton Island assigned all of its rights as the Declarant in charge of the Subject Property to Fulcrum. Plaintiffs' MSJ, Ex. 43.

Hampton Island assigned all of its trademarks directly to Fulcrum. Plaintiffs' MSJ, Ex. 3, pp. 220-223 & Plaintiffs' MSJ, Ex. 44.

**I.    Total Debt Encumbering Subject Property at the Time of Foreclosure; Market Value of the Subject Property at the Time of Foreclosure**

The parties dispute the total debt encumbering the Subject Property at the time of 2013 Foreclosure Sale, but these facts are not material to the resolution of the cross-motions for summary judgment. Plaintiffs' MSJ, Exs. 8, 12, and 33; April 2023 Leventhal Affidavit, ¶¶ 60, 62-64, & 104 (Defendants' MSJ, Ex. 110).

The parties dispute the market value of the Subject Property at the time of the 2013 Foreclosure Sale, but these facts are not material to the resolution of the cross-motions for summary judgment. Plaintiffs' MSJ, Exs. 3, pp. 251-253 & 36; Defendants' MSJ Exs. 57-97, 110, & 112-120.

**J.    Badges of Fraud**

As a result of the 2013 Foreclosure Sale, the Subject Property ended up in the control and possession of Fulcrum, which is another entity owned and controlled by Leventhal and an affiliate of Liberty Capital and Hampton Island. April 2023 Leventhal Affidavit, ¶¶ 65-67 (Defendants' MSJ, Ex. 110).

Prior to the 2013 Foreclosure Sale, Plaintiffs had exercised their "Put Rights" in the amount of $1,250,000 each and threatened litigation against Liberty Capital. *Complaint*, ¶¶ 13, 15; Liberty Capital *Answer*, ¶¶ 13, 15.

At the time of the 2013 Foreclosure Sale, the debts owed to the Three Banks were overdue, and that Liberty Capital had no means to repay the Three Banks. Plaintiffs' MSJ, Ex. 14, pp. 12-14 & 22; April 2023 Leventhal Affidavit, ¶¶ 24-31 (Defendants' MSJ, Ex. 110).

### K.     Fraud on Judge Bedford in 2013 Litigation

The parties dispute whether Leventhal, Hampton, and Liberty perpetuated a fraud on Judge Bedford in the 2013 Litigation, but these facts are not material to the resolution of the cross-motions for summary judgment. Plaintiffs' MSJ, Ex. 2, ¶ 19; Plaintiffs' MSJ, Ex. 3, pp. 32-33; Plaintiffs' MSJ, Ex. 5, pp. 58-59; Plaintiffs' MSJ, Ex. 14, pp. 18; Plaintiffs' MSJ, Exs. 19; Plaintiffs' MSJ, Ex. 26, p. 92; Plaintiffs' MSJ, Ex. 27, pp. 184-185; Plaintiffs' MSJ, Exs. 38-41; Plaintiff's MSJ, Ex. 20-25; Plaintiffs' MSJ, Ex. 39-42; Defendants MSJ, Exs. 49, 105, & 106.

### IV.     Conclusions of Law

### A.     Standard of Review

The parties have presented cross motions for summary judgment. Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." O.C.G.A. § 9-11-56(c). The

moving party has the burden of showing that there is no genuine issue of material fact and that the undisputed facts, viewed in a light most favorable to the nonmoving party, warrant judgment as a matter of law.  *Peterson et al. v. Peterson, et al.*, 303 Ga. 211, 213, 811 S.E.2d 309, 312 (2018).

On cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis.  Each party must bear its own burden of proof and show there is no genuine issue as to any material fact and that the moving party is entitled to judgment.  *See Morgan Enterprises, Inc. v. Gordon Gillett Bus. Realty, Inc*., 196 Ga. App. 112, 395 S.E.2d 303, 304 (1990).  The nonmoving party should be given the benefit of all reasonable doubt, and the court should construe the evidence and make all reasonable inferences in the light most favorable to the party opposing the motion.  *See Hicks v. Gabor*, 354 Ga. App. 714, 720, 841 S.E.2d 42, 50 (2020).  "If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." *Windward Campus Owner, LLC v. Good Night Med. of Ohio, LLC*, 363 Ga. App. 177, 180, 871 S.E.2d 36, 40 (2022).  Affidavits supporting and opposing summary judgment must be made on personal knowledge and be based on admissible evidence; provided that, a self-serving, conclusory affidavit not supported by facts or circumstances is insufficient to create a genuine issue of material fact.  *Liles v. Innerwork, Inc.*, 279 Ga. App. 352, 353, 631 S.E.2d 408, 410 (2006).

"A defendant may prevail by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case." *Windward Campus Owner,* 363 Ga. App. at 180.  A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing

out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case." *Id.*

### B.    Cross-Motions for Summary Judgment

#### 1.    Count II (Fraudulent/Voidable Transfer)

Plaintiffs are seeking to avoid the 2013 Foreclosure Sale and the 2014 Consent Judgment as "actual fraudulent transfers" pursuant to O.C.G.A. § 18-2-74(a)(1).   An actual fraudulent transfer is defined as --

> (a)  A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1)  With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

O.C.G.A. § 18-2-74(a)(1).

Since "actual intent" can be difficult to determine in particular cases, the statute sets forth a non-exclusive list of factors, or badges of fraud, for courts to consider when determining a debtor's "actual intent:"

> (b)  In determining actual intent under paragraph (1) of subsection (a) of this Code section, consideration may be given, among other factors, to whether:
>
> (1)  The transfer or obligation was to an insider;
>
> (2)  The debtor retained possession or control of the property transferred after the transfer;
>
> (3)  The transfer or obligation was disclosed or concealed;
>
> (4)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5)  The transfer was of substantially all the debtor's assets;
>
> (6)  The debtor absconded;
>
> (7)  The debtor removed or concealed assets;

(8)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b).

Plaintiffs, as the creditors in the 2017 Litigation, bear the burden of proving the elements of an actual fraudulent transfer under O.C.G.A. 18-2-74(a)(1) by a preponderance of the evidence. *See* O.C.G.A. § 18-2-74(d)("A creditor making a claim for relief under subsection (a) of this Code section has the burden of proving the elements of the claim for relief by a preponderance of the evidence.").

As stated in the Procedural History section (Section II *supra*), Defendants have asserted in their Defendants' MSJ that the Liberty/Hampton Note and the Liberty/Hampton Security Deed were absolutely assigned to Georgia Bank in 2007 and therefore were not "assets" that would be subject to avoidance as fraudulent transfers under GA UFTA.[11]  *See* O.C.G.A. § 18-2-71(2). Defendants further argue that, *assuming arguendo* the Liberty/Hampton Note and the Liberty/Hampton Security Deed were "assets," that Defendants did not make any transfer with the requisite "actual intent to hinder, delay, or defraud any creditor" necessary for avoidance.  *See* O.C.G.A. § 18-2-74(a)(1).

---

[11]   As stated in the Procedural History, Defendants first raised this issue roughly 6 years after the commencement of contentious litigation and subsequent appeals in this case.  *See* Section II.C *supra*.

Plaintiffs argue that Defendants have previously made binding admissions *in judicio* regarding their ownership of the Liberty/Hampton Note and the Liberty/Hampton Security Deed. Plaintiffs argue that these prior admissions prevent Defendants from introducing any evidence at this stage that they did not own the Liberty/Hampton Note and the Liberty/Hampton Security Deed at the time of the challenged transfers. Plaintiffs further argue that Defendants did make the transfers with the requisite "actual intent to hinder, delay, or defraud any creditor" as evidenced by Leventhal's prior testimony in this matter.

For the reason set forth below, the Special Master disagrees with Defendants and finds (1) Liberty Capital did possess sufficient rights in the Liberty/Hampton Note and the Liberty/Hampton Security Deed for them to be "assets" under O.C.G.A. § 18-2-71(2) and (2) Liberty Capital engaged in a series of transactions that transferred these assets with the requisite "actual intent to hinder or delay any creditor" for avoiding these transfers. The Special Master does not find that the Defendants' prior answers regarding ownership of the Liberty/Hampton Note and the Liberty/Hampton Security Deed are binding admissions *in judicio* or that the Assignment Agreement may not be introduced into evidence now based on principles of judicial estoppel as applied to the 2013 Litigation, but this is not fatal to Plaintiffs' claims for the reasons set forth below.

### a.    GA UFTA Definitions – What is an Asset?

Defendants rightly point out that the threshold issue in any fraudulent transfer action is whether there has been a "transfer" of an "asset" as such terms are defined in Georgia's Uniform

Fraudulent Transfers Act, O.C.G.A. § 18–2–70, *et seq.* ("GA UFTA").[12]  To determine what is an

"asset" under GA UFTA requires a review of several GA UFTA definitions.

First, GA UFTA defines a "transfer" as

"Transfer" means every mode, direct or indirect, absolute or conditional, voluntary
or involuntary, of disposing of or parting with *an asset or an interest in an asset*
and includes payment of money, release, lease, and creation of a lien or other
encumbrance.

O.C.G.A. § 18-2-71(16)(emphasis added).

This definition of "transfer" requires the unpacking of what is an "asset" under GA UFTA.

An "asset" is defined as--

"Asset" means *property of a debtor*, but the term does not include:

(A) *Property to the extent it is encumbered by a valid lien*;
(B) Property to the extent it is generally exempt under nonbankruptcy law; or
(C) An interest in property held in tenancy by the entireties to the extent it is not
subject to process by a creditor holding a claim against only one tenant.

O.C.G.A. § 18-2-71(2)(emphasis added).

This "asset" definition requires further reference to the definitions of "property," "debtor,"

and "claim:"

"Property" is defined as "*anything* that may be the subject of ownership."

O.C.G.A. § 18-2-71(12)(emphasis added).

"Debtor" is defined as "a person who is liable on a *claim*."   O.C.G.A. § 18-2-

71(6)(emphasis added).

"Claim" is defined as

---

[12]  The "Uniform Fraudulent Transfers Act" (O.C.G.A. § 18-2-70, *et seq.*) was the version of the Article in
effect at the time of the transfers in 2013.  In 2015, the "Uniform Voidable Transactions Act" replaced the "Uniform
Fraudulent Transfers Act" and retained the same codification (O.C.G.A. § 18-2-70, *et seq.*)  The two versions of the
Article are substantially similar to one another and which version is applied will not affect the determination of the
issues presented in the summary judgment briefs.

except for claim for relief, means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

O.C.G.A. § 18-2-71(3).

But, certain "property of a debtor" that would otherwise be an "asset" is carved out from the "asset" definition. *See* O.C.G.A. 18-2-71(2). The carve-out most relevant to the present case can be found in sub-section (A): "*Property to the extent it is encumbered by a valid lien*." *Id.* (emphasis added). The definitions of "lien" and "valid lien" are --

"Lien" means *a charge against or an interest in property* to secure payment of a debt or performance of an obligation and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien.

. . .

"Valid lien" means *a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings*.

O.C.G.A. § 18-2-71(9) & (17)(emphasis added).

By parsing these definitions and applying to the facts of this case, the "asset" inquiry in this case may be distilled to the following question: *At the time of the 2013 Foreclosure Sale and 2014 Consent Judgment, did Liberty Capital possess a property interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed that was not otherwise encumbered by Georgian Bank's perfected interest, if any, to secure the payment of the Georgian Bank Loans*. For the reasons that follow, the Special Master finds the answer to this inquiry is yes.

        **b.**    **Liberty Capital retained a sufficient interest in the Liberty/Hampton Note and Liberty/Hampton Security Deed to have an "asset" under GA UFTA.**

The threshold question is whether Liberty Capital retained a sufficient interest in the Liberty/Hampton Note and Liberty/Hampton Security Deed (*i.e.*, the debt and the lien, respectively) that would qualify as an "asset," notwithstanding the prior Assignment Agreement

given by Liberty Capital to Georgian Bank.[13]  As set forth below, the Special Master finds that

Liberty Capital did retain a sufficient interest in the Liberty/Hampton Note and Liberty/Hampton

Security Deed to qualify as an "asset" for GA UFTA purposes.

> **(i)**      **"PROPERTY" - Liberty Capital retained a property
> interest in the Liberty/Hampton Note and the
> Liberty/Hampton Security Deed, coupled with a broad
> license to exercise all of the rights of a lender.**

In January 2007, Liberty Capital delivered the Assignment Agreement (Defendants' MSJ,

Ex. 25) to Georgian Bank as consideration for Georgian Bank making and maintaining a loan to

Liberty Capital in the principal aggregate amount of $12,500,000 (defined as the "Loan" in the

Assignment Agreement) pursuant to a "Loan Agreement" of even date (as "Loan Agreement" is

defined in the Assignment Agreement).  Assignment Agreement, § 3(a)(Defendants MSJ, Ex. 25).

The Assignment Agreement was recorded on January 12, 2007 in Deed Book 1443, Page 522, in

the Liberty County, Georgia official records.  *Id.* at p. 1.

As set forth in the Assignment Agreement, Liberty Capital assigned, transferred, conveyed,

and set over unto Georgian Bank all right, title, and interest in and to the "Assigned Loan Assets,"

(as such term is defined in the Assignment Agreement).   Assignment Agreement, at § 3(a)

(Defendants MSJ, Ex. 25).   The definition of "Assigned Loan Assets" includes the

Liberty/Hampton Note and Liberty/Hampton Security Deed.  *Id.* at Exs. A & B.  The Assignment

Agreement also contains the self-serving statement that it was "a present and absolute assignment

and is intended to be unconditional and not as an assignment for additional security only."  *Id.* at

§ 3(a).

---

[13] The Assignment Agreement is not signed by Georgian Bank, which is not atypical in assignment
agreements given by borrowers in secured loan transactions.

Notwithstanding this "absolute" transfer and assignment, however, Georgian Bank simultaneously granted back to Liberty Capital the following defeasance and reconveyance option with respect to the Assigned Loan Assets:

> **Section 10.  Defeasance.**  If Borrower [Liberty Capital] shall pay or cause to be paid in full to Lender [Georgian Bank] all monetary obligations under the Loan Documents [the Loan and the Loan Agreement] on or before the date on which they are due and payable, and in the manner stipulated herein and therein, all without deduction or credit for taxes or others charges paid by Borrower, and if Borrower and Borrower shall have kept, performed and observed all the covenants and conditions contained herein and all of the other Loan Documents, then Lender shall deliver to Borrower all such documents in recordable form *to reconvey the Assigned Loan Assets [the Liberty/Hampton Note and the Liberty/Hampton Security Deed] and otherwise release said Assigned Loan Assets from the encumbrances created hereby*, but otherwise this Assignment shall remain in full force and effect.

Assignment Agreement, § 10 (Defendants MSJ, Ex. 25) (emphasis added).

Additionally, Georgian Bank concurrently granted to Liberty Capital a revocable license in the Assigned Loan Assets:

> . . . Borrower [Liberty Capital] shall have a license, but limited as provided in this Assignment: (1) to collect, as trustee for Borrower and Lender, all of the Payments for not more than one monthly installment in advance, and Borrower shall receive and apply such Payments (not necessarily in the following order), subject to any obligation to escrow the same with Lender: (i) to the payment of taxes upon the Secured Property before penalty or interest are due thereon; (ii) to the cost of insurance, maintenance and repairs as may be required by the terms of the Assigned Deeds to Secure Debt or any Assigned Loan Document; and (iii) to pay interest and principal and other charges becoming due, as and when due and payable, under the Loan Documents, with the balance, so long as no Event of Default has occurred under this Assignment or any other Loan Document, to the account of Borrower; and (2) *to otherwise deal with, and enjoy the rights of the lender under the Assigned Loan Documents*.

Assignment Agreement, § 3(a) (Defendants MSJ, Ex. 25) (emphasis added).

Notably, Georgian Bank could only revoke this license by providing written notice to Liberty Capital stating that an "Event of Default" existed under Section 6 of the Assignment Agreement and that Georgian Bank was exercising its rights under the Assignment Agreement:

> Upon receipt by Borrower [Liberty Capital] of written notification from Lender [Georgian Bank], stating that an Event of Default by Borrower exists and Lender is exercising its rights hereunder, and without the necessity of Lender taking any *further action* whatsoever, the license referred to in paragraph (a) above shall immediately be revoked.

Assignment Agreement, § 3(b) (Defendants MSJ, Ex. 25) (emphasis added).

As previously stated by Leventhal in the 2014 Leventhal Affidavit (Defendants' Response to Plaintiffs' MSJ, Ex. 2), which was given after the 2013 Foreclosure Sale (October 1, 2013), Georgian Bank never revoked Liberty Capital's license to enjoy all the rights of a lender under the Liberty/Hampton Note and Liberty/Hampton Security Deed:

> Liberty has never received a written notification from Georgian Bank or from First Citizens that either was exercising its rights under the Assignment revoking Liberty's license to exercise its rights as Grantee under the Security Deed.

2014 Leventhal Affidavit at ¶ 12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).

First Citizens Bank, as successor to Georgian Bank, affirmed the same in that certain *Amended Forbearance and Settlement Agreement* dated December 5, 2013 (Plaintiffs' MSJ, Ex. 12) (the "Amended Forbearance Agreement"):

> Bank [First Citizens Bank] has not revoked the license granted to Liberty [Capital] in the assignment recorded in Deed Book 1443, Page 522, Liberty County, Georgia records.

Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12).

The Assignment Agreement's reconveyance/defeasance clause and Liberty Capital's license "to otherwise deal with, and enjoy the rights of the lender under the Assigned Loan Documents" undercuts Defendants' eleventh-hour position that the Assignment Agreement divested Liberty Capital of all right, title, and interest in and to the Liberty/Hampton Note and the Liberty/Hampton Security Deed.[14] At the time of the 2013 Foreclosure Sale and the 2014 Consent

---

[14] Leventhal previously testified in this action that "Liberty Capital, LLC had a valid security deed, and its rights were clear. These facts were not in question." 2022 Leventhal Affidavit, ¶ 29 (Plaintiffs' MSJ, Ex. 2).

Judgment, Liberty Capital retained a sufficient interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed to make all manner of unilateral decisions regarding the collection, enforcement, prosecution, foreclosure, and release of the Liberty/Hampton Note and the Liberty/Hampton Security Deed.  Among other things, Liberty Capital had the power to dictate the foreclosure bid strategy when foreclosing the Liberty/Hampton Security Deed (*e.g.*, Liberty Capital's minimum and maximum credit bid and acceptable bid increments) and the sole discretion to determine what to accept as the winning bid for the Subject Property.[15]  Additionally, Liberty Capital possessed the sole discretion to negotiate the 2014 Consent Judgment that resolved the 2013 Litigation.[16]  Liberty Capital's free rein to dictate the 2013 Litigation and 2013 Foreclosure Sale was a significant retained property interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

Liberty Capital, *in its own name and for its personal benefit*, had the power to (1) foreclose the lien of the Liberty/Hampton Security Deed, determine the winning foreclosure bid amount by not submitting a topping credit bid[17], (2) transfer the Subject Property (*i.e.*, Liberty Capital's collateral) to a "clean entity," Liberty Capital's affiliate, Fulcrum, which  booked $1.392 million in revenue from its ownership of the Subject Property from December 31, 2013 to January 1, 2015 (Plaintiffs' MSJ, Ex. 3, pp. 190-191) and (3) receive and retain the foreclosure sale proceeds of $50,000, all in apparent conflict with the express terms of the Assignment Agreement.  *Cf.*

---

[15] "The Receivership and Deed 5 Foreclosure were initiated, conducted and pursued by Liberty [Capital] *following notice to the Bank but without the consent of or participation by the Bank*."  Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12)(emphasis added).

[16] *Id.*

[17] Liberty Capital held over $36 million of Hampton Island debt that could have been used in a credit bid for the Subject Property.  *See* 2014 Consent Judgment, pp. 2-3.  Through this enormous amount of debt, Liberty Capital held the power to take back the Subject Property or let it go to another bidder.

Assignment Agreement, § 5(b)(ii) (Defendants MSJ, Ex. 25) ("Borrower shall not, *without the prior written consent of Lender* . . . (ii) satisfy, release, cancel, terminate, or otherwise impair the security title created by the Assigned Loan or Assigned Loan Documents").  Notwithstanding the Assignment Agreement's seeming requirement of Georgian Bank's prior written consent, Liberty Capital transferred the Subject Property (*i.e.*, Liberty Capital's collateral) to its affiliate Fulcrum free and clear of the security title and lien of the Liberty/Hampton Security Deed without the consent of Georgian Bank.  *See* Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12).  Liberty Capital also retained the collateral sale proceeds of $50,000 for application as a credit against the indebtedness owed by Hampton Island to Liberty Capital.  2014 Consent Judgment, p. 3.

Furthermore, Liberty Capital, *in its own name and for its personal benefit,* had the power to commence the 2013 Litigation against Hampton Island and to compromise and settle this litigation through the negotiation of the 2014 Consent Judgment, which among other things, (1) awarded Liberty Capital a $31,621,321.37 money judgment[18] to Liberty Capital against Hampton Island -- which no longer owned the Subject Property; (2) transferred to Liberty Capital certain Hampton Island personal property, including without limitation, (a) any and all equipment, furniture, fixtures, and vehicles, including a 2004 31-foot Contender, (b) all logos, websites, utilities, permits, entitlements, zoning and land use rights related to the Subject Property, and (c) all easements and licenses related to the Subject Property; (3) transferred and assigned to Liberty Capital a $812,363.62 promissory note made payable by Hampton Island Owner's Association,

---

[18]    The 2014 Consent Judgment recited the outstanding principal and interest owing under the Liberty/Hampton Note as $36,371,321.37.  2014 Consent Judgment, pp. 2-3.  The record does not contain an accounting for Liberty Capital's agreement to reduce Hampton Island's indebtedness by $5,050,000 when agreeing to a money judgment amount of $31,621,321.37.  *Id.* at p. 6.  Leventhal subsequently testified that the difference, in part, reflected a credit for Liberty Capital's receipt of the $50,000 foreclosure sale proceeds.  *See* 2022 Leventhal Affidavit, ¶ 31 (Plaintiffs' MSJ, Ex. 2); *see also* 2014 Consent Judgment, p. 3.

Inc. to Hampton Island for the rent of structures; (4) transferred and assigned to Liberty Capital Hampton Island's membership interest in Retreat Living, LLC; and (5) transferred the declarant rights to the Subject Property from Hampton Island to Fulcrum, notwithstanding Liberty Capital previously asserting possession of these declarant rights.[19]  *See* 2014 Consent Judgment.

Again, First Citizens Bank was aware that Liberty Capital was taking all of these actions in its own name and did not assert any objection to Liberty Capital's exercise of these various rights and remedies.  As recited in the Amended Forbearance Agreement:

> The Receivership and the Deed 5 Foreclosure [the 2013 Foreclosure Sale] were initiated, conducted and pursued by Liberty [Capital] *following notice to the Bank [First Citizens Bank] but without consent of or participation by the Bank*.  The Deed 5 Foreclosure and the DUPOS [Deed Under Power of Sale] are and remain subject and subordinate to Bank's right, title and interest in and to the Property and the Project [the Subject Property] pursuant to the Deeds and other Loan Documents.

Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12)(emphasis added).

Liberty Capital held a significant property interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed, which had not been revoked by Georgian Bank or First Citizens Bank – namely, the power to make all decisions regarding the collection and enforcement of the "debt" (the Liberty/Hampton Note) and the "lien" (the Liberty/Hampton Security Deed), including without limitation, the disposition of the Subject Property (Liberty Capital's collateral).  As stated previously, Liberty Capital possessed the power and authority (1) to foreclose and extinguish the lien of the Liberty/Hampton Security Deed in the Subject Property, (2) to determine the foreclosure bid strategy for the 2013 Foreclosure Sale and whether to submit a topping credit bid for the Subject Property, (3) to transfer the Subject Property (Liberty Capital's collateral), free and clear of the security title and lien of the Liberty/Hampton Security Deed (but subject to the Senior Loans

---

[19]  *See* Notice of Exercise ("Liberty further confirms that the possession evidenced hereby includes the rights of Hampton as the successor "Managing Declarant" pursuant to and as defined in the Covenants").

of the Three Banks), to Fulcrum, and (4) to reduce the Liberty/Hampton Note into a judgment against Hampton Island *after* transferring the Subject Property out of Hampton Island and into Fulcrum.  Liberty Capital took all of these actions with the full knowledge, but without the consent, of First Citizens Bank, the assignee of the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

All of Liberty Capital's actions, coupled with the tacit approval, but not the consent, of Georgian Bank and First Citizens Bank, make sense when the Assignment Agreement is viewed as either a collateral assignment for security or a conditional assignment agreement, notwithstanding the Assignment Agreement's self-serving recitation of it being "a present and absolute assignment and is intended to be unconditional and not as an assignment for additional security only."  Assignment Agreement, § 3 (Defendants MSJ, Ex. 25).[20]

First, Liberty Capital has spent the better part of the last 6+ years of litigation asserting that Liberty Capital, not Georgian Bank or First Citizens Bank, was the owner of the Liberty/Hampton Security Deed.  On May 26, 2022, Defendants filed the 2022 Leventhal Affidavit (Plaintiffs' MSJ, Ex. 2), which stated, "Liberty Capital, LLC had a valid security deed, and its rights were clear. *These facts were not in question.*"  2022 Leventhal Affidavit, ¶ 29 (Plaintiffs' MSJ, Ex. 2)(emphasis added).  Defendants have now attempted to back-track from this clear position and muddy the waters through their amended answers in support of a last-minute summary judgment argument.  The Special Master is unpersuaded by these amendments and will take Leventhal's

---

[20] The Special Master takes judicial notice of the fact that First Citizens Bank filed a *Satisfaction and Termination of Assignment* with respect to the Assignment Agreement on March 3, 2017 in Deed Book 1939, Page 771, Liberty County, Georgia official records, pursuant to O.C.G.A. § 24-2-201.  *See Amberfield Homeowners Ass'n, Inc. v. Young*, 346 Ga. App. 29, 31 n.4, 813 S.E.2d 618, 620 (2018).  First Citizens Bank directed and authorized the Clerk of the Superior Court of Liberty County, Georgia to mark the Assignment Agreement terminated and satisfied of record as provided in O.C.G.A. § 44-14-4, which sets for the procedure for recording a cancellation of a lien mortgage.  *See* O.C.G.A. § 44-14-4.

May 26, 2022 unequivocal testimony at face value: Liberty Capital was the owner and holder of

the Liberty/Hampton Security Deed at the time of the 2013 Foreclosure Sale.  *See "Has."*

MERRIAM-WEBSTER.COM   THESAURUS,   MERRIAM-WEBSTER,   https://www.merriam-

webster.com/thesaurus/has. Accessed 4 May. 2024.  ("Has.  1. As in owns.  To keep, control, or

experience as one's own.  My uncle has a sizable collection of black powder rifles.).  This is the

*only* reasonable inference to draw from such a clear and concise statement.  *See Eickhorn v.*

*Boatright*, 219 Ga. App. 895, 897, 467 S.E.2d 214, 216 (1996) (although nonmoving party is

entitled to all reasonable inferences on a motion for summary judgment, when "only one

*reasonable* inference can be drawn from the uncontroverted facts in evidence, that is

the inference which will be drawn.").  The fact that Defendants have amended their answers to

now "question" Leventhal's prior testimony "does not have the effect of wiping such admissions

from the record for all purposes."  *See Georgia-Pac., LLC v. Fields*, 293 Ga. 499, 502, 748 S.E.2d

407, 411 (2013).  Plaintiffs can use the original admission as evidence of a statement against

interest to be considered by the Court on a motion for summary judgment. *Id.*  (party should have

been permitted to point to withdrawn admissions to contest summary judgment); *Stallings v. Britt*,

204 Ga. 250, 49 S.E.2d 517, 518 (1948) ("[W]hile the party may withdraw them formally from

the pleadings, he cannot by a mere withdrawal avoid the effect of the admissions since they may

still be used as evidence against him."); O.C.G.A. § 24-8-821 ("Without offering the same in

evidence, either party may avail himself or herself of allegations or admissions made in the

pleadings of the other.").  Based on Leventhal's testimony and Defendant's prior admissions,

Liberty Capital retained a property interest in the Liberty/Hampton Note and the Liberty/Hampton

Security Deed.

Second, Georgian Bank expressly granted a property interest to Liberty Capital when it included the reconveyance/defeasance clause in the Assignment Agreement. *See* Assignment Agreement, § 10 (Defendants MSJ, Ex. 25). The reconveyance/defeasance clause required Georgian Bank "to reconvey the Assigned Loan Assets and otherwise release said Assigned Loan Assets *from the encumbrances created hereby*" upon Liberty Capital's repayment of its monetary obligations under the "Loan Documents" (as defined in the Assignment Agreement) and satisfaction of the covenants and conditions contained in the Assignment Agreement and the other "Loan Documents" (as defined in the Assignment Agreement). *Id*. (emphasis added). This section's use of "encumbrances" is at direct odds with an absolute conveyance and assignment of the Assigned Loan Assets. *See Encumbrances,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("Encumbrance. A claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; *any property right that is not an ownership interest*.")(emphasis added). Prior to Georgia's codification of O.C.G.A. § 44-14-60 governing deeds to secure debt, Georgia law held that the presence of a defeasance clause indicated the creation of a lien rather than the passing of title. *See Grady v. T.I. Harris, Inc.*, 41 Ga. App. 111, 151 S.E. 829, 829-830 (1930)("[A] written instrument which purports to be a bill of sale passing the title as security for a debt contains a defeasance clause, the instrument is, by virtue of the defeasance clause, a mortgage, and, being a mortgage, the title, which under the language of the instrument purports to pass, does not pass to the vendee") *Hix v. Williams*, 42 Ga. App. 143, 155 S.E. 355 (1930).

The presence of the reconveyance/defeasance clause in the Assignment Agreement, which expressly describes Georgian Bank's interests as "the encumbrances created hereby," is clear evidence that Liberty Capital retained a property interest in the Liberty/Hampton Note and the

Liberty/Hampton Security Deed, notwithstanding the Assignment Agreement's self-serving claim to be a "present and absolute assignment." Assignment Agreement, at § 3 (Defendants MSJ, Ex. 25). *See also Kennedy v. Thruway Serv. City, Inc*., 133 Ga. App. 858, 860, 212 S.E.2d 492, 494 (1975) (the parties' nomenclature is "not determinative" as to the effect of an agreement: "The contents of a can of sliced beets are not changed by a label denoting them to be garden peas. It is the substance and the real intent of the parties which determine the character of an agreement."). Notably, First Citizens Bank subsequently filed a *Satisfaction and Termination of Assignment* with respect to the Assignment Agreement on March 3, 2017 in Deed Book 1939, Page 771, Liberty County, Georgia official records, which directed and authorized the Clerk of the Superior Court of Liberty County, Georgia to mark the Assignment Agreement terminated and satisfied of record as provided in O.C.G.A. § 44-14-4. [21] This statute sets forth the procedure for cancelling a mortgage lien (*i.e.*, an *encumbrance* against property), not for reconveying property rights that have been absolutely assigned to a lender. *See* O.C.G.A. § 44-14-4.

Third, the presence of the reconveyance/defeasance clause and the license granted to Liberty Capital call into question the extent of Georgian Bank's interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed, if any. Under Georgia law, only the holder of a security deed may initiate foreclosure proceedings. *See Mike's Furniture Barn, Inc. v. Smith*, 32 Ga. App. 558, 803 S.E.2d 800 (2017)(foreclosure sale invalidated because lender was not the holder of deed to secure debt); *see also* GEORGIA REAL ESTATE FINANCE AND FORECLOSURE LAW § 5:3 (2023-2024 ed.). To the extent there has been a valid assignment of a security deed and

---

[21] The Special Master takes judicial notice of the recording of this *Satisfaction and Termination of Assignment* pursuant to O.C.G.A. § 24-2-201. *See Amberfield Homeowners Ass'n, Inc. v. Young*, 346 Ga. App. 29, 31 n.4, 813 S.E.2d 618, 620 (2018).

power of sale, the assignee may exercise the power to foreclose on the underlying property.  *See* O.C.G.A. § 44-14-64(a)(valid assignment of security deed shall be in writing and witnessed as required for deeds); O.C.G.A. § 44-14-162(b)(assignment vesting title to assigned security deed in assignee shall be filed prior to the time of the foreclosure sale in the office of the clerk of the superior court where the real property is located); *Williams v. Joel*, 89 Ga. App. 329, 333, 79 S.E. 2d 401, 405 (1953)(the valid assignee of a security deed obtains "all rights of the original grantee, together with all remedies for enforcing the same.").

    If the Assignment Agreement in this case had truly been an absolute assignment rather than a conditional or collateral assignment, Liberty Capital, *in its own name*, would not have been able to foreclose on the Subject Property.  *See Harold v. Modern Homes Const. Co.*, 104 Ga. App. 415, 121 S.E.2d 809 (1961)(after a valid assignment, an attempted foreclosure by the original grantee is void unless there is a reassignment back to him prior to the purported sale of the foreclosed property).  But, where an assignment is made as collateral security for the assignor's debt to the assignee, the original holder may still foreclose.  *See* O.C.G.A. § 23-2-114; *Smith v. Pharr*, 162 Ga. 358, 133 S.E. 863, 864 (1926)(distinguishing cases where the assignment "was absolute, and not as security"); *White v. First Nat. Bank*, 174 Ga. 281, 162 S.E. 701, 706 (1932)(original holder still had power of sale because assignment "abstain[ed] from any transfer of title"); 3 GEORGIA REAL ESTATE LAW & PROCEDURE § 21:49 (7th ed. 2013).  This is precisely what happened in this case when Liberty Capital, not First Citizens Bank, foreclosed the Liberty/Hampton Security Deed and transferred the Subject Property to Fulcrum with the full knowledge, but not the consent, of First Citizens Bank.

Fourth, under Georgia law, the only person entitled to enforce the Liberty Capital Note is the holder[22] of the Liberty Capital Note or a nonholder in possession of the Liberty Capital Note who has the rights of a holder.  *See* O.C.G.A. § 11-9-301.  Liberty Capital, *in its own name*, would not have been able to sue on the Liberty Capital Note and obtain the 2014 Consent Judgment unless it was in possession of the Liberty Capital Note, either as a holder or nonholder with the rights of a holder.   In either case, Liberty Capital – not Georgian Bank – would need to have possession of the Liberty Capital Note in order to sue on the note.  There is no evidence in the record to indicate that Georgian Bank, not Liberty Capital, had possession of the Liberty Capital Note.  This is an important distinction that will be revisited in Section IV.B.1(iii) *infra* when discussing whether Georgian Bank held a valid lien in the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

Fifth, Liberty Capital continued to deal with Hampton Island as the holder of the Liberty/Hampton Note and the Liberty/Hampton Security Deed *subsequent* to the date of the Assignment Agreement.   On September 9, 2008 (a little over 20 months from the date of the Assignment Agreement), Liberty Capital and Hampton Island entered into that certain *Modification and Ratification of Loan Documents*, recorded on September 10, 2008, in Deed Book 1551, Page 559, Liberty County, Georgia official records, to expand the scope of the security title, interest, and lien of the Liberty/Hampton Security Deed to cover certain "Additional Property" as defined therein.  *See* Defendants' MSJ, Ex. 21.  The foregoing Modification and Ratification of Loan Documents references that such expanded security title, interest, and lien shall be "subject and junior to that certain first security title to be granted to Georgian Bank," but makes no other

---

[22] As applicable this case, "[h]older" is defined as "[t]he person *in possession* of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."   O.C.G.A. § 11-1-201(21)(A)(emphasis added).

mention of Georgia Bank, including any reference to the Assignment Agreement. *Id.* at p. 2. Georgian Bank is not a party to this Modification and Ratification. Liberty Capital would not have been able to enter into the Modification and Ratification if it was not the holder of the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

Through the exercise of its retained rights in the Liberty/Hampton Note and the Liberty/Hampton Security Deed, Liberty Capital was able to (1) sue Hampton Island, (2) have a receiver appointed for the Subject Property, (3) determine the winning foreclosure bid amount for the Subject Property by not submitting a topping credit bid, (4) foreclose on the Subject Property (Liberty Capital's collateral) and transfer it to Fulcrum free and clear of the security title and lien of the Liberty/Hampton Security Deed, (5) keep the $50,000 in foreclosure sale proceeds paid by Fulcrum, (6) convert and reduce the Liberty/Hampton Note indebtedness from $36,671,321.37 to a $31,621,321.37 consent judgment (a $5,050,000 reduction), (7) receive certain personal property and general intangible assets from Hampton Island in the consent judgment, and (8) direct the transfer of declarant rights from Hampton Island to Fulcrum in the consent judgment. Liberty Capital was able to accomplish all of this *with the full knowledge of*, but not the consent of, Georgian Bank / First Citizens Bank, notwithstanding the existence of the Assignment Agreement. *See* Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12).

The Special Master finds that Liberty Capital's interest in the Liberty/Hampton Note and the Liberty Hampton Security Deed, coupled with its powers under the unrevoked license, constitute "property" of Liberty Capital that qualifies as an "asset" for GA UFTA purposes unless it is excluded by the "valid lien" carve-out in O.C.G.A. § 18-2-71(2)(A).

> **(ii)**   **LIEN - Georgian Bank held a "lien" against the Liberty/Hampton Note and the Liberty/Hampton Security Deed at the time of the Transfers.**

Plaintiffs have met their burden of proof that the Liberty/Hampton Note and the Liberty/Hampton Security Deed were "assets" at the time of the 2013 Foreclosure Sale and 2014 Consent Judgment. The burden now shifts to Defendants to show whether the Liberty/Hampton Note and the Liberty/Hampton Security Deed "drop out" of the "asset" definition by virtue of the "valid lien" carve-out found in O.C.G.A. § 18-2-71(2)(A). *See Golden Eagle Cmty. Bank v. Rego Grp., Ltd.*, No. 2–14–1127, 2015 WL 5783290, at *12 (Il. Ct. App. Sep. 30, 2015) (party that argues property is not an "asset" reachable by the Illinois Uniform Fraudulent Transfer Act bears the burden of proving the "existence and amount" of the lien when such party raises argument on summary judgment); *El Saad v. Tarakji*, No. G044716, 2011 WL 5910059, at *8 (Cal. Ct. App. Nov. 28, 2011) (burden properly shifted to debtor to show that transferred assets had no value where creditor made a prima facie showing that debtor had assets which were presumptively available to satisfy claims of creditors).

The first step in the analysis is determining whether the "assets" (*i.e.*, the Liberty/Hampton Note and the Liberty/Hampton Security Deed) were encumbered with a "lien" at the time of the 2013 Foreclosure Sale and the 2014 Consent Judgment. *See* O.C.G.A. § 18-2-71(9)("Lien means a charge against or an interest in property to secure payment of a debt or performance of an obligation . . .").

At the time of the 2013 Foreclosure Sale and the 2014 Consent Judgment, the Special Master finds that Georgian Bank held a "lien" against the Liberty/Hampton Note and the Liberty/Hampton Security Deed by virtue of the Assignment Agreement. *See* Assignment Agreement (Defendants MSJ, Ex. 25). There is nothing in the factual record creating a genuine issue of material fact on whether Georgian Bank held a security interest or lien in the Liberty/Hampton Note and the Liberty/Hampton Security Deed to secure certain debts owed to

61

Georgian Bank by Liberty Capital. *See* O.C.G.A. § 11-1-201(b)(35)("Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The term also includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9 of this title.").[23]

Plaintiffs have objected to the admissibility of the Assignment Agreement, but not to whether the Assignment Agreement was sufficient to grant a security interest or lien to Georgia Bank. Since the Special Master is denying Plaintiffs' objection and request to strike any evidence or testimony related to the Assignment Agreement[24], the Special Master finds the Assignment Agreement was sufficient to grant a lien to Georgian Bank.

> **(iii)   VALID LIEN - Georgian Bank did not hold a "valid lien" against the Liberty/Hampton Note and the Liberty/Hampton Security Deed because it did not perfect its security and lien in accordance with Article 9 of the Uniform Commercial Code.**

The next step in the analyzing the "asset" carve-out is determining whether the Liberty/Hampton Note and the Liberty/Hampton Security Deed were encumbered with a "valid lien" at the time of the 2013 Foreclosure Sale and the 2014 Consent Judgment. *See* O.C.G.A. § 18-2-71(17)("a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings). For the reasons that follows, the Special Master finds that the Liberty/Hampton Note and the Liberty/Hampton Security Deed were not encumbered with a "valid lien" at the time of the transfers.

---

[23] Article 9 of the Uniform Commercial Code governs "[a] transaction, *regardless of its form*, that creates a security interest in personal property or fixtures by contract." O.C.G.A. § 11-9-109(a)(1)(emphasis added).

[24] *See* Section IV.C *infra*.

As stated in the Section IV.B.1.b(i) *supra*, the Assignment Agreement was not an "absolute" assignment of the Liberty Capital's right, title, and interest in and to the Liberty/Hampton Note and the Liberty/Hampton Security Deed. This was due to the nature of the Assignment Agreement and the substantive property interests that were retained by Liberty Capital. Instead, the Assignment Agreement operated as a conditional or collateral assignment that granted to Georgian Bank a security interest in and to the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

Specifically, Article 9 applies to the Assignment Agreement, notwithstanding that the underlying obligation (the Liberty/Hampton Note) is secured by real property (the Subject Property) pursuant to the Liberty/Hampton Security Deed. See O.C.G.A. § 11-9-109(b)("The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply."). This expressly includes the transfer of a note secured by a real estate interest--

**Security Interest in Obligation Secured by Non-Article 9 Transaction.** Subsection (b) is unchanged in substance from former Section 9-102(3). The following example provides an illustration.

**Example 1:** O borrows $10,000 from M and secures its repayment obligation, evidenced by a promissory note, by granting to M a mortgage on O's land. This Article does not apply to the creation of the real-property mortgage. However, if M sells the promissory note to X or gives a security interest in the note to secure M's own obligation to X, this Article applies to the security interest thereby created in favor of X. The security interest in the promissory note is covered by this Article even though the note is secured by a real-property mortgage. Also, X's security interest in the note gives X an attached security interest in the mortgage lien that secures the note and, if the security interest in the note is perfected, the security interest in the mortgage lien likewise is perfected. See Sections 9-203, 9-308.

*It also follows from subsection (b) that an attempt to obtain or perfect a security interest in a secured obligation by complying with non-Article 9 law, as by an assignment of record of a real-property mortgage, would be ineffective. Finally, it is implicit from subsection (b) that one cannot obtain a security interest in a lien, such as a mortgage on real property, that is not also coupled with an equally effective security interest in the secured obligation.* This Article rejects cases such

as *In re Maryville Savings & Loan Corp.*, 743 F.2d 413 (6th Cir. 1984), clarified on reconsideration, 760 F.2d 119 (1985).

O.C.G.A. § 11-9-109, Uniform Commercial Code Comment No. 7 (emphasis added).[25]

In *Chen v. Profit Sharing Plan of Bohne*, 216 Ga. App. 878, 456 S.E.2d 237 (1995), the Georgia Court of Appeals held that Article 9 of the UCC applied to pledge of collateral or lien against negotiable instruments created by *a transfer and assignment* by a debtor to a creditor of a third-party note and security deed held by the debtor. *Id.* at 881, 456 S.E.2d at 241. Most relevant to the present case, the transfer and assignment in the *Chen* case was a conditional or collateral assignment that *only became effective upon the occurrence of a payment default under the note between the debtor and the creditor*. *Id.* at 879, 456 S.E.2d at 239. The Court of Appeals held that the transaction between the debtor and the creditor did not involve the creation or transfer of an instrument involving an interest in or lien on real estate, but involved the pledge of collateral or lien against negotiable instruments. *Id.* at 881, 456 S.E.2d at 241. *See also In re SGE Mortg. Funding Corp.*, 278 B.R. 653, 658–659, 662 (Bankr. M.D. Ga. 2001)(Article 9 of the Georgia UCC governs the transfer of notes secured by real estate deeds to secure debt)(collecting cases and secondary sources); *Palmetto Cap. Corp. v. Smith*, 284 Ga. App. 819, 821, 645 S.E.2d 9, 10–11(2007)(Article 9 of the Georgia UCC governed a collateral assignment of note and security even if real property law governed whether transferee of collateral assignment had power to foreclose).

In the present case, Georgian Bank was the assignee of the Liberty/Hampton Note and the Liberty/Hampton Security Deed. The Assignment Agreement pledged or created a lien against these negotiable instruments to secure the repayment of Liberty Capital's debt to Georgian Bank.

---

[25] The Georgia legislature has adopted O.C.G.A. § 11-9-109 verbatim from the Uniform Commercial Code. As such, "due consideration" is to be given to the official comments when interpreting the intentions of the drafters. *See Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.*, 120 Ga. App. 578, 580, 171 S.E.2d 643, 645 (1969); *In re SGE Mortg. Funding Corp.*, 278 B.R. 653, 659 n.4 (Bankr. M.D. Ga. 2001)

*See* Assignment Agreement, § 10 (Defendants MSJ, Ex. 25) ("the encumbrances created hereby");

*see also* 2014 Leventhal Affidavit, ¶ 12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2)("*To secure* certain obligations of Liberty [Capital] to Georgian Bank ("Georgian"), Liberty [Capital] assigned the Security Deed to Georgian [Bank] by [the Assignment Agreement].")(emphasis added).  Moreover, just as in the *Chen* case, the Assignment Agreement conditioned Georgian Bank's rights to the Liberty/Hampton Note and the Liberty/Hampton Security Deed *upon Georgian Bank's providing written notice to Liberty Capital that an Event of Default by Borrower exists under the Georgian Bank/Liberty Capital loan documents or under the Assignment Agreement*.  *See* Assignment Agreement, § 3 (Defendants MSJ, Ex. 25).  As previously affirmed by Georgian Bank and Leventhal, Georgian Bank never provided such a written notice to Liberty Capital.  *See* Amended Forbearance Agreement, Recital M (Plaintiffs' MSJ, Ex. 12); *see also* 2014 Leventhal Affidavit, ¶ 12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).  Consequently, the Assignment Agreement and the transaction evidenced thereby is governed by Article 9 of the UCC. *See* O.C.G.A. § 11-9-109(b).

Since Article 9 of the UCC governs the transfer and assignment of the Liberty/Hampton Note and the Liberty/Hampton Security Deed evidenced by the Assignment Agreement, the next inquiry is whether Georgian Bank perfected its security interest in the transfer and assignment of the Liberty/Hampton Note and the Liberty/Hampton Security Deed.  The Special Master finds that Defendants have not presented any evidence that Georgian Bank properly perfected its security interest in the transfer and assignment of the Liberty/Hampton Note and the Liberty/Hampton Security Deed.  *See Golden Eagle Cmty. Bank v. Rego Grp., Ltd.*, No. 2–14–1127, 2015 WL 5783290, at *12 (Il. Ct. App. Sep. 30, 2015) (party that argues property is not an "asset" reachable by the  Illinois Uniform Fraudulent Transfer Act bears the burden of proving the "existence and

amount" of the lien when such party raises argument on summary judgment); *El Saad v. Tarakji*, No. G044716, 2011 WL 5910059, at *8 (Cal. Ct. App. Nov. 28, 2011) (burden properly shifted to debtor to show that transferred assets had no value where creditor made a prima facie showing that debtor had assets which were presumptively available to satisfy claims of creditors).

A secured party may perfect its security interest in an instrument by either filing a UCC financing statement in the appropriate filing office or by taking possession of the instrument. *See* O.C.G.A. §§ 9-312(a) & 9-313(a).

A promissory note is treated as an "instrument" for purposes of Article 9:

"Instrument" means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.

O.C.G.A. § 11-9-102(a)(48).

Since Liberty Capital has been a Georgia limited liability company at all relevant times, the proper filing office for a UCC financing statement, would be the office of the clerk of the superior court of any county of Georgia. *See* O.C.G.A. §§ 301, 307(e), and 501(a)(2).

There is nothing in the evidentiary record indicating that Georgian Bank or First Citizens Bank had possession of the Liberty/Hampton Note as of the date of the commencement of the 2013 Litigation, the date of the 2013 Foreclosure, or the date of entry of the 2014 Consent Judgment.

Moreover, there is nothing in the evidentiary record indicating Georgian Bank or First Citizens Bank had an active UCC financing statement filed against Liberty Capital and describing the Liberty/Hampton Note and the Liberty/Hampton Security Deed, or "Instruments" more

broadly, as of the date of the commencement of the 2013 Litigation, the date of the 2013 Foreclosure, or the date of entry of the 2014 Consent Judgment.[26]

There is no evidence that Georgian Bank or First Citizens Bank held a perfected security interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed as of the date of the commencement of the 2013 Litigation, the date of the 2013 Foreclosure, or the date of entry of the 2014 Consent Judgment.  Consequently, under Article 9, Georgian Bank's unperfected interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed would be subordinate to the rights of a "lien creditor."  *See* O.C.G.A. § 11-9-102(a)(53)("Lien creditor" means a creditor that has acquired a lien on the property involved by attachment, levy, or the like."); O.C.G.A. § 11-9-317 (a)(2)("A security interest or agricultural lien is subordinate to the rights of a person that becomes a lien creditor before the earlier of the time: (A) The security interest or agricultural lien is perfected; or (B) A financing statement covering the collateral is filed.").

GA UFTA's definition of a "valid lien" is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."  O.C.G.A. § 18-2-71(17).  As set forth in the preceding paragraphs, there is no evidence that Georgian Bank or First Citizens Bank properly perfected its security interest in the Liberty/Hampton Note and the Liberty/Hampton Security Deed, by actual possession or the filing of a financing statement, that would be effective against a subsequent lien creditor.

Consequently, The Special Master finds that Georgian Bank does not hold a "valid lien" against the Liberty/Hampton Note and the Liberty/Hampton Security Deed.

---

[26]  The Assignment Agreement does reference the assignment of a 2006 UCC financing statement that was filed in the real estate records, but not in the UCC records.  *See* Assignment Agreement, § Ex. A, 2 (Defendants MSJ, Ex. 25).  Additionally, UCC financing statements lapse after 5 years.  *See* O.C.G.A. § 11-9-515(a).  There is nothing in the evidentiary record indicating the timely filing of a continuation statement with respect to this real estate-related financing statement prior to the 2013 Foreclosure Sale or the filing of any other UCC financing statements covering Liberty Capital's assets.

> **c.    TRANSFER – Liberty Capital's foreclosure of the Liberty/Hampton Security Deed and conversion of the Liberty/Hampton Note into a reduced judgment is a "transfer" under GA UFTA.**

The Special Master finds that the 2013 Foreclosure Sale and the 2014 Consent Judgment, when analyzed in the global context of the 2013 Litigation, are "transfers" for purposes of GA UFTA.  Liberty Capital devised a scheme for transferring the Subject Property (Liberty Capital's collateral) – approximately 2,600 acres of a 4,000-acre residential, resort development on the coast of Georgia – from Hampton Island to its "clean" affiliate, Fulcrum, in order to remove it from the reach of Plaintiffs and other creditors.  Instead of Liberty Capital foreclosing on its collateral and taking title to the Subject Property, Leventhal orchestrated Fulcrum submitting the winning bid and taking title to the Subject Property, thereby putatively insulating it from Liberty Capital's creditors (other than the Three Banks), including Plaintiffs.  When Plaintiffs obtained their judgment against Liberty Capital, Liberty Capital had already foreclosed on the Subject Property.  But, instead of Liberty Capital having taken title to the Subject Property (Liberty Capital's collateral) in its own name, Liberty Capital permitted its affiliate Fulcrum (both entities being controlled by Leventhal) to outbid Liberty Capital for the Subject Property and take title to the Subject Property.  As a result, at the time Plaintiffs obtained their judgment, Liberty Capital only held title to a few parcels of real estate and other personal property that had been transferred to it under the 2014 Consent Judgment.  This collateral swap was a substantial change in the composition of Liberty Capital's assets.

The definition of "transfer" under GA UFTA is extremely broad and intended to cover any manner of disposing of an asset or an interest in an asset:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and

includes payment of money, release, lease, and creation of a lien or other encumbrance.

O.C.G.A. § 18-2-71(16).

When analyzing fraudulent transfers, a court may look past the form of a transaction to its substance. "Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir. 1993) (internal quotations and citations omitted). "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [fraudulent conveyance statutes]." *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir. 1995) (citation omitted); *see also Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 212 (3d Cir. 1990).

In this case, Plaintiffs have challenged the 2013 Foreclosure Sale and the 2014 Consent Judgment as fraudulent transfers: (1) the 2013 Foreclosure Sale released the Subject Property from the security title, interest, and lien of the Liberty/Hampton Security Deed and transferred to the Subject Property to Liberty Capital and Hampton Island's affiliate, Fulcrum, in return for a $50,000 payment and (2) the 2014 Consent Judgment converted the Liberty/Hampton Note in the outstanding principal and interest amount of $36,671,321.37, which was secured by the Subject Property, into the 2014 Consent Judgment in the amount of $31,621,321,37, which is no longer secured by the Subject Property, but did transfer certain other assets from Hampton Island to Liberty Capital.

A GA UFTA "transfer" includes the disposing of or parting with an asset or an interest in an assets and includes the release of a lien or other encumbrance. *See* O.C.G.A. 18-2-71(16). When Liberty Capital foreclosed on the Subject Property pursuant to the power of sale clause in

the Liberty/Hampton Security Deed, Liberty Capital transferred the Subject Property (Liberty Capital's collateral) to Fulcrum free and clear of the security title, interest, and lien of the Liberty/Hampton Security Deed.  *Murray v. Chulak*, 250 Ga. 765, 770, 300 S.E.2d 493, 498 (1983)(purchaser at foreclosure sale obtained title free and clear of all liens).  By definition, Liberty Capital's foreclosure and transfer of its collateral, the Subject Property, free and clear of the lien of the Liberty/Hampton Security Deed was a "transfer" for GA UFTA purposes.

Additionally, Liberty Capital transferred the Subject Property to its affiliate, Fulcrum, rather than submitting a topping bid for the Subject Property.  Leventhal reported that Liberty Capital submitted an initial credit bid of $45,000 and Fulcrum submitted a subsequent cash bid of $50,000.  *See* Plaintiffs' SMF ¶ 52-54 & Plaintiffs' MSJ, Exs. 29-31; Defendants' Response to Plaintiffs' SMF ¶ 52-54.  Although Liberty Capital had at least $36,000,000 of debt with which to credit bid, Liberty Capital accepted Fulcrum's $50,000 cash bid as the winning bid for the Subject Property.  *See Id.*; *see also* April 2023 Leventhal Affidavit, ¶¶ 13, 32, & 65-66 (Defendants' MSJ, Ex. 110).  Liberty Capital's decision allowed the transfer of its collateral, the Subject Property, to Fulcrum free and clear of the Liberty/Hampton Security Deed (*i.e.*, a release of the lien).  This decision permitted Fulcrum, rather than Liberty Capital, to take fee simple title to the property and, among other things, book $1.392 million in revenue from its ownership of the Subject Property from December 31, 2013 to January 1, 2015 (Plaintiffs' MSJ, Ex. 3, pp. 190-191).  For all intents and purposes, Leventhal was in control of both Liberty Capital and Fulcrum at the time of the 2013 Foreclosure Sale.  *See* Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15, 36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62; Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110).

Liberty Capital's transfer of its collateral, the Subject Property, to Fulcrum is a "transfer" for GA UFTA purposes.

Liberty Capital also reduced and converted the debt evidenced by the Liberty/Hampton Note into the 2014 Consent Judgment.  As a result, Hampton Island's secured obligation to repay $36,671,321.37 (secured by a junior security title, interest, and lien in the Subject Property) was reduced and converted into a secured obligation to repay $31,621,321.37 (secured by a junior judgment lien in Hampton Island's remaining property).  *See* 2014 Consent Judgment.  The entry of the 2014 Consent Judgment resulted in the reduction of the Hampton Island debt owed to Liberty Capital by a face amount $5,050,000 in return some personal property and intangible assets that were to be transferred by Hampton Island to Liberty Capital.  *See* 2014 Consent Judgment.[27]  The reduction and conversion of the Liberty/Hampton Note into the 2014 Consent Judgment was also a "transfer" for GA UFTA purposes.

The Special Master finds that the 2013 Foreclosure Sale and the 2014 Consent Judgment, when analyzed in the global context of the 2013 Litigation and its ultimate result, are "transfers" for purposes of GA UFTA.

> **d.    ACTUAL INTENT – Liberty Capital's "transfer" was made with the actual intent to hinder or delay creditors of the Liberty Capital, including without limitation, Plaintiffs.**

A transfer is voidable if it was made "with actual intent to hinder, delay, or defraud *any creditor* of the debtor.  O.C.G.A. § 18-2-74(a)(1).  "Because actual intent to defraud is difficult to prove, the Georgia UFTA lists 11 nonexclusive factors (sometimes called the 'badges of fraud') that can be considered in determining whether funds were transferred with the actual intent to

---

[27]  There is no evidence in the record as to the value of the assets that were to be received by Liberty Capital pursuant to the 2014 Consent Judgment.

defraud a creditor." *SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 3-4, 709

S.E.2d 267, 270 (2011)(citing O.C.G.A. § 18-2-74(b)(1)-(11); *Bishop v. Patton*, 288 Ga. 600, 607,

706 S.E.2d 634 (2011)).  "The badges of fraud are indicators of such intent on which the trial court

may rely to make its findings based on evidence presented by the parties." *U.S. Cap. Funding VI,*

*Ltd. v. Patterson Bankshares, Inc.*, 137 F.Supp.3d 1340, 1369 (S.D. Ga. 2015)(internal citations

omitted).  "There is no magic formulation in considering the badges of fraud – one badge may be

enough; many badges may not be enough." *Id*.  In determining actual intent, "a court should

evaluate the totality of the circumstances, including 'all indicia negativing as well as suggesting

fraud.'" *Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 88, 437 P.3d 758, 789 (Wyo.

2019).

The plaintiff/creditor bears the initial burden of presenting evidence sufficient to establish

fraud. *See Target Corp. v. Amerson,* 326 Ga. App. 734, 737, 755 S.E. 2d 333, 337 (2014).  But,

"once the plaintiff/creditor puts forward some evidence on the badges of fraud, the burden shifts

to the defendant/debtor to show the transaction was undertaken in good faith." *Kipperman v. Onex*

*Corp.*, No. 1:05-CV-01242-JOF, 2010 WL 761227 at *3 (N.D. Ga. March 2, 2010).

A court's determination of "actual intent" is generally a jury question resolved through

reference to the "badges of fraud" found in O.C.G.A. § 18-2-74(b).  *See Target Corp. v. Amerson*,

326 Ga. App. 734, 742, 755 S.E. 2d 333, 341 (2014)("The law is well established that the question

of intent in a fraudulent conveyance case is generally one for the jury."); *Johnson v. Sheridan*, 179

Ga. App. 331, 333, 346 S.E.2d 109, 110 (1986)("[Q]uestions as to the fairness of the transaction,

the grantee's notice or ground for reasonable suspicion of the grantor's intention to delay or

defraud creditors, and the solvency of the grantor at the time of the conveyance are usually for jury

resolution."); *In re Think Retail Solutions, LLC*, No. 15-56153-BEM, 2019 WL 2912717, *12

(Bankr. N.D. Ga. July 5, 2019) ("Courts recognize that direct proof of fraudulent intent is rarely available; therefore, it may be established by circumstantial evidence."). This is because a defendant rarely admits an actual intent to commit a fraudulent transfer. *See Kipperman* at *6 ("Because individuals will rarely state directly that they are acting with an intent to hinder or defraud creditors, the law allows the plaintiff to present circumstantial evidence of such an intent through 'badges of fraud.'").

But, there are exceptions to every rule, and this case presents such an exception here. *See Roach v. Roach*, 327 Ga. App. 513, 514 (2014)(a fraudulent transferor is bound by an admission that he intended to hinder, delay or defraud creditors; "Appellee admitted that his 'whole intention' in having the property transferred to Appellant was to shield it from creditors"); *Hoffman v. AmericaHomeKey, Inc.*, No. 3:12-CV-3806-B, 2014 WL 7272596, at *11 (N.D. Tex. Dec. 22, 2014)("Thus, although the issue of fraudulent intent is generally a fact question for the fact-finder to decide, summary judgment may still be appropriate in rare cases, such as 'when the defendant admits the fraud, the conveyance instrument is fraudulent on its face, the defendant retains an interest in the property inconsistent with the conveyance alleged, or the evidence indisputably reveals that the transfer was made [with] the intent to defraud.'").

In support of Defendants' MSJ, Leventhal submitted the April 2023 Leventhal Affidavit (Defendants' MSJ, Ex. 110). In this affidavit, Leventhal freely admits that he was concerned that if any of the Three Banks foreclosed on the Subject property that

> Liberty [Capital] would lose its best chance at recouping the $37,500,000.00 it was owed by Hampton [Island]. Certainly, Hampton and Liberty would be "wiped out" of the Subject Property . . . Liberty and Hampton would have been rendered assetless (except for uncollectable claims against Hampton), seriously hindering Liberty's ability to repay any of its creditors or potential creditors, including Plaintiffs . . . I believed it might be possible to resolve the debts if the Subject Property was controlled by a "clean" entity that was capable of borrowing or courting investors to infuse additional capital to pay down the Loans . . . Liberty

has no reasonable option but to foreclose on the Subject Property as a last-ditch effort to obtain some value from Liberty's license to exercise First Citizen's junior security interest in the Subject Property *before a senior creditor foreclosed and rendered it forever worthless to Liberty*. . . Further, I believed that the Subject Property did not have any value as an asset while it was encumbered by more than $70,000,000 in *debt owed to the Three Banks*, but hoped that *the Subject Property could become valuable in the future if the debt was resolved*.

April 2023 Leventhal Affidavit, ¶¶ 32-34; 36-37 (Defendants' MSJ, Ex. 110)(emphasis added).

Leventhal's stated hope and belief was that if he could transfer the Subject Property to a "clean entity" that he may be able to borrow funds or court investors for additional capital to pay down the Bank Loans so he could recoup the $37,500,000 loaned by Liberty Capital to Hampton Island. *Id.* Furthermore, Leventhal hoped Liberty Capital or another entity controlled by him would be the "clean entity" to purchase the Subject Property. *See* Plaintiffs' MSJ, Ex. 3, p. 183. Leventhal's stated objective was to foreclose on the Subject Property "before a senior creditor foreclosed and rendered it forever worthless to Liberty [Capital]" in order to buy time so "the Subject Property could become valuable in the future if the debt was resolved." April 2023 Leventhal Affidavit, ¶¶ 36-37 (Defendants' MSJ, Ex. 110). Leventhal has testified that his "understanding [was] that a receiver being appointed might temporarily block the banks from being able to foreclosure." Plaintiffs' MSJ, Ex. 14, p. 99.

At a minimum, Leventhal wanted to "delay" any senior creditor foreclosure. *See Delay, Hinder.* BLACK'S LAW DICTIONARY (11th ed. 2019) ("Delay. The act of postponing or slowing"); ("Hinder. To impede, delay, or prevent.") Leventhal's actual intent in foreclosing the Subject Property and transferring it to Fulcrum is clear from his statements: he wanted to buy more time and delay any senior creditor foreclosure until such time as Leventhal or one of his companies could resolve the senior indebtedness encumbering the Subject Property and the Subject Property could become valuable in the future. Leventhal's own testimony squarely fits the definitions of "delay" and "hinder," so the only reasonable inference to draw is that he wanted to delay or hinder

any senior creditor foreclosure by the Three Banks. *Eickhorn v. Boatright*, 219 Ga. App. 895, 897, 467 S.E.2d 214, 216 (1996) (although nonmoving party is entitled to all reasonable inferences on a motion for summary judgment, when "only one *reasonable* inference can be drawn from the uncontroverted facts in evidence, that is the inference which will be drawn.").

Additionally, Leventhal wanted to transfer the Subject Property from Hampton Island – which owed approximately $36,671,321.37 to Liberty Capital, over a million dollars to HAOP, LLC pursuant to an outstanding judgment, and various trade payables (*See* 2014 Consent Judgment; Plaintiffs' MSJ, Ex. 14, pp. 20-23, 26 & 19 -- to a "clean entity" (*i.e.*, Fulcrum) that did not owe any of these millions of dollars in debts and might be able to borrow funds or obtain additional investor capital. Defendants have stated the "clean entity" (Fulcrum) would not have "Hampton [Island]'s or Liberty [Capital]'s *considerable baggage*." Defendants' MSJ, p. 34 (emphasis added). Leventhal has testified that what he meant by a "clean entity" was a "'clean' entity that was capable of borrowing or courting investors to infuse additional capital to pay down the Loans." April 2023 Leventhal Affidavit, ¶ 34 (Defendants' MSJ, Ex. 110). Leventhal is describing an entity with a "clean" balance sheet: an entity with little or no liabilities that could raise new funds. *Id*. ("a 'clean' credit-worthy entity"). Leventhal's clear objective was to use the 2013 Foreclosure Sale to transfer the Subject Property from Hampton Island (an entity that owed millions to creditors, including to Liberty Capital) to Fulcrum (that had a clean balance sheet) rather than to Liberty Capital (who owed millions to Plaintiffs), so he would have additional time to resolve the outstanding indebtedness of the Three Banks. *Id*. Leventhal did not testify that he wanted more time to resolve the outstanding debts owed to Plaintiffs, HAOP, LLC, or other trade creditors, but only "the debt owed to the Three Banks." *Id*. Leventhal's statements show an intent to "hinder" Plaintiffs and any other creditors. The effect of Leventhal's scheme was to interfere

75

with the collection efforts of Plaintiffs and other creditors. *See In re Think Retail Solutions*, 2019 WL 2912717, at *12 ("To establish the requisite intent [to hinder, delay, or defraud], 'the trustee must show that the debtor had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends.'")(internal citation omitted). Leventhal's statements evince a clear intent to hinder Plaintiffs and any other creditors.

Additionally, the undisputed evidence shows the presence of the following badges of fraud, at a minimum, at the time of the 2013 Foreclosure Sale: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; and (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. *See* O.C.G.A. § 18-2-74(b)(1), (2), (4), & (9).

It is undisputed, and has been admitted in pleadings and testimony, that upon the foreclosure and release of the Liberty/Hampton Security Deed, the Subject Property ended up in the control and possession of Fulcrum, which is another entity owned and controlled by Leventhal and an affiliate of Liberty Capital and Hampton Island. *See* Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15, 36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62; and, Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110). *See Tindall v. H & S Homes, LLC*, 757 F. Supp. 2d 1339, 1357 (M.D. Ga. 2011) ("Transfers to related or affiliated corporations have also justified the finding of fraudulent intent."); *see also* §§ O.C.G.A. 18-2-71(1)(B) & (8)(D). It is also undisputed and admitted in pleadings, that prior to this transfer, Plaintiffs had exercised their "put rights" in the amount of $1,250,000 each and threatened litigation against Liberty Capital. *See Complaint*, ¶¶ 13, 15; Liberty Capital Answer, ¶¶ 13, 15. Leventhal has further testified that the Senior Loans

owed to the Three Banks were overdue, and that Liberty Capital had no means to repay the Three

Banks.  *See* April 2023 Leventhal Affidavit, ¶¶ 24-31 (Defendants' MSJ, Ex. 110); Plaintiffs'

SMF ¶ 24; Defendants' Response to Plaintiffs' SMF ¶ 24.  *See also* O.C.G.A. § 18-2-72(b) ("A

debtor who is generally not paying his or her debts as they become due other than as a result of a

bona fide dispute is presumed to be insolvent.  The presumption imposes on the party against

which the presumption is directed the burden of proving that the nonexistence of insolvency is

more probable than its existence.").

　　　　To put it another way, two affiliated companies (Liberty Capital and Hampton Island),

owned and controlled by the same individual (Leventhal), were plaintiff and defendant in a lawsuit

where substantially all of the assets of one of the entities (Hampton Island) ended up in the control

and possession of a third affiliated company (Fulcrum), owned and controlled by the same

individual (Leventhal), at a time when one or more creditors (Plaintiffs) had exercised put rights

and threatened litigation against one of the entities (Liberty Capital) and this same entity was not

generally paying its debts as they became due.  "Careful scrutiny" needs to be applied to the 2013

Litigation, the 2013 Foreclosure Sale, and the 2014 Consent Judgment given the Leventhal's

control of Liberty Capital, Hampton Island, and Fulcrum.  *See Acme Security, Inc. v. CLN*

*Properties, LLC (In re Acme Security, Inc.)*, 484 B.R. 475, 486 (Bankr. N.D. Ga. 2012) ("An

insider's formation of a new company to acquire a debt secured by all of his company's assets and

the new company's later acquisition of the company's assets through exercise of his rights as a

secured creditor legitimately subjects the transaction to careful scrutiny."); *see also Brown v.*

*Cooper*, 237 Ga. App. 348, 353, 514 S.E.2d 857, 862 (1999) ("[T]ransactions where the same

person are on  both sides should be even more closely scrutinized.").

These undisputed badges of fraud provide further evidence of actual intent to hinder or delay creditors of Liberty Capital.  *See* O.C.G.A. § 18-2-74(b).  *See also Tindall v. H & S Homes, LLC*, 757 F. Supp. 2d 1339, 1350–51 (M.D. Ga. 2011)("[A] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance; but several of them considered together may form a basis to infer fraud.  Moreover, the factors listed in the statute are not the sole indicators of an intent to defraud.  Fraudulent intent may be inferred from the totality of the circumstances."); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir. 1995)("It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [fraudulent conveyance statutes].").  Leventhal's affidavit testimony, together with the present badges of fraud, evince an actual intent to hinder or delay Liberty Capital's creditors in the collection and enforcement of their debts.  Plaintiffs have satisfied their burden on Liberty Capital's actual intent.

Leventhal attempts to create a genuine issue of material fact as to his "intent" by including a conclusory statement in the April 2023 Leventhal Affidavit that parrots the language of O.C.G.A. § 18-2-74(a)(1): "Liberty [Capital] did not foreclose on the Subject Property to hinder, delay, or defraud any creditor or potential creditor of Liberty [Capital], including Plaintiffs or the Three Banks."  April 2023 Leventhal Affidavit, ¶ 35 (Defendants' MSJ, Ex. 110).  Such self-serving and conclusory statements are insufficient to create a dispute of a material fact for summary judgment purposes.  *Foster v. Ramsey*, 245 Ga. App. 118, 119, 536 S.E.2d 550, 552 (2000) (self-serving and conclusory affidavits are insufficient to create an issue of material fact in the absence of substantiating evidence); *Lipton v. Warner, Mayoue, & Bates, P.C.*, 228 Ga. App. 516, 517, 92 S.E.2d 281, 282 (1997) ("[a] self-serving, conclusory affidavit not supported by fact or

circumstances is insufficient to raise a genuine issue of material fact."); *Morton v. Stewart*, 153 Ga. App. 636, 642, 266 S.E.2d 230, 235 (1980) ("Ultimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary judgment motion.").

Leventhal testified that he wanted Liberty Capital to foreclose on the Subject Property "as a last-ditch effort to obtain some value from the Liberty [Capital]'s license to exercise First Citizen's junior security interest in the Subject Property *before a senior creditor foreclosed and rendered it forever worthless to Liberty.*" April 2023 Leventhal Affidavit, ¶ 36 (Defendants' MSJ, Ex. 110). Leventhal's motivation was to preserve value for Liberty Capital by foreclosing and transferring the Subject Property to its affiliate Fulcrum, an entity without the "considerable baggage" (i.e., debts) of Liberty Capital. As stated previously, Leventhal controlled which entity – Liberty Capital or Fulcrum – was the winning bidder at the 2013 Foreclosure Sale. These intentional actions were taken in an attempt to place the Subject Property beyond the reach of creditors, like Plaintiffs. By definition, Leventhal's statements disclose an actual intent to "hinder or delay" a creditor. *See Roach v. Roach*, 327 Ga. App. 513, 514, 759 S.E.2d 587, 589 (2014)(a fraudulent transferor is bound by an admission that he intended to hinder, delay or defraud creditors.

The Special Master finds Leventhal's affidavit testimony, together with the present badges of fraud, provide undisputed evidence of Liberty Capital's actual intent to hinder or delay its creditors, including without limitation, Plaintiffs.

### e. GOOD FAITH AND REASONABLY EQUIVALENT VALUE DEFENSE.

Having established that Liberty Capital committed an actual fraudulent transfer, the burden shifts to Defendants Fulcrum and Hampton Island to prove their entitlement to the "good faith and

reasonable equivalent value" defense found in O.C.G.A. § 18-2-78(a).[28]  *See* O.C.G.A. § 18-2-78(g)(1)("A party that seeks to invoke subsections (a), (d), (e), or (f) of this Code section has the burden of proving the applicability of that subsection."); *see also Post-Confirmation Comm. for Small Loans, Inc. v. Innovate Loan Serv. Corp.*, No. 1:13-cv-191, 2015 WL 5769229, at *8 (M.D. Ga. Sept. 30, 2015)(O.C.G.A. § 18-2-78 defenses can only be raised after a transfer is found to be fraudulent); *In re Int'l Mgmt. Assocs., LLC*, No. 06-62966-PWB, 2016 WL 552491, at * 13 (Bankr. N.D. Ga. Feb. 10, 2016)(O.C.G.A. § 18-2-78 defenses are affirmative defenses and the burden of proof to establish entitlement to the defense is on Defendants); *Kipperman v. Onex Corp.*, No. 1:05-CV-01242-JOF, 2010 WL 761227 at *3 (N.D. Ga. 2010) ("[O]nce the plaintiff/creditor puts forward some evidence on the badges of fraud, the burden shifts to the defendant/debtor to show the transaction was undertaken in good faith.").  The applicable burden of proof is a preponderance of the evidence standard.  *See* O.C.G.A. § 18-2-78(h).  For the reasons set forth below, the Special Master finds Defendants Fulcrum and Hampton Island lack the good faith required for asserting this affirmative defense.

Pursuant to O.C.G.A. § 18-2-78(a), "a transfer or obligation is not voidable under paragraph (1) of subsection (a) of Code Section 18-2-74 [actual fraud] against a person who took in good faith *and* for a reasonably equivalent value or against any subsequent transferee or obligee. O.C.G.A. § 18-2-78(a)(emphasis added).  By its plain language, a defendant seeking to assert this affirmative defense must satisfy both prongs: good faith *and* reasonably equivalent value.  *See In re White*, No. 14-65320-WLH, 2017 WL 3278842, at *6 (Bankr. N.D. Ga. Aug. 1, 2017) (summary judgment not warranted where reasonably equivalent value remained in dispute); *Nohr v. Jang*,

---

[28]  This defense is not available to the *transferor* of a fraudulent transfer. *See In re Int'l Mgmt. Assocs., LLC*, No. 09-MP-601, 2009 WL 6506657 , at *7 (Bankr. N.D. Ga. 2009) (O.C.G.A. § 18-2-78(a) "provide[s]  a defense for a *transferee* who has received the transfer 'in good faith' and 'for value.'") (emphasis added).

No. 1:14-CV-2761-SCJ, 2017 WL 11627872, at *5 (N.D. Ga. Mar. 2, 2017) (summary judgment

denied where movant could not satisfy good faith and reasonably equivalent value prongs).

"Good faith" is not defined in GA UFTA, and there are no Georgia state court cases

establishing the proper standard for determining "good faith" in the context of O.C.G.A. § 18-2-

78(a).    But, Georgia bankruptcy courts interpreting matters of Georgia law have relied on the

different tests used in other jurisdictions in determining a transferee's "good faith."[29]    The *Think

Retail Solutions* case provides a summary of the different tests that have been used in assessing

the good faith of a transferee.    *See In re Think Retail Solutions, LLC*, 2019 WL 2912717, at *21

(collecting cases).    The various tests that have been used boil down to whether (1) the transferee

knew or should have known the transferor was insolvent or the transfer may have a fraudulent

purpose and (2) whether the transfer was an arms-length transaction.    *Id.*[30]    Courts have differed

on whether to apply an objective or subjective approach or both.    *Id.*    Irrespective of which test or

---

[29]    "Given the dearth of Georgia case law construing the GA UFTA's provisions, 'Georgia courts look to the decisions of other jurisdictions for guidance.'"    *U.S. Cap. Funding VI, Ltd v. Patterson Bankshares, Inc.*, 137 F. Supp. 3d 1340, 1364  (S.D. Ga. 2015) (quoting *Jones & Tauber & Balser, P.C.*, 503 B.R. 162, 182 (N.D. Ga. 2013); *see also In re Think Retail Solutions, LLC*, No. 15-56153-BEM, 2019 WL 2912717, at *21–23 (applying federal bankruptcy standard for "good faith" under § 548(c) to GA UFTA claim); *In re Int'l Mgmt. Assocs., LLC*, No. 06-62966-PWB, 2016 WL 552491, at *12 (Bankr. N.D. Ga. 2016) (bankruptcy definition of "good faith" is "comparable for purposes of Georgia law).

[30]    As summarized by the Court in  *Think Retail Solutions*:

The first step is to determine "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." If the transferee did have the requisite notice, the second step is to determine whether a diligent inquiry would have discovered the fraudulent purpose . . . Also relevant is whether the transaction "carries the earmarks of an arms-length bargain . . . Finally, whether a party is on inquiry notice of fraud is to be viewed in light of the "standards, norms, practices, sophistication, and experience generally possessed by participants in the transferee's industry or class.

2019 WL 2912717, at *21 (internal citations omitted).

approach is used in this case, Fulcrum and Hampton Island cannot have acted in good faith due to Leventhal's actual intent being imputed to each of these entities.

In many fraudulent transfer cases, the transferor and transferee may be independent entities under the control of different individuals, which would be prevent the transferor's actual intent being imputed to the transferee. For example, let's say ABC LLC controlled by Mr. Smith transferred its cows to XYZ LLC controlled by Ms. Jones. Let's further assume Mr. Smith of ABC LLC made this transfer with the actual intent to hinder, delay, or defraud ABC LLC's creditor, Acme Bank. If Acme Bank were to sue XYZ LLC, as the transferee of a fraudulent transfer, and seek the turnover of the cows, XYZ LLC would have the ability to assert its good faith in being a party to the transaction. The inquiry would center on whether Ms. Jones was "in" on Mr. Smith's fraudulent scheme or if this was an arms-length transaction for value. If the former, XYZ LLC would not have been in good faith and the transfer could be avoided. If the latter, XYZ LLC may be permitted to retain the cows if she also paid a reasonably equivalent value for them.

This case presents a very different situation than the above hypothetical due to Leventhal's unique position as the person in control of the parties on both sides of the transactions. Neither Fulcrum not Hampton Island are able to defend on the basis of their alleged "good faith" due to Leventhal's control and direction of the entities on both sides of the transactions. *See In re J.T. Real Est. Invs., LLC*, 498 B.R. 869, 873 (Bankr. N.D. Ind. 2013)(transferee could not defend on the basis of good faith where the transferee was owned by the same person who engaged in the fraudulent transfer: "*the stipulated facts reveal[ed] little more than an attempt at 'washing' a fraudulent transfer through third parties so that the fraudulent transferee can try to keep its ill-gotten gains*.")(emphasis added). Leventhal was in control of both the transferor and the transferee. Leventhal owned and controlled Liberty Capital, Hampton Island, and Fulcrum at the

time of the 2013 Foreclosure Sale.  Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15,

36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62;

and, Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex.

110).  It is undisputed that Leventhal was the agent of each of these entities.  *Id.*  Leventhal's actual

intent and knowledge, as set forth in his affidavit testimony, is imputed to each of these entities.

*See, e.g., Brown v. Cooper*, 237 Ga. App. 348, 353, 514 S.E.2d 857, 863 (1999)("[K]nowledge of

officers of a corporation is knowledge to that corporation and the corporation is bound

thereby.")(internal citation omitted).  This issue was previously litigated and ruled upon by the

Special Master in his *Special Master's Motion to Compel Order* entered in this case on September

2, 2022, and fully adopted by this Court in its *Order Fully Adopting the Special Master's Order

on Motion to Compel* entered in this case on December 13, 2022.  Rather than restate all of the

reasons for why Leventhal's actual intent and knowledge are imputed to each of the Defendant-

entities, the Special Master directs the parties to these prior orders.  As a result, Fulcrum and

Hampton Island are saddled with Leventhal's actual intent to hinder or delay creditors, and

therefore do not possess the requisite good faith necessary to assert this affirmative defense.

Moreover, the fraudulent transfers in this case (*i.e.*, the 2013 Foreclosure Sale and the 2014

Consent Judgment) were the not the result of an arms-length transaction.  Although "arms-length

transaction" is not defined in GA UFTA, the Georgia legislature has defined this term in the

context of the ad valorem taxation of property: an "arms-length transaction" is "a transaction which

has occurred in good faith without fraud or deceit carried out by unrelated or unaffiliated parties,

as by a willing buyer and a willing seller, each acting in his or her own self-interest, including but

not limited to a distress sale, short sale, bank sale, or sale at public auction."  O.C.G.A. § 48-5-

2(.1).  Since GA UFTA does not provide a separate definition of "arms-length transaction," the

Special Master will apply this definition to the transactions in this case. The relevant transactions in this case occurred between affiliates that were owned and controlled by the same individual who possessed the actual intent to hinder or delay his creditors at the time of the transfers. Nothing about these transactions qualifies them as "arms-length transactions." This provides a further basis for finding Fulcrum and Hampton Island lack the requisite good faith necessary for this affirmative defense.

Since a transferee has to satisfy both prongs of O.C.G.A. § 18-2-78(a) (*i.e.*, good faith and reasonably equivalent value), Fulcrum and Hampton Island's lack of good faith is fatal to the availability of this defense. The failure to satisfy one of the prongs vitiates the entire defense without the need to address both prongs. *See Nohr*, WL 11627872, at *5.

To the extent the reasonably equivalent prong were to be relevant, the Court would need to analyze the value given by the transferee as compared to the value of the assets received in return. *See* O.C.G.A. § 18-2-73(a); *Tuggle v. Ameris Bank*, 363 Ga. App. 600, 605, 872 S.E.2d 1, 5–6 (2022) (because purpose of GA UFTA is to protect creditors, "the adequacy of consideration for purposes of the Act should be determined from the standpoint of the creditor, not the debtor."). There remains a genuine issue of material fact over whether Fulcrum and Hampton Island provided reasonably equivalent value in consideration for the 2013 Foreclosure Sale and the 2014 Consent Judgment. To the extent the reasonably equivalent prong were to become relevant, the Court would need to determine if Fulcrum and Hampton Island have carried their burden on this prong.

Based on the foregoing, Plaintiffs' motion for summary judgment on Count II is **GRANTED** and Defendants' motion for summary judgment on Count II is **DENIED**.

2.    **Count VI (Continuation/Successor/Partnership/Joint Venture Liability)**

Plaintiffs and Defendants have both moved for summary judgment on the successor liability in Count VI of the Complaint.

As Defendants correctly point out, successor liability is not an independent cause of action, but rather it is "an equitable tool to transfer liability from a predecessor to a successor." *Tindall v. H&S Homes, LLC*, No. 5:10-CV-044 CAR, 2011 WL 4345189 at *3 (M.D. Ga. Sep. 15, 2011).

In Georgia, a successor entity does not assume the liabilities of its predecessor unless "(1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the [successor] is a mere continuation of the predecessor corporation." *Dan J. Sheehan Co. v. Fairlawn on Jones Condo Ass'n, Inc.*, 334 Ga. App. 595, 597, 780 S.E.2d 35, 38 (2015); *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284, 328 S.E.2d 726, 727 (1985)(footnotes omitted)(emphasis added).

Neither of the parties have asserted the first two exceptions, (1) by express agreement and (2) a *de facto* merger, apply to the facts in this case.  Plaintiffs assert, and Defendants dispute, that the remaining two exceptions, (3) a fraudulent attempt to avoid liabilities and (4) the mere continuation or corporate continuation doctrine, apply here.  For the reasons that follow, the Special Master finds that each exception is applicable, so it is appropriate to impose successor liability upon Fulcrum for Liberty Capital's obligations to Plaintiffs.

a.    **Fraudulent Attempt to Avoid Liabilities**

"Georgia law allows for successor liability in cases where a transaction is proved to be a fraudulent attempt to avoid liabilities." *Tindall v. H&S Homes, LLC*, 2011 WL 4345189 at *3 (M.D. Ga. 2011).  The same allegations used establish liability for a fraudulent transfer under GA

UFTA are "also sufficient to support a claim for the equitable imposition of successor liability." *Tindall* at * 4 (citations omitted).

Plaintiffs have established that Defendants engaged in the 2013 Foreclosure Sale and the 2014 Consent Judgment with the actual intent to hinder or delay their creditors by shielding the Subject Property from the reach of Plaintiffs and other creditors. *See* Section IV.B.1.d, *supra*. Moreover, Defendants have not established their good faith as a defense to the avoidance of these transactions. *Id*. at Section IV.B.1.e, *supra*. For these same reasons, Plaintiffs are entitled to the equitable imposition of successor liability against Defendant Fulcrum.

### b.    Mere Continuation or Corporate Continuity Doctrine

The second applicable exception, the mere continuation or "the common law doctrine of corporate continuity applies where ... *there is a substantial identity of ownership and a complete identity of the objects, assets, shareholders, and directors.* The corporate continuity doctrine is one of equity." *Dan J. Sheehan Co.*, 334 Ga. App. at 597, 780 S.E.2d at 38; *Bullington v. Union Tool Corp.*, 254 Ga. at 284, 328 S.E.2d at 727 (1985)(footnotes omitted)(emphasis added). For the following reasons, the Special Master finds that equity demands the application of the corporate continuity doctrine to the facts of this case.

### i.    Substantial Identity of Ownership

A "substantial identity of ownership" does not require complete identity and may involve merely "some" identity of ownership. We have thus found a substantial identity of ownership where the new corporation succeeded to the assets of a partnership, even though only three of the four partners were stockholders in the new corporation. Similarly, we have held that this element was satisfied where the new entity, an LLC, was formed by one of two members in the old LLC.

*POP 3 Ravinia, LLC v. Embark Holdco Management, LLC*, 364 Ga. App. 414, 419, 875 S.E.2d 401, 405 (2022)(internal citations omitted).

Here, the evidence viewed in the light most favorable to Defendants shows a substantial identity of ownership among all three entities – Liberty Capital, Hampton Island, and

Fulcrum.  Defendants have admitted that Leventhal is the ultimate owner of Liberty Capital, Hampton Island, and Fulcrum, and controlled all three entities at the time of the 2013 Foreclosure Sale.  *See* Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15, 36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62; and, Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110).  The same person or entity having a substantial controlling interest in both the old and new entities (i.e., Leventhal), whether directly or indirectly, meets the test for a substantial identity of ownership under the continuation doctrine. *See id.* at 364 Ga. App. at 420, 875 S.E.2d at 406 (internal citations omitted).

Plaintiffs have established the substantial identity of ownership required for the first element of the mere continuation or corporate continuity doctrine.

### ii.    Complete Identity of the Objects, Assets, Shareholders, and Directors

The identity-of-assets-and-objects element gets at whether "the new company is running a business that just looks something like the old company's business (not enough), as opposed to continuing to run the old company's business.  *See Dan J. Sheehan Co.*, 334 Ga. App. at 597 (1), 780 S.E.2d 35 (continuation doctrine applied where "[f]or practical purposes, nothing changed except the name of the [corporation]").  When analyzing this element, Courts have compared the old and new entities' operations, assets, employees, management, location, vendors, and clients. *See Wilson*, 355 Ga. App. at 845-46 (3), 846 S.E.2d 101 (new company was properly held liable for old company's obligations where new company provided the same services, used the same brokers, employed the same personnel, had the same assets, and serviced the same clients as old company); *Dan J. Sheehan Co.*, 334 Ga. App. at 597-98 (1), 780 S.E.2d 35 (new homeowners' association should have been held liable as a matter of law for liabilities of old HOA where the new HOA had, among other things, the same purpose, subject property, board of directors, officers, voting members, unit owners, and physical location as the old HOA); *Pet Care*, 219 Ga. App. at 118–19 (1), 464 S.E.2d 249 (new corporation was properly held liable for old company's obligations where it was incorporated to operate the same type of business from the same location and used the same assets and vendors). Cf. *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 592-93 (5) (c), 533 S.E.2d 136 (2000) (purchasing corporation did not share a "complete identity of assets" with seller where it acquired the seller's name but just 60-90% of the its real estate holdings).

*POP 3 Ravinia, LLC*, 364 Ga. App. at 419–420, 875 S.E.2d at 406.

87

As set forth in Plaintiffs' MSJ, there is an overwhelming overlap in the pre- and post-foreclosure sale operation of the Subject Property.  *See* Plaintiffs' MSJ, pp. 12-13.  Leventhal put it best in his deposition testimony:

> Q:    There was really – other than the change in title to the property from Hampton Island, LLC, to Fulcrum, being out there on the ground, there was no other change that anyone would notice?
>
> A:    For the most, no.  I mean except for they changed the title to thousands of acres. No.

Plaintiffs' MSJ, Ex. 3, p. 203.

Plaintiffs have asserted this overwhelming overlap is sufficient to satisfy the identity of assets and objects prong.  *See Dan J. Sheehan Co.*, 334 Ga. App. at 597, 780 S.E.2d at 38 ("For practical purposes, nothing changed except the name of the association.").

Defendants have countered that while there may be a tremendous amount of overlap, there is not a *complete or entire* identity of assets and objects among the various Defendants. Specifically, Defendants assert Hampton Island did not transfer all of its assets to Fulcrum and still continues to own "significant real estate assets."  *See* Defendants' MSJ Response, p. 19.  Liberty Capital did not transfer any of its assets to Fulcrum and, in fact, acquired additional property from Hampton Island via the 2014 Consent Judgment.  *Id*.  *See also* 2014 Consent Judgment  Moreover, both Liberty Capital and Hampton Island have maintained their separate corporate existences and have filed their annual registrations with the Georgia Secretary of State.  *See* Defendants' Response to Plaintiffs' MSJ, Ex. 3.  Liberty Capital was a lender to Hampton Island.  *Id*.  Hampton Island was an owner and borrower.  *Id*.  Fulcrum is now the owner.  *Id*.  Based on these facts, Defendants assert there can never be a *complete* identity of assets and objects among the Defendant entities. *See Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 592–93 (5) (c), 533 S.E.2d 136, 145–46 (2000) (purchasing corporation did not share a "complete identity of assets" with seller where it

acquired the seller's name but just 60-90% of the its real estate holdings); *Conservit, Inc. v. Glob. Mill Supply, Inc.*, No. 1:19-CV-00274-ELR, 2023 WL 2731717, at *12 (N.D. Ga. Jan. 5, 2023)("Georgia courts have found successor liability attaches" on a continuation theory only "when there is . . . *complete* identity of . . . assets" between the two entities.")(internal citation omitted); *Patterson v. VPC Produce LLC*, No. 7:17-CV-25(WLS), 2019 WL 650414, at *5 (M.D. Ga. Jan. 4, 2019)(no complete identity where the companies were separate entities with current registrations).

At first blush, it appears there is not a "complete" identity of assets and objects among the three entities – Liberty Capital, Hampton Island, and Fulcrum – based on a superficial application of the case law.   But, to end the inquiry here would be the epitome of elevating form over substance.   Since successor liability is an equitable remedy, equity will requires a deeper look into the true nature of the transactions.   *See Acme Sec., Inc. v. CLN Properties, LLC (In re Acme Sec., Inc.)*, 484 B.R. 475, 487 (Bankr. N.D. Ga. 2012)("[E]quity is loath to elevate the form of the transfer over its substance, and deigns to inquire into its true nature.")(internal citation omitted). Accordingly, further inquiry is required to determine who is "running the business" (i.e., the development and operation of the Subject Property) both before and after the transfers and whether the assets and objects are the same.   In this case, Leventhal remained in control of the Subject Property and retained control over the same assets and objects both before and after the transfers. *See* Plaintiffs' SMF ¶¶ 2 & 62; Plaintiffs' MSJ, Ex. 2, ¶¶ 14, 15, 36, & 40; Plaintiffs' MSJ, Ex. 3, pp. 201, 213; Defendants' Response to Plaintiffs' SMF ¶ 2 & 62; and, Defendants' SMF ¶ 267 & April 2023 Leventhal Affidavit, ¶¶ 66-67 (Defendants' MSJ, Ex. 110).   The fact that Leventhal shuffled the assets and objects among his conduit companies does not alter this reality.   To find otherwise would provide a simple recipe for debtors seeking to avoiding successor liability: form

new entities controlled by the same person who controlled the old entities and divide and transfer component assets and duties of the old business among the new entities. Voila! The new entities do not have a "complete identity" of assets and objects, so successor liability is successfully avoided. Adopting this application and interpretation of the case law would be rife with abuse by clever debtors looking to shed their just, albeit inconvenient, debts and obligations and further run contrary to the State of Georgia's public policy of protecting creditors. *See* O.C.G.A. § 18-2-20 ("The rights of creditors shall be favored by the courts; and every remedy and facility shall be afforded them to detect, defeat, and annul any effort to defraud them of their just rights.").

For these reasons, the analysis does not end after looking only one link up the corporate chain, but after a closer look into the substance of the transactions. "Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir. 1993)(internal quotations and citations omitted). "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [fraudulent conveyance statutes]." *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir. 1995) (citation omitted); *see also Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 212 (3d Cir. 1990).

In this case, it is clear that the collapsed transactions resulted in the same person having control over the same assets and objects before and after the transfers: Leventhal. The undisputed facts on the amount of overlap are overwhelming:

- Leventhal's intention was to rekindle and continue the development started by Liberty Capital and Hampton Island. Plaintiffs' MSJ, Ex. 3, p. 185.

- The ownership structure between Liberty Capital and Fulcrum was the same at all relevant times, with Leventhal ultimately owning 90% of both and his son owning

10% of both.  Plaintiffs' MSJ, Ex. 3 at pp. 201 & 213; Plaintiffs' MSJ, Ex. 49; and, Plaintiffs' MSJ, Ex. 50.

- Management and control was the same as Leventhal controlled all three entities, Liberty Capital, Hampton Island, and Fulcrum.  Plaintiffs' MSJ, Ex. 3,  p. 201; Plaintiffs' MSJ, Ex. 14, p. 46.

- Fulcrum got its income from the same sources as Liberty Capital and Hampton Island did before the foreclosure.  Plaintiffs' MSJ, Ex. 3, pp. 61-62).

- The staff that was used at the in-island club stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, pp. 201-202.

- The equipment being used stayed the same after the foreclosure.  Plaintiffs' MSJ, ¶ Ex. 3, p. 202.

- The club facilities stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

- The back-office staff stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

- The back-office staff performed similar services after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 203.

- The "Hampton Island" branding remained the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 204.

- The facilities for members stayed the same after the foreclosure.   Plaintiffs' MSJ, Ex. 3, p. 204.

- The fees being charged to members stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 205.

- The horses on the farm stayed the same after the foreclosure.  Plaintiffs' MSJ, Ex. 3, p. 202.

- Although it had not borrowed the money from First Citizens Bank (formerly Georgian Bank), Fulcrum signed on to take responsibility for the debt.  Plaintiffs' MSJ, Ex. 3, pp. 126, 131, & 134.

- Fulcrum made payments towards the debt owed to First Citizens Bank, which were credited against the debt incurred by Liberty Capital and Hampton Island.  Plaintiffs' MSJ, Ex. 3, pp. 126, 131, & 134

- Fulcrum ultimately paid off the Senior Debt.  Plaintiffs' MSJ, Ex. 3, p. 193.

- Leventhal hoped the transfer would be to a company he owned.  Plaintiffs' MSJ, Ex. 3, p. 183.

- The transfer to Fulcrum allowed Leventhal to restart the development.  Plaintiffs' MSJ, Ex. 3, p. 179.

- Hampton Island gave Fulcrum the trademark rights to the development because it would benefit Fulcrum.  Plaintiffs' MSJ, Ex. 3, pp. 220-223 & 44.

- Hampton Island transferred the declarant's (developers) rights to Fulcrum. Plaintiffs' MSJ, Ex. 3, p. 179.

- Hampton Island was the owner of the Subject Property prior to the foreclosure. Defendants' Response to Plaintiffs' MSJ, Ex. 1, ¶ 3.  Fulcrum was the owner of the Subject Property following the foreclosure.  *Id*.  Liberty Capital was a lender that lent money to Hampton Island and thereby obtained a security interest in the Subject Property, but never directly owned the Subject Property.  *Id*.

When collapsing these transactions and looking at their true nature, Plaintiffs have established the complete identity of assets and objects required for the second element of the mere continuation or corporate continuity doctrine.

Based on the foregoing, Plaintiffs' motion for summary judgment on Count VI is **GRANTED** and Defendants' motion for summary judgment on Count VI is **DENIED**.

### 3.    Count I (Set Aside Consent Judgment)

Defendants have moved for summary judgment on Count I on the basis that Plaintiffs were not parties to the 2013 Litigation and, therefore, cannot attack the 2014 Consent Judgment as a "collusive" judgment.  *See* Defendants' MSJ, pp. 51-52.  Furthermore Defendants assert the 2013 Litigation was not a sham or collusive lawsuit.  *Id*.  Defendants cite a 2 page Georgia Supreme Court opinion in support of their position.  *See generally Commonwealth United Corp. v. Rothberg*, 221 Ga. 175, 143 S.E.2d 741 (1965).  Plaintiffs have not moved for summary judgment on this count.  The Special Master disagrees with Defendants' arguments and finds the cited case inapplicable to the present matter.

First, as set forth in Section IV.B.1 *supra*, the Special Master finds the 2013 Foreclosure Sale and the 2014 Consent Judgment are subject to avoidance as actual fraudulent transfers under O.C.G.A. § 18-2-74(a)(1). *See* Section IV.B.1 *supra*. O.C.G.A. § 18-2-77(a)(3) expressly preserves a broad range of potential remedies for the attacking creditor:

> (a) In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitations in Code Section 18-2-78, may obtain:
>
> > (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
> >
> > (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
> >
> > (B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
> >
> > (C) *Any other relief the circumstances may require*.

O.C.G.A. § 18-2-77(a)(3)(emphasis added).

The setting aside of the 2014 Consent Judgment is an available remedy under GA UFTA.

Second, "[c]reditors may attack as fraudulent a judgment, conveyance, or any other arrangement interfering with their rights, either at law or in equity." O.C.G.A. § 18-2-21. Plaintiffs have a "viable cause of action at law" for attacking a fraudulent conveyance in addition to the GA UFTA provisions (O.C.G.A. § 18-2-70, *et seq.*):

> It is evident that the Georgia legislature intended UFTA and [OCGA] § 18-2-21 to co-exist. Primarily, the legislature did not repeal [OCGA] § 18-2-21. In addition, UFTA provides that, "[u]nless displaced by the provisions of this article, the principles of law and equity, including ... the law relating to ... fraud ... supplement its provisions." OCGA § 18-2-80. This indicates that the Georgia legislature was cognizant of the role of OCGA § 18-2-21 in relation to the repeal of OCGA § 18-2-22 and the adoption of UFTA.
>
> *In the Matter of: Galbreath*, 475 B.R. 749, 752 (1) (b) (S. D. Ga. 2003). It therefore concluded that "OCGA § 18-2-21 provides a viable cause of action at law for fraudulent conveyance" following the repeal of OCGA § 18-2-22. Id. at 752 (1) (a). This Court has also recognized that in the absence of "any clear indication in the language" of the UFTA, we will not find that it has displaced our former law.

See *RES-GA Hightower, LLC v. Golshani*, 334 Ga. App. 176, 179-180 (1) (a), 778 S.E.2d 805 (2015).

*Interfinancial Midtown, Inc. v. Choate Constr. Co.*, 343 Ga. App. 793, 804-805, 806 S.E.2d 255, 264 (2017).

Therefore, the setting aside of the 2014 Consent Judgment remains a viable remedy separate and apart from the remedies found in GA UFTA.

Third, the Georgia Supreme Court has been clear that a collusive or fraudulent judgments may be attacked "anywhere and everywhere:"

> The apprehended judgments at law will, if collusive, be utterly harmless to these complainants, because, if collusive, the complainants can attack them anywhere and everywhere. A collusive judgment is open to attack whenever and wherever it may come in conflict with the rights or the interest of third persons. Fraud is not a thing that can stand, even when robed in a judgment.

*Smith v. Cuyler*, 78 Ga. 654, 659-60, 3 S.E. 406, 407 (1887).  *See also Williams v. Lancaster*, 113 Ga. 1020, 39 S.E. 471 (1901)("A collateral attack upon a judgment may be made in any court upon the ground of fraud.").

Fourth, Defendants reliance on the *Rothberg* decision is misplaced.  The *Rothberg* decision dealt with a third party seeking to enjoin a pending action to which it was not a party.  *See Rothberg* at 175-176.   This decision is distinguished from the present case where Plaintiffs are challenging a previously-obtained judgment, the 2014 Consent Judgment, as an actual fraudulent transfer. Having found the 2014 Consent Judgment, together with the 2013 Foreclosure Sale, were actual fraudulent transfers, the *Smith* and *Williams* decisions cited above are the controlling authority, not the *Rothberg* decision.

Based on the foregoing, Defendants' motion for summary judgment on Count I is **DENIED**.

## 4.    Count III (Constructive Trust)

Defendants have moved for summary judgment on Count III on the basis that a constructive trust is a remedy, not a cause of action, and, therefore, must be dismissed if the underlying tort

(Count II – Fraudulent/Voidable Transfer) is dismissed.  *See* Defendants' MSJ, pp. 53-54.

Plaintiffs did not move for summary judgment on this count.  The Special Master finds this count

survives since he has ruled in favor of Plaintiffs on Count II and found the presence of actual

fraudulent transfers.  "A constructive trust arises with respect to property the  title to which was

acquired by fraud, or where although acquired originally without fraud, it is against equity that the

title should be retained by the one who holds it."  *Kelly v. Johnston*, 258 Ga. 660, 661(1), 373

S.E.2d 7, 8 (1988).  This remedy survives as an option for returning Plaintiffs to the *status quo*

*ante*.

Based on the foregoing, Defendants' motion for summary judgment on Count III is

**DENIED**.

### 5.       Count VII (Conspiracy)

Defendants have moved for summary judgment on Count VII on the basis that conspiracy

is not an independent cause of action, and, therefore, must be dismissed if the underlying tort

(Count II – Fraudulent/Voidable Transfer) is dismissed.  *See* Defendants' MSJ, p. 54.  Plaintiffs

did not move for summary judgment on this count.  The Special Master finds this count survives

since he has ruled in favor of Plaintiffs on Count II and found the presence of actual fraudulent

transfers.

Based on the foregoing, Defendants' motion for summary judgment on Count VII is

**DENIED**.

### 6.       Count VIII (Punitive Damages)

Defendants have moved for summary judgment on Count VIII on the basis that punitive

damages are not an independent cause of action, and, therefore, must be dismissed if the underlying

tort (Count II – Fraudulent/Voidable Transfer) is dismissed.   *See* Defendants' MSJ, p. 54.

Plaintiffs did not move for summary judgment on this count.  The Special Master finds this count survives since he has ruled in favor of Plaintiffs on Count II and found the presence of actual fraudulent transfers.

Based on the foregoing, Defendants' motion for summary judgment on Count VIII is **DENIED**.

### C.   Plaintiffs' Objection to Inadmissible Evidence and Request to Strike

Plaintiffs object to, and seek to strike, Defendants introduction of any evidence, documentary or testimony, to suggest or establish that Liberty Capital did not own the Liberty/Hampton Note or the Liberty/Hampton Security Deed at the time of the alleged fraudulent transfers because it had previously assigned these documents to Georgian Bank and its successors pursuant to the Assignment Agreement (the "Subject Evidence").  Plaintiffs seek to strike the Subject Evidence based on (1) Georgia law prohibiting the Court from considering evidence that contradicts binding admissions *in judicio*, (2) Defendants' failure to timely and properly amend their prior admissions, (3) and principles of judicial estoppel.

Defendants have countered that Georgia law allows them to amend their answers as a matter of course without leave of court.  Defendants assert Plaintiffs knew about the existence of the Assignment Agreement, which was a matter of public record, was filed with this Court on September 28, 2018, and was used by Plaintiffs as an exhibit during a prior deposition.  Further, Plaintiffs did not object to Defendants' Statement of Material Facts, which also included the Assignment Agreement as an exhibit.  Defendants further dispute that their prior factual admissions ever contradicted the existence of the Assignment Agreement or admitted ownership of the Liberty/Hampton Note and the Liberty/Hampton Security Deed in the context of the 2013

Litigation.  Finally, Defendants argue these general admissions cannot be escalated into legal conclusions that would be binding judicial admissions.

At the same time as filing their responses to Plaintiffs' objection and request to strike, Defendants Liberty Capital, Hampton Island, and Leventhal also filed amendments to their original answers to the 2017 Complaint to "clarify" their prior statements regarding ownership of the Liberty/Hampton Note and Liberty/Hampton Security Deed being "assets" of Liberty Capital and to reference the Assignment Agreement between Liberty Capital and Georgia Bank (now First Citizens Bank).  These amendments were filed after the close of discovery, the close of summary judgment proceedings, and after Plaintiffs' filing of their objection and request to strike.

For the following reasons, the Special Master finds that Defendants are permitted to amend their Answers and introduce the Subject Evidence, although the Court is not bound by any change in the prior admissions and the Court may draw all reasonable inferences from Defendants' prior admissions and Defendants' subsequent amendment to the same.

Although Plaintiffs argue that Defendants may not amend their pleadings without leave of this Court, and cite to (among other cases) *SAKS Assocs., LLC v. Se. Culvert, Inc*., 282 Ga. App. 359, 638 S.E.2d 799 (2006) and *Heath v. Color Imprints USA, Inc*., 329 Ga. App. 605, 765 S.E.2d 751 (2014), the *SAKS* and *Heath* decisions are easily distinguished from the present case.  The *SAKS* decision deals with prior pleadings that are deemed admitted when a party is seeking to introduce new evidence *at trial*.  The *Heath* decision deals with unanswered requests for admissions that are deemed admitted by operation of law under O.C.G.A. § 9-11-36.  Neither *SAKS* nor *Heath* applies to the present issue before the Special Master because this case has not proceeded to trial and Defendants are not seeking to amend unanswered requests for admissions that are deemed admitted under O.C.G.A. § 9-11-36.

O.C.G.A. § 9-11-15(a) governs the present situation and it allows "[a] party [to] amend his pleading as a matter of course and without leave of court at any time before the entry of a pretrial order." O.C.G.A. § 9-11-15(a). In this case, no pretrial order has been entered, so Defendants are free to amend their original answers as a matter of right under O.C.G.A. § 9-11-15(a). *See Harvey v. Merchan*, 311 Ga. 811, 818, 860 S.E.2d 561, 570 (2021)(parties enjoy "considerable freedom in amending the complaint before the entry of a pre-trial order, at which point the plaintiff must seek leave of the trial court to amend the pleading."); *Skylake Prop. Owners Ass'n, Inc. v. Powell*, 281 Ga. App. 715, 720, 637 S.E.2d 5, 55 (2006)(would be abuse of discretion for trial court to deny motion to amend complaint before entry of pretrial order).

Although Defendants are able to amend the admissions in their original answer, "that does not have the effect of wiping such admissions from the record for all purposes." *See Georgia-Pac., LLC v. Fields*, 293 Ga. 499, 502, 748 S.E.2d 407, 411 (2013). Instead, Plaintiffs can use the original admission as evidence of a statement against interest to be considered by the Court on a motion for summary judgment. *Id.* (party should have been permitted to point to withdrawn admissions to contest summary judgment); *Stallings v. Britt*, 204 Ga. 250, 49 S.E.2d 517, 518 (1948) ("[W]hile the party may withdraw them formally from the pleadings, he cannot by a mere withdrawal avoid the effect of the admissions since they may still be used as evidence against him."); O.C.G.A. § 24-8-821 ("Without offering the same in evidence, either party may avail himself or herself of allegations or admissions made in the pleadings of the other.").

Plaintiffs' remaining arguments with respect to the introduction of the Subject Evidence, and specifically, the Assignment Agreement, are equally unavailing. As discussed above, prior admissions made in pleadings are not binding admissions *in judicio* after they are validly withdrawn, and instead become evidence against the withdrawing party as a statement against

interest. *See Georgia-Pac., LLC v. Fields*, 293 Ga. 499, 502, 748 S.E.2d 407, 411 (2013); *Wahnschaff v. Erdman*, 232 Ga. App. 77, 78, 502 S.E.2d 246, 249 (1998).

Additionally, an admission *in judicio* "applies only to the admission of fact and does not apply where the admission is merely the opinion or conclusion of the pleader as to law or fact." *Id*. Defendants rely on the Subject Evidence to argue that (1) they did not own the Liberty/Hampton Note or the Liberty/Hampton Security Deed at the time of the fraudulent transfer and (2) the Liberty/Hampton Note and the Liberty/Hampton Security Deed were encumbered by a valid lien and therefore were not "assets" under GA UFTA. At its heart, the Subject Evidence speaks to the legal effect of the Assignment Agreement and whether the Liberty/Hampton Note and the Liberty/Hampton Security Deed remained Liberty Capital's "assets." These prior admissions are legal conclusions that cannot serve as a binding admissions *in judicio*. *See id*. ("There may be an admission *in judicio* as to the existence of a legal relationship between the parties, but not concerning the effect of such relationship, as this would be a legal conclusion."). As a result, Defendants' prior admissions are not binding admissions *in judicio*, but as discussed above, they become statements against interest that may be used as evidence by Plaintiffs.

Plaintiffs also appear to have been aware of the Assignment Agreement since they introduced it as an exhibit during the April 26, 2023 deposition of Jim Smith and questioned him about it. *See Defendants' Reply in Support of Defendants' Motion for Partial Summary Judgment*, Ex. A. Additionally, Plaintiffs introduced as a summary judgment exhibit a forbearance agreement between Defendants and First Citizens Bank that reaffirmed the existence of the Assignment Agreement after the date of the 2013 Foreclosure Sale. *See* Plaintiffs' MSJ, Ex. 12, Recital A.8. Further, the Assignment Agreement was referenced and discussed in the 2014 Leventhal Affidavit

that was part of the certified record of the 2013 Litigation filed by Defendants' in this case. *See* 2014 Leventhal Affidavit, ¶¶ 8-10 & 12 (Defendants' MSJ, Ex. 110); *see also Defendants' Notice of Filing the Certified Record of Fulton County Action No. 2013CV236057*.

Lastly, Plaintiffs are deemed to have constructive notice of the Assignment Agreement. *See Cummings v. Johnson*, 218 Ga. 559, 560-561, 129 S.E.2d 762, 763 (1963)("A duly filed and recorded deed to secure debt is notice of all the rights which the grantee has thereunder. The record of a security deed is constructive notice to subsequent grantees. Constructive notice is notice to all the world.)(international citations and quotation omitted).

Plaintiffs next argue that principles of judicial estoppel preclude the introduction of the Subject Evidence in this case. Although judicial estoppel depends on the facts and circumstances of each case, the United States Supreme Court has set forth the following "pertinent factors" to the decision to apply judicial estoppel: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to accept the party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *See Fulton Cnty. v. Ward-Poag*, 310 Ga. 289, 293, 849 S.E.2d 465, 472 (2020); *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Judicial estoppel is not appropriate in this case because the Defendants' use of the Subject Evidence is not "clearly inconsistent" with its position in the 2013 Litigation.

In responding to the 2013 Complaint, Liberty Capital answered that the Liberty/Hampton Security Deed grants to Liberty Capital, *inter alia*, (1) ownership over the rents and income of the Subject Property, (2) the right to appoint a receiver to take charge over its collateral, and (3) the right to exercise the power of sale after an event of default. 2013 Complaint, ¶¶ 9, 26, and 30.

None of the foregoing rights are "clearly inconsistent" with Liberty Capital's rights and obligations under the recently-remembered Assignment Agreement, which provide that Liberty Capital may "enjoy the rights of a lender under the Assigned Loan Documents." Assignment Agreement, ¶ 3(a) (Defendants MSJ, Ex. 25). Hampton Island's underlying debt to Liberty Capital was not extinguished by virtue of the Assignment Agreement, and Liberty Capital still had the right to "act as a lender" with such debt pursuant to the license granted by Georgian Bank (now First Citizens Bank) pursuant to the Assignment Agreement. Because Liberty Capital's enforcement of the Liberty/Hampton Security Deed was not clearly inconsistent with its rights and obligations under the Assignment Agreement, judicial estoppel will not be applied to bar the admission of the Subject Evidence.[31]

Accordingly, Defendants Liberty Capital, Hampton Island, and Leventhal are permitted to amend their Answers and Defendants may introduce the Subject Evidence in support of Defendants' MSJ and in response to Plaintiffs' MSJ; *provided that*, the Court may draw all reasonable inferences from Defendants' prior admissions and Defendants' subsequent amendment to the same.

Based on the foregoing, Plaintiffs' Objection to Inadmissible Evidence and Request to Strike is **DENIED**.

### D.    Defendant Leventhal's Expedited Motion to Cancel Lis Pendens

Defendant Leventhal has filed a motion to cancel the *Notice of Lis Pendens* that was filed on January 10, 2018 in Deed Book 1976, Page 905, Liberty County, Georgia official records (the "Lis Pendens"). As relevant background, Defendant Fulcrum had previously filed a motion to

---

[31]  Additionally, the Assignment Agreement was referenced and discussed in the 2014 Leventhal Affidavit that was filed in the 2013 Litigation. *See* 2014 Leventhal Affidavit, ¶¶ 8-10 & 12 (Defendants' Response to Plaintiffs' MSJ, Ex. 2).

cancel the Lis Pendens on February 8, 2018.[32] *See* Fulcrum's Motion to Cancel Lis Pendens. This Court initially granted Fulcrum's Motion to Cancel Lis Pendens, but the Court of Appeals subsequently stayed the effect of this order. *See* Lis Pendens Cancellation Order & Court of Appeals Granting the Emergency Stay Motion. In response, this Court stayed its prior Lis Pendens Cancellation Order "pending final resolution of this dispute and exhaustion of all appellate rights." *See* Order Staying Lis Pendens Cancellation Order entered on September 6, 2018. Defendant Leventhal asserts the Court of Appeal's prior ruling left open challenges to "perceived deficiencies" in the Lis Pendens. Defendant Leventhal asserts there is a deficiency in the Lis Pendens because Plaintiffs' summary judgment briefs make clear that the alleged fraudulent transfer in this case involves the transfer of the Liberty/Hampton Note and the Liberty/Hampton Security Deed and not the transfer of fee simple title to the Subject Property. Consequently, Defendant Leventhal asserts that the *Lis Pendens* is now deficient because it does not "involve" real property as required under O.C.G.A. § 44-14-610.

Plaintiffs have countered that (1) Leventhal is not the owner of the property at issue in this case and therefore lacks standing to challenge the Lis Pendens, (2) the Lis Pendens is entirely proper as the present dispute involves the property at issue in this case, (3) Leventhal's motion is barred by the law of the case, and (4) there have been no changes that would invalidate the law of the case rule or allow reconsideration of the Court of Appeals Order Granting the Emergency Stay Motion. Plaintiffs have requested they be awarded their fees and expenses in responding to Leventhal motion pursuant to O.C.G.A. § 9-15-14.

---

[32] *See* Section II.C at pp. 11-13 *supra* for a listing of the relevant procedural history.

The Special Master concurs with Plaintiffs' response, in part, and finds that Defendant Leventhal's motion to cancel should be denied for the following reasons. First, Defendant Leventhal does not own the Subject Property, which is presently encumbered with the Lis Pendens. Defendant Fulcrum owns the Subject Property. Defendants' Response to Plaintiffs' MSJ, Ex. 1, ¶ 3. Defendant Fulcrum is the proper party to file this motion (like it did back in 2018), but it has not joined in the present motion. *Georgia Home Appraiser, Inc. v. Trintec Portfolio Servs*., LLC, 349 Ga. App. 356, 362–63, 825 S.E.2d 833, 838–39 (Ga. App. 2019) (party seeking relief must demonstrate, among other things, that it has *personally* suffered some actual or threatened injury); *Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 381, 870 S.E.2d 430, 436 (2022)(same). Here, Leventhal has not presented any evidence that he has personally suffered actual or threatened injury. Fulcrum is the party that is potentially suffering any actual or threatened injury and it has not joined in this motion or filed its own motion as it did earlier in the case.

Second, the Lis Pendens remains entirely proper in this case. The purpose of a *lis pendens* is to "notify prospective purchasers that the real property in question is directly involved in a pending suit over title or an interest, *i.e.*, a lien, an equitable interest, fraudulent conveyance, contract right, or other similar interest, which seeks some relief respecting such alleged interest in such realty." *Hutson v. Young*, 255 Ga. App. 169, 170, 564 S.E.2d 780, 782 (2002). Contrary to Defendant Leventhal's argument that the Lis Pendens is no longer proper because it does not "involve" real property, Plaintiffs continue to seek remedies directly involving the Subject Property. Plaintiffs ask this Court in Count III impose a constructive trust over the Subject Property. *See Scroggins v. Edmondson*, 250 Ga. 430, 432, 297 S.E.2d 469, 472 (1982) (*lis pendens* was proper where party sought to impose a trust or lien on property involved in litigation). Plaintiffs also seek to undo the 2013 Foreclosure Sale of the Subject Property (*i.e.*, cancelling the

Deed Under Power), restoring title to the Subject Property in Hampton Island, and reimposing Liberty Capital's security title and lien on the Subject Property, which is a "classic example" of pending litigation that involves the underlying real estate. *Moore v. Bank of Fitzgerald*, 266 Ga. 190, 191, 465 S.E.2d 445, 446 (1996) (canceling deed under power of sale a "classic example" of suit in which real property is involved in litigation). Moreover, the Special Master has granted Plaintiffs' MSJ on Count II (Fraudulent/Voidable Transfer), which means the Special Master may enter one of several remedies that all involve the Subject Property. *See* O.C.G.A. § 18-2-77 ("(1) Avoidance of the transfer . . . (2) An attachment or other provisional remedy against the asset transferred *or other property of the transferee* . . . (3)(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred *or other property of the transferee*; (B) Appointment of a receiver to take charge of the asset transferred or of *other property of the transferee*; or (C) *Any other relief the circumstances may require*.")(emphasis added). Any potential purchaser of, or potential real estate lender seeking to take a lien in, the Subject Property, would have a significant interest in knowing whether the Subject Property was the subject of a lawsuit that could impose one or more of these remedies. The purpose of a *lis pendens* is to provide precisely this type of notice.

Third, to the extent Defendant Leventhal is seeking relief from this Court's prior Order Staying Lis Pendens Cancellation Order, he has not asserted sufficient changed circumstances or just cause that would warrant a setting aside or modification of this order under O.C.G.A. § 9-11-60(h).[33] The Court of Appeals Order Overruling the Dismissal Order made express reference to the "security interest in the real property" as a potential "asset" under GA UFTA. *See Lyle, et al.*

---

[33] Defendant Leventhal's motion to cancel does not expressly reference whether it is seeking relief from this Court's prior order, but the Special Master has interpreted the motion as seeking this relief since this Court is without jurisdiction to modify an order of the Court of Appeals.

*v. Fulcrum Loan Holdings, LLC, et al.*, 358 Ga. App. 742, 746, 841 S.E.2d 182, 188 (2020)("We are also unpersuaded by their [Defendants'] argument that Liberty's security interest in the real property, as described in the complaint allegations, is excluded from the statute's definition of 'asset.'")(emphasis added).  The Court of Appeals' own language makes clear it was well-aware that Plaintiffs were challenging the transfer of a "security interest in the real estate" in this action. Defendant Leventhal has not provided sufficient justification for this Court to modify or set aside its prior Order Staying Lis Pendens Cancellation Order, which states: "Therefore, consistent with the directive from the Court of Appeals, it is hereby ORDERED that the Cancelation Order is STAYED *pending the final resolution of this dispute and the exhaustion of all appellate rights*." Order Staying Lis Pendens Cancellation Order, pp. 1-2.  As this dispute remains ongoing and appellate rights have not been exhausted, the Order Staying Lis Pendens Cancellation Order shall remain in place.

Based on the foregoing, Defendant Leventhal's Expedited Motion to Cancel Lis Pendens is **DENIED.**  The Special Master denies Plaintiffs' counsel's request for their fees and expenses under O.C.G.A. § 9-15-14.

V. **Conclusion**

Based on the foregoing findings of fact and conclusions of law, the Special Master **RECOMMENDS** as follows:

A.     Plaintiffs' MSJ is **GRANTED** on Count II (Fraudulent/Voidable Transfer) and Count VI (Continuation/Successor/Partnership/Joint Venture Liability).  Plaintiffs' Judgment against Liberty Capital in the amount of 3,286,048.61 (*i.e.*, Plaintiffs' Judgment), together with accrued and accruing post-judgment interest thereon and any other amounts awarded at trial in this action, shall attach to Fulcrum and its assets, including without limitation, the Subject Property.

B.     Defendants' MSJ is **DENIED** on Count I (Set Aside Consent Judgment), Count II (Fraudulent/Voidable Transfer), Count III (Constructive Trust), Count VI (Continuation/Successor/Partnership/Joint Venture Liability), Count VII (Conspiracy), and Count VIII (Punitive Damages).

C.     Count I (Set Aside Consent Judgment), Count III (Constructive Trust), Count IV (Piercing the Corporate Veil), Count V (Bad Faith), Count VII (Conspiracy), and Count VIII (Punitive Damages) will proceed to trial.

D.     Plaintiffs' Objection to Inadmissible Evidence and Request to Strike is **DENIED**. Defendants Liberty Capital, Hampton Island, and Leventhal are permitted to amend their Answers and Defendants may introduce the Subject Evidence in support of Defendants' MSJ and in response to Plaintiffs' MSJ; *provided that*, the Court may draw all reasonable inferences from Defendants' prior admissions and Defendants' subsequent amendment to the same. Plaintiffs' request for their fees and expenses under O.C.G.A. § 9-15-14 is also **DENIED**.

E.     Defendants' Motion to Cancel Lis Pendens is **DENIED**. Plaintiffs' request for their fees and expenses under O.C.G.A. § 9-15-14 is also **DENIED**.

So ORDERED this 6th day of May, 2024.

ERICH N. DURLACHER
Court-Appointed Special Master

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| WAYNE LYLE and CHARLES CARY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. |
| LIBERTY CAPITAL, LLC, HAMPTON | ) | |
| ISLAND, LLC, FULCRUM LOAN HOLDINGS, | ) | 2017CV295620 |
| LLC, and RONALD S. LEVENTHAL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this **6ᵗ** of May, 2024 served a true and correct copy of the

foregoing ***REPORT AND RECOMMENDATION ON (I) PARTIES' CROSS-MOTIONS FOR***

***PARTIAL SUMMARY JUDGMENT, (II)  PLAINTIFFS' OBJECTION TO INADMISSIBLE***

***EVIDENCE AND REQUEST TO STRIKE, AND (III) DEFENDANT LEVENTHAL'S***

***EXPEDITED MOTION TO CANCEL LIS PENDENS*** by email and Odyssey e-file GA

electronic mail to the following counsel of record and parties:

Steven G. Hall
Baker, Donelson, Bearman,
Caldwell & Berkowitz, PC
Monarch Plaza, Suite 1500
3414 Peachtree Road, N.E.
Atlanta, Georgia  30326
shall@bakerdonelson.com

F. Beaumont Howard
Fox Rothschild LLP
999 Peachtree Street NE
Suite 1500
Atlanta, Georgia  30309
fbhoward@foxrothschild.com

Ronald S. Leventhal, *pro se*
One Midtown Plaza
Suite 750
1360 Peachtree Street, NE
Atlanta, Georgia  30309
rsl@tivoli-properties.com

Erich N. Durlacher
Court-Appointed Special Master

107