

**IT IS ORDERED as set forth below:**

**Date: October 31, 2025**

_____

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NUMBER: 24-56114-PWB (JOINTLY ADMINISTERED) |
| FULCRUM LOAN HOLDINGS, LLC, *et al.,* | CHAPTER 11 |
| Debtors. . | JUDGE BONAPFEL |

**Order Denying Motions of Ronald Leventhal**
**for Reconsideration and Stay of Confirmation Order**

Bay Point Capital Partners II, LP ("Bay Point"), the holder of a claim secured by

cross-collateralized deeds to secure debt on the real properties (as well as other collateral)

of the five affiliated debtors (the "Debtors") in their jointly administered cases, filed

separate plans for their liquidation.

Ronald Leventhal[1] controls all the affiliates, has guaranteed a portion of the Bay Point debt, and asserts that he is "the single largest individual through entities with assets at risk exceeding the principal of the loans provided by Bay Point." [2]  The Court entered an order [293] (the "Confirmation Order") that confirmed the plans over Mr. Leventhal's objections [246].[3]  Mr. Leventhal has moved for reconsideration[4] of the Confirmation Order and for its stay pending appeal.[5]

For reasons set forth herein, the Court denies the motions.

## I.  Background

Each plan provides for the sale of the real properties of the Debtors.  The properties of the Debtors are parcels of real property on Hampton Island, Georgia, that are part of the Hampton Island Preserve subdivision, a residential, resort development on the coast of Georgia.  Other nondebtor affiliates and unrelated third parties own other parcels, and Bay Point owns, or holds security deeds, on other parcels.

In the case of Fulcrum Loan Holdings, LLC ("Fulcrum"), the plan (the "Fulcrum Plan") provides for the sale of Fulcrum's real estate (the "Fulcrum Property") free and clear of all interests and attachment of those interests to the proceeds of the sales pending

---

[1] Mr. Leventhal, in his individual capacity and not as a representative of the Debtors, is proceeding *pro se.*
[2] Reconsideration Motion (*infra* note 4), at 4, n.1.
[3] The Debtors also objected to confirmation [249] but have not moved for reconsideration or a stay pending appeal.
[4] Amended and Restated Motion for Reconsideration and/or to Stay Pending Appeal [308] (the "Reconsideration Motion.")  Although styled a motion for reconsideration, the Reconsideration Motion under the terminology of the Federal Rules of Bankruptcy Procedure is a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), *applicable under* Fed. R. Bankr. P. 9023, and a motion to amend its findings of fact (or make additional findings) under Fed. R. Civ. P. 52(b), *applicable under* Fed. R. Bankr. P. 7052, which applies in this contested matter under Fed. R. Bankr. P. 9014(c).  The Reconsideration Motion supersedes an earlier-filed motion [307], which the Court disregards.
[5] Motion for Stay Pending Appeal of Confirmation Order [306] (the "Stay Motion").  Mr. Leventhal has not filed a notice of appeal, but a party may seek a stay of an order or judgment before filing a notice of appeal. Fed. R. Bankr. P. 8007(a)(2).

Document      Page 3 of 29

final judicial determination of the validity and priorities of the interests and distribution of the proceeds in accordance with that determination.

In addition to Bay Point's interests, the interests in Fulcrum's real estate (the "Fulcrum Property") that will attach to the sales proceeds are the interests of Wayne Lyle and Charles Cary (the "Plaintiffs").   The Plaintiffs filed a *lis pendens* notice on the Fulcrum Property in January 2018 that references litigation pending in the Superior Court of Fulton County since 2017 in which they contend that Fulcrum acquired it through a fraudulent foreclosure sale and collusive consent judgment that should be set aside to restore ownership of it to its pre-foreclosure owner, Hampton Island, LLC ("Hampton"), an affiliate of the Debtors, subject to the security deed of the foreclosing lender, Liberty Capital LLC ("Liberty"), another affiliate.  If they obtain this relief, they contend that they can enforce their claims against Liberty against the Fulcrum Property and that their claims have priority over Bay Point's security deed that Fulcrum executed after the filing of the *lis pendens.*

The Plaintiffs objected to confirmation of the Fulcrum Plan and moved for reconsideration and a stay pending appeal.  The Court is simultaneously entering an Order denying the Plaintiffs' motion (the "Plaintiffs' Reconsideration and Stay Order"). That Order has further details concerning the Plaintiffs' underlying claims and their objections to confirmation.[6]

---

[6] The primary objections of the Plaintiffs to confirmation of the Fulcrum Plan are:  (1) for several reasons, the Fulcrum plan impermissibly provides for the sale of Fulcrum's property free and clear of their interests and their claim that Fulcrum has no interest in the property because Fulcrum acquired it through a fraudulent transfer; (2) the attachment of their interests to the proceeds deprives them of their property rights; and (3) the plan impermissibly provides for the subordination of their claims for punitive damages against nondebtor parties that they can collect from the property in which Fulcrum has no ownership

In the cases of the four other affiliates other than Fulcrum,[7] each plan similarly provides for the free and clear sale of each debtor's property and attachment of liens to the proceeds, but they permit Bay Point to credit bid.  The Plaintiffs do not have an interest in the properties of these affiliates.

The plans contemplate the simultaneous sale of all the properties through an auction process concluding on November 14, 2025, about six weeks after entry of the Confirmation Order and less than three weeks after the hearing on motions for reconsideration and a stay.

The plans provide for a release of affirmative claims of the Debtors against Bay Point but permit the use of any claims defensively as an offset against the debt owed to Bay Point.

## II.  Contentions of Mr. Leventhal

Mr. Leventhal contends that the sale of the Debtors' real estate under the plans will not result in orderly marketing to realize true market values.  He correctly points out that it has been impossible to market and sell the Fulcrum Property (which is the primary part) at all because it is subject to a *lis pendens* filed by the Plaintiffs that asserts their interests in it and, indeed, the claim that Fulcrum does not own it.  (Reconsideration Motion at 5, 8, 10, 12, 13, 14, 17).  He notes that the amount of Bay Point's claim is in dispute, thereby chilling alternative prospects for refinancing or a joint venture because the amount owed to Bay Point is unknown.  (*Id.* at 8, 9, 13, 16).

---

interest.  For reasons explained in the Plaintiffs' Reconsideration and Stay Order, the Court found no merit in any of them and no likelihood that they would prevail on appeal.
[7] Fulcrum Tale LLC, Strategic Retreat Holdings, LLC, HIP II, LLC, and Jarbai, LLC.

These complexities, he states, "literally destroy the marketability of the real property to be either refinanced, joint ventured, or liquidated." (Stay Motion at 4). Before the Court can authorize the sale, he concludes, the Court must first determine the Plaintiffs' interests in the Fulcrum Property and the amount of Bay Point's claim. (Reconsideration Motion, *passim*). The dispute over the amount of Bay Point's debt, he adds, makes impermissible its ability to credit-bid at the sale. (Reconsideration Motion 9, 13).

Mr. Leventhal also contends that the plans provide for a "short, artificially imposed, sale process" that does not allow time for "the approved marketing firm of Sotheby's International to procure a purchaser, which could become an investor or joint venture partner or outright buyer of all the property at a fair market price." (Reconsideration Motion at 10). He asserts that the properties should not be sold earlier than 60 days after effective marketing becomes possible upon resolution of the Plaintiffs' interests and the amount of the Bay Point claim. (Reconsideration Motion at 17).

Procedurally, Mr. Leventhal contends that the Court must determine the Plaintiffs' interests in the Fulcrum Property and Fulcrum's ownership of it in an adversary proceeding before confirmation of a plan for its sale. (Stay Motion at 5-6,  8, 10-15). The failure to do so, he contends, denies due process to the Plaintiffs and to the Debtors. This position, he states, is the primary legal issue that the Reconsideration Motion raises and that is likely to succeed on appeal. (Stay Motion at 8).

A contention running through all of Mr. Leventhal's objections is that Bay Point, through its plans, is misusing the bankruptcy process to pursue its prepetition and

postpetition plan to own the properties.  (Reconsideration Motion at 4, 6, 17, 18, 19).  Mr. Leventhal asserts that the Debtors have claims against Bay Point based on its misconduct in pursuing that objective in violation of Bay Point's duties of good faith and fair dealing. (*Id.* at 6-7, 11-12).  He concludes that the plans improperly release these claims (*Id.* at 13), that Bay Point has "unclean hands" (*Id.* at 11), and that it did not propose the plans in good faith.  (*Id.* at 18).

Because the plans do not provide for appropriate marketing of the properties and release claims against Bay Point, Mr. Leventhal asserts that the plans are not feasible. (Reconsideration Motion at 17).

The plans provide for the appointment of a Plan Administrator, selected by Bay Point and identified in the plans, to take charge of the Debtors and, specifically, to manage the marketing of the properties and conduct their sale.  Mr. Leventhal asserts that the plans do not impose a proper level of fiduciary duty on the Plan Administrator. (Reconsideration Motion at 11, 14).

Finally, Mr. Leventhal contends that the plans unfairly discriminate (Reconsideration Motion at 19) and are not fair and equitable.  (*Id.* at 9).

### III.  Discussion

A key component of the plans and their objective is the free and clear sale of the Debtors' properties pursuant to 11 U.S.C. § 363(f).  The Court assumes familiarity with the fundamental principles that govern free and clear sales in bankruptcy cases and with the application of them in these cases.[8]

---

[8] The Court discusses them in Part II of the Plaintiffs' Reconsideration and Stay Order.

Three points are important here.

First, the free and sale provisions in the plans mean that a purchaser will take good title, free and clear of Bay Point's security deeds and the Plaintiffs' interests and claims identified in the underlying litigation of which the *lis pendens* gives notice. Even if the Plaintiffs eventually succeed in their contention that Fulcrum does not own the property, that determination will not affect the title of the purchaser.

Second, the interests of Fulcrum, Bay Point and the Plaintiffs (and anyone else who claims an interest in any of the properties) will attach to the proceeds of the sales, which will be distributed to them in accordance with later final judicial determinations of their interests.

Third, the plans, and the free and clear sale and attachment of proceeds for which they provide, do not make any determination of the nature, extent, validity, priority, or anything else about those interests. As such, the plans do not affect a single right of the Debtors, Bay Point, or the Plaintiffs in any of the properties other than: (1) in the case of the Debtors, the ability to control the sales or otherwise deal with the properties – which they lost when they filed their chapter 11 cases; (2) in the case of the Plaintiffs, the ability to prevent any productive use of the Fulcrum Property through sale or refinancing; and (3) in the case of Bay Point, the ability to foreclose, which is of questionable benefit since a foreclosure on the Fulcrum Property would be subject to the *lis pendens* and the simultaneous marketing and sale of all of the Debtors' properties is likely to maximize their value.

With these points in mind, the Court explains the legal principles that require the Court to reject Mr. Leventhal's arguments and deny his motions.

**A.  An Adversary Proceeding to Determine Fulcrum's Interest in the Fulcrum Property Before Confirmation and a Free and Clear Sale Is Not Necessary**

Rule 7001 of the Federal Rules of Bankruptcy Procedure identifies ten types of "proceedings" that are "adversary proceedings."  The only one potentially applicable here is Bankruptcy Rule 7001(b), which is "a proceeding to determine the validity, priority, or extent of a lien or other interest in property – except a proceeding under Rule 3012 or Rule 4003(d)."  The two exceptions – one for determining the amount of a secured or priority claim on a party's request (Bankruptcy Rule 3012) and the other for avoiding liens on exempt property in an individual case (Bankruptcy Rule 4003(d)) – have no application here.

The Confirmation Order does not determine the validity, priority, or extent of any lien or other interest in the Fulcrum Property.  They all attach to the proceeds of the sales for later final judicial determination.

Nevertheless, the Plaintiffs in their objections to confirmation assert that the Fulcrum Property cannot be sold free and clear under § 363(f) in view of their contention that the true owner of the Fulcrum Property is Hampton.  Their argument is that, absent a determination that Fulcrum, not Hampton (as they allege), is the owner of the Fulcrum Property. Fulcrum has nothing to sell.  Agreeing with this proposition, Mr. Leventhal contends that determination of Fulcrum's ownership interest requires an adversary proceeding under Bankruptcy Rule 7001.

The Court in the Plaintiffs' Reconsideration and Stay Order explains why the Plaintiffs are wrong on this issue.  The controlling question under § 363(f) for purposes of confirmation under elementary bankruptcy law is whether the Fulcrum Property is *property of Fulcrum's estate,* not whether Fulcrum fraudulently acquired it and, therefore, does not actually own it.

The answer is that the Fulcrum Property is indisputably property of Fulcrum's estate. Under 11 U.S.C. § 541(a)(1), property of the estate includes, with exceptions not applicable here, "all legal or equitable interests of the debtor in property as of the commencement of the case."  Upon the filing of Fulcrum's chapter 11 petition that commenced this case, Fulcrum held title of record to the Fulcrum Property.  *No one disputes this fact.*  As the undisputed holder of record title to the Fulcrum Property, Fulcrum as a matter of indisputable law has a "legal or equitable interest" in it.     It follows that the Fulcrum Property is indisputably property of the estate.  Whether Fulcrum's legal title survives the Plaintiffs' contention that Fulcrum has no interest because Fulcrum acquired the Fulcrum Property fraudulently is an issue for later proceedings.

Because the Confirmation Order does not determine the validity, priority, or extent of any lien or interest in the Fulcrum Property and it is indisputably property of Fulcrum's estate, no issue material to confirmation requires an adversary proceeding under Bankruptcy Rule 7001.

Even if an adversary proceeding on the property of the estate issue were necessary, the requirement of an adversary proceeding can be waived.  It is not

jurisdictional. And the absence of an adversary proceeding when a final judgment occurs

without one does not invalidate the judgment or offend due process rights if affected

parties had notice and an opportunity to be heard.[9]  All parties in this case had notice of

the plans and the confirmation hearings and the opportunity to be heard.  *No one* raised

the issue that the Bankruptcy Rules require an adversary proceeding to determine the

property of the estate issue or any other confirmation issue.

No procedural defect based on the lack of an adversary proceeding exists.

**B.  The Free and Clear Sale of the Fulcrum Property Resolves Problems of Clear Title Such That Determination of Interests In It Prior to Confirmation Is Not Necessary**

The existence of the *lis pendens* and the claims of the Plaintiffs in the underlying

litigation have, as Mr. Leventhal points out, frustrated efforts to sell or refinance the

Fulcrum Property or attract investors to provide capital for its reorganization.

Confirmation of the Fulcrum Plan removes this impediment in the case of a sale.

The sale will be free and clear of the claims that the Plaintiffs assert regarding ownership

of the Fulcrum Property, and the purchaser will take title to it free and clear of any claims

or interests they have in it.  Pursuant to 11 U.S.C. § 1142(b), the Plaintiffs must cancel

their *lis pendens* of record so that it does not create a cloud on the title.

For the same reasons, confirmation makes it unnecessary to resolve Bay Point's

claim prior to confirmation.  Bay Point's claim is eliminated from all the properties and

attached to the sales proceeds.

---

[9] *E.g.,* United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260 (2010).

If anyone doubts whether a purchaser will acquire good title free and clear of any claims of Bay Point, the Plaintiffs, or anyone else, the Court notes that the plans provide for the Court to retain jurisdiction after confirmation as necessary to implement the plan and entertain requests for appropriate orders that are necessary to establish that encumbrances will not cloud a purchaser's title.

Because the interests of Bay Point in all the properties and the Plaintiffs' interests in the Fulcrum Property are eliminated and transferred to the sales proceeds, it is not necessary to resolve their interests before confirmation of the plans or the free and clear sales for which they provide.

Unfortunately for Mr. Leventhal, confirmation does not remove impediments to refinancing the Fulcrum Property or obtaining new capital for the reorganization of Fulcrum.  (A new joint venture or partnership with Fulcrum as a participant could, of course, purchase it.)  And it does not appear that the Bankruptcy Code has a way to remove the impediments as necessary for such alternatives.

It is far from clear that the Bankruptcy Code permits removal of liens from property that is being refinanced and attachment of the proceeds to the refinancing.  It is doubtful that the Bankruptcy Code permits removal of liens that a debtor proposes to retain in a reorganization involving new capital.  Even if either of those is possible, the removal of liens from the Fulcrum Property and attachment of them to the proceeds would require proceeds that are at least equal to the sum of the claim of Bay Point, which is disputed, and the claims of the Plaintiffs, which are disputed *and* unliquidated.

11

Mr. Leventhal is correct that determinations of the claims of Bay Point and the
Plaintiffs are necessary before Fulcrum, under his management, could propose to solve
the Debtors' problems through refinancing or reorganization with new capital.

The problem is that the claims of Bay Point and the Plaintiffs are not going to be
resolved by a trial court in the near future. Appeals, which appear inevitable given the
confident predictions of all sides that they will prevail, will extend the time even longer.

Section § 502(c) permits estimation of a claim "for purposes of allowance" but it
is of limited utility here. 11 U.S.C. § 502(c). First, any estimation is likewise likely to be
appealed. Second, the Court is uncertain whether estimation is permissible for purposes
of attaching an interest in property to the proceeds of its sale. Third, it is highly
questionable that attachment of an interest in property in proceeds from a sale, much less
from refinancing or new capital, can be based on an estimation that limits the amount of a
disputed or unliquidated claim.

The hard fact of life in chapter 11 cases is that the time for the proposal of
alternative solutions to a debtor's problems is not unlimited. The hard fact of life in these
cases is that the time has run out. Fulcrum and the Hampton Island Preserve project of
which it is an integral part have been in a distressed financial situation for years. The
situation has not gotten better in the 17 months the Debtors have been in chapter 11
cases. Litigation over the proceeds and the amount of Bay Point's claim may eventually
determine who is justly responsible for that.

But today's problem is what to do with the property of the Debtors in the current
situation, and it must be solved now. It is not appropriate to permit the continued

12

management and operation of Hampton Island Preserve without financially stable ownership and management, and the Court will not permit it.

The only bankruptcy solution to the problems of these Debtors is the sale of their properties.  The alternative is dismissal of their cases to let Bay Point, the Plaintiffs, and the Debtors deal with the problems through exercise of their remedies under Georgia law and in the Georgia courts.  Although the nonbankruptcy alternative seems to be the preference of the Plaintiffs, the Court sees that alternative as unattractive and wasteful for everyone else.

In these circumstances, the luxury of months or years of litigation to adjudicate the rights and interests of Bay Point and the Plaintiffs does not exist.  The Court will not permit continuation of the project without stable financial management and ownership for the time it will take to accomplish that.

In short, it is not necessary to litigate the rights and interests of Bay Point and the Plaintiffs before the free and clear sale of the properties, and the circumstances here provide no basis for deferring the resolution of these cases to pursue potential alternatives that are possible only after final determination of those disputes.

**C.  The Procedures for the Sale of Property, Including the November 14 Auction Date, and the Plan Administrator's Management of the Debtors After Confirmation Reflect Reasonable Business Judgment**

The confirmed plans provide for the auction sale of the Debtors' properties to occur on November 14, about six weeks after confirmation and less than three weeks after the hearing on the motions for reconsideration and stays pending appeal.  Mr.

Leventhal contends that the time is too short to permit proper marketing of the properties necessary to maximize their value.

He also objects to provisions of the plans that put a Plan Administrator in charge of the Debtors, limit the Plan Administrator's fiduciary duties, and do not provide for notice to Mr. Leventhal of certain matters.

As an initial matter, the Court observes that the Debtors could have proposed their own plans (or filed a motion for § 363(f) sales) for liquidation of their assets that contained a schedule for sales that Mr. Leventhal prefers and the retention of Mr. Leventhal as the manager for the Debtors (or the appointment of a Plan Administrator chosen by the Debtors with a description of duties more to his liking). If the Debtors' plans were confirmable (and plans that mirrored Bay Point's except for matters such as these presumably could have been confirmable if at least one impaired class of claims accepted them), the Court would then have to decide which plan to confirm, "considering the preferences of creditors and equity security holders." 11 U.S.C. § 1129(c).

The timing of the sale was a contested issue at the confirmation hearing. Bay Point originally proposed an earlier date; the Debtors and Mr. Leventhal wanted a later date. The Court received expert testimony that ordinary marketing of the properties would take a year.

The Court explained that the timing of a sale is a business question and observed that courts ordinarily defer to the trustee's business judgment on such issues, which in a chapter 11 case is the business judgment of the debtor in possession. The Court indicated, however, that a different standard is necessary in the context of business issues

14

in a plan that the debtor in possession does not propose.  After colloquy, the Court

concluded that the sale of property must occur in a reasonable way and that Bay Point's

proposed auction date was not reasonable.[10]

　　After a recess for the parties to discuss the issue among themselves, the parties

reported that they had resolved this particular issue and that, if the Court confirmed the

plans, the auction would occur on November 14.  Specifically, Bay Point, the Debtors,

the Plaintiffs, *and Mr. Leventhal* agreed.[11]

　　The foregoing has two consequences.  First, the Court deems Mr. Leventhal's

agreement to be a waiver or withdrawal of any objection to confirmation based on the

date of the proposed sale.  Second, the Court accepts the selection of the November 14

date as reflecting the appropriate business judgment of Bay Point, the Debtors, the

Plaintiffs, and Mr. Leventhal, who agreed on it.[12]

　　The Plan Administrator is a financial consultant previously engaged by the

Debtors at the recommendation of Bay Point.  No one at the confirmation hearing

objected to his service as the Plan Administrator.  The provisions in the plans that

describe his duties, powers, and authorities are appropriate, reflect reasonable business

judgment in the circumstances, and do not improperly limit his fiduciary duties.

## D.  The Release of Bay Point From Liability to the Debtors That Permits the Use of Such Claims to Reduce Bay Point's Debt Is Permissible

　　The plans provide for the release of Bay Point from affirmative recovery by the

Debtors on any claims that they have against Bay Point. They do not, however, preclude

---

[10] Transcript of September 15, 2025 Hearing at 54-61 [Doc. 286].
[11] Transcript of September 15, 2025 Hearing at 66:11-69:16 [Doc. 286].
[12] The parties' agreement to resolve this issue did not waive or impair any other objections to confirmation.

15

the use of such claims by way of offset to reduce the liabilities of the Debtors to Bay Point.  In other words, the releases do not extinguish the claims, but they preclude the Debtors from recovering a money judgment against Bay Point on them.

Bay Point is providing financing to the Debtors to pay administrative expense claims, such as the Debtors' attorney's fees, and to finance the Debtors' activities, including the marketing and sale of the properties, after confirmation.  Lenders who provide postpetition financing in chapter 11 cases typically insist on releases of claims because they do not want to finance litigation against themselves and do not want to lend money to a borrower who is going to sue them.

The situation is different here.  In the usual situation, the *debtor* is voluntarily giving the release, whereas here the Debtors *involuntarily* lose their claims.  The distinction makes it inappropriate – as a matter of objectively reasonable business judgment and as a matter of fairness to creditors and holders of equity securities in the Debtors – to eliminate totally any value that the claims may have.

At the same time, the interests of a lender who is financing the case with new money are entitled to some protection.  As the Court announced at the confirmation hearing, a proper balancing of those interests under the circumstances here permits the plans to remove the prospect of Bay Point's liability for a money judgment on the claims while preserving the value of those claims up to the amount of the debt by allowing them to reduce the debt.   Moreover, it is appropriate for the plans to provide that the lender is not responsible for paying the attorney's fees or other expenses of litigating such claim.

16

Particularly in the absence of any contrary authority from Mr. Leventhal, the

Court finds no reason to change its conclusion.

**E.  The Provisions for Credit Bidding By Bay Point Are Appropriate**

All the plans except Fulcrum's permit Bay Point to request estimation of its

disputed claim for purposes of credit bidding.[13]  Credit bidding in bankruptcy sales is

available as a matter of right if a creditor has a lien on the property to secure an *allowed*

secured claim,[14] but Bay Point does not have an allowed claim because of objections to

it.[15]  Section 502(c), however, permits estimation of a contingent or unliquidated claim if

the "fixing or liquidation" of the claim would "unduly delay the administration of the

case."  11 U.S.C. § 502(c).

Bay Point has filed a motion for the estimation of its claim for purposes of credit

bidding, which the Court will hear prior to the auction sale.  [315].

Mr. Leventhal asserts that Bay Point's credit bidding is inconsistent with

attachment of liens to the proceeds of the sale and later determination of disputes.

(Reconsideration Motion at 13-14).  Mr. Leventhal also contends that permitting Bay

Point to credit bid chills the bidding at the auction sale and gives it "substantially an

unrestricted ability to skew the bidding" among the assets of the various Debtors (other

than Fulcrum).  (Reconsideration Motion at 9-10, 13).

---

[13] Credit bidding for the Fulcrum Property is not workable because of the Plaintiffs' contentions, disputed by Bay Point and Fulcrum, that Fulcrum has no valid interest in it and that the Plaintiffs in any event have priority over Bay Point.
[14] 11 U.S.C. § 363(k).
[15] 11 U.S.C. § 502(a).

In many circumstances, it is not appropriate for a creditor with a disputed claim to have the right to credit bid because, if the creditor is the successful bidder, no cash exists for disbursement to the estate if the claim is disallowed. Indeed, this is why § 363(k) restricts credit bidding to the holder of an *allowed* claim.

But those circumstances do not exist here. At the hearing on the Reconsideration Motion, Bay Point asserted that its claim is now around $39 million. Mr. Leventhal stated his position that the proper amount of the claim is in the range of $26 to $28 million. Bay Point thus has an undisputed claim of at least $26 million. Perhaps the claim is subject to reduction based on Fulcrum's claims against Bay Point for violation of its duties of good faith and fair dealing, but nothing in the record indicates what the amount of those claims would be.

Proper application of the Bankruptcy Code's credit bidding rules requires that a partial dispute over the amount of a claim not completely eliminate a creditor's credit bidding rights. The proper remedy is to allow the creditor to credit bid to the extent that its claim is not subject to a bona fide dispute, estimated as § 502(c) contemplates. Here, the amount of the estimated claim is for later determination.

In these cases, to the extent that Bay Point's credit bids based on an estimation of its claim is more than the amount of its claim as finally allowed, Bay Point must return the excess. No one suggests that Bay Point will not be capable of doing so.

The Bankruptcy Code recognizes credit bidding rights as part of its provisions in § 363(f) for free and clear sales. Perhaps, as Mr. Leventhal suggests, the existence of

18

credit bidding to some extent may have a chilling effect.  Nevertheless, such speculation does not provide a basis for eliminating credit bidding rights.

The credit bidding provisions in the plans are appropriate and permissible.

**F.  Bay Point Proposed The Plans in Good Faith, They Do Not Discriminate Unfairly, and They Are Fair and Equitable**

Mr. Leventhal throughout the Reconsideration Motion complains that Bay Point has engaged in conduct that establishes claims against it for breach of its duties of good faith and fair dealing (Reconsideration Motion at 6-7, 11-12) and that Bay Point, through the plans, is misusing the bankruptcy process to pursue its prepetition and postpetition objective to own the properties. (*Id.* at 4, 6, 17, 18, 19).  Similarly, Mr. Leventhal contends that the plans favor "Bay Point Capital and nobody else" and that they are "designed for [Bay Point] to become the owner."  (*Id.* at 19).  He asserts that the plans are "not designed to protect the interests of creditors, and investors/equity" and that they leave him, "as a guarantor, substantially exposed."  (*Id.* at 9).

Based on these contentions, Mr. Leventhal contends that Bay Point has "unclean hands" (*Id.* at 11), that Bay Point did not propose the plans in good faith (*Id.* at 18), that the plans discriminate unfairly (*Id.* at 19), and that the plans are not "fair and equitable." (*Id.* at 9).

The question before this Court is whether to confirm the plans that Bay Point filed to address the financial problems of the Debtors.  The questions are not whether Bay Point caused the problems, is somehow responsible for them, or is liable for damages that could reduce its claim.  And in the context of these cases, the question is not whether the

plans *may* permit Bay Point to accomplish the acquisition of the properties if that has been its objective.

Rather, the question is whether the plans comply with the confirmation requirements of § 1129.   The only requirements that possibly apply to Mr. Leventhal's positions are the good faith requirement in § 1129(a)(3), the unfair discrimination requirement in § 1129(b)(1), and the fair and equitable requirement in § 1129(b)(1).

With regard to good faith, the issue is whether – regardless of history – the plans provide for a reasonable solution to the problems these cases present.  The good faith requirement focuses on the *process* for proposing and seeking confirmation of a plan.[16] The Court in the circumstances of this case finds no evidence that Bay Point did anything improper in connection with the filing of the plans, the preparation of the disclosure statement, or the prosecution of the plans.  The Court finds nothing in the plans that provide an unfair advantage to Bay Point.

Further, the circumstances of this case make it clear that the sale of the properties of the Debtors free and clear is the only realistically available bankruptcy alternative. Mr. Leventhal would prefer a different process, and it is possible that a different process might produce a better result.  But an auction sale is a reasonable solution, and the parties at the hearing collectively made reasonable business judgments by agreeing on various

---

[16] *See, e.g.,* 7 Collier on Bankruptcy P 1129.02 [3][a][ii] (16th ed. 2025); 4 Norton Bankr. L. & Prac. 3d § 112:10 (2025).

aspects of the sale process – including the date of the sale – that Bay Point incorporated into the plans.

The Court declines to turn the confirmation process into an inquiry into the lengthy relationship among the Debtors, Bay Point, and Mr. Leventhal. The Court heard Mr. Leventhal's testimony concerning Bay Point's conduct for the purpose of determining the existence of potential claims against Bay Point in connection with its consideration of the proposed releases, not for the purposes of evaluating Bay Point's good faith for purposes of § 1129(a)(3), which no one seriously raised (if at all) during the confirmation hearings. The Court made findings and conclusions on the record that Bay Point had complied with § 1129(a)(3). The Court finds no reason to reconsider those decisions.

The unfair discrimination requirement in § 1129(b)(1) applies when a class of claims or interests does not accept a plan. In general, it requires like treatment for like claims or interests. Bay Point is a secured creditor and is properly in its own class. Its treatment complies with applicable provisions of the Bankruptcy Code. The plans do no "discriminate unfairly."

The fair and equitable requirement, also in § 1129(b)(1), likewise applies when a class of claims or interests does not accept a plan. Section 1129(b)(2) states the requirements for meeting the condition that a plan be "fair and equitable." With regard to unsecured claims and interests, the fair and equitable rule prohibits any class of claims or interests junior to a class of claims or interests that has not accepted the plan from

receiving anything under the plan unless the non-accepting class is paid in full.  11

U.S.C. § 1129(b)(2)(B), (C).  The plans satisfy these requirements.

Some courts have concluded that the fair and equitable test includes other

requirements, but Mr. Leventhal has not cited any authority for the proposition that his

contentions support a conclusion that the plans violate the fair and equitable requirement.

The Court is not aware of any such authority.

**G.  The Plans Are Feasible**

Mr. Leventhal asserts that the plans are not feasible because "the property cannot

be sold [for] the highest market price without [marketing for] at least 60 days based upon

the testimony of the marketing representative, with a clear level playing field."

(Reconsideration Motion at 17).   Related arguments are, as mentioned above, that the

plans provide for a short, artificially imposed sale process without prior determination of

disputes concerning Fulcrum's ownership of the Fulcrum Property, Bay Point's claim,

and the Plaintiffs' claims and their *lis pendens*.  (*Id.* at 10, 12, 14-18).

The plans provide for the free and clear sale of the properties of the Debtors at an

auction sale.  As Parts III(B), (C), (D), (E), and (F) explain, (1) the timing of the sale and

the sales procedures reflect reasonable business judgment in accordance with the

agreement of the parties; and (2) the provisions for a free and clear sale eliminate any

concerns about Fulcrum's ownership of, and the claims and interests of Bay Point and the

Plaintiffs in, the Fulcrum Property and the amount of Bay Point's debt.

The sales process can proceed, and a purchaser (or purchasers) will obtain good

title.  The fact that the method of sale may not produce as good a result as Mr. Leventhal

thinks his preferred procedures would produce does not mean that the plans are not feasible.

## H. The Requirements for Issuance of a Stay Pending Appeal Have Not Been Met

Determination of whether to grant a stay pending appeal requires consideration of four factors: (1) the likelihood of success on the merits of the appeal; (2) whether the appellant will suffer irreparable injury in the absence of a stay; (3) whether issuance of a stay will substantially injure other parties with an interest in the proceeding; and (4) where the public interest lies. *E.g., Nken v. Holder,* 556 U.S. 418, 434 (2009); *Garcia-Mir v. Meese,* 781 F.2d 1450, 1453 (11th Cir. 1986); *see In re Gay*, 2005 WL 6487208, at *1 (Bankr. N.D. Ga. June 24, 2005).

None of Mr. Leventhal's objections are likely to be successful on appeal. Based on largely undisputed facts or the Court's findings of fact on disputed ones, the plans meet the requirements for confirmation in 11 U.S.C. § 1129 based on the application of established principles of bankruptcy law.

In particular, the primary legal issue he identifies as likely to succeed on appeal – the denial of due process because of the absence of an adversary proceeding to determine disputes involving interests of Fulcrum, Bay Point, and the Plaintiffs in the Fulcrum Property (Stay Motion at 8) – has no chance of success for the reasons that Part III(A) explains. No adversary proceeding was required to resolve *confirmation* issues, and Mr. Leventhal and everyone else had notice and the opportunity to be heard on all those issues, including the opportunity to introduce any evidence material to their

determination.  The confirmation process and the Confirmation Order do not violate the due process rights of Mr. Leventhal or anyone else.

If Mr. Leventhal is correct that different sales procedures would produce more money from the properties of the Debtor, the absence of a stay would mean less (and perhaps no) money for the indirect equity interests that Mr. Leventhal has and could increase his guaranty exposure.  Because reversal or modification of the Confirmation Order likely will not affect the finality of the sale,[17] and because conclusion of the sale may moot any appeal, the opportunity for more money will disappear if the Confirmation Order – and therefore the sales of the properties – are not stayed.

Such an injury is irreparable, but it occurs only if an appeal is successful. Moreover, the Court must also consider harm to other parties and the public interest if the Court grants a stay. Both factors require denial of a stay.

It is time for the Debtors' properties to be sold.  The Debtors have had the opportunity for over a year to file plans for their or their own § 363(f) motions for the free and clear sale of their properties but have not done so.  The Fulcrum Property cannot otherwise be sold or refinanced because of the filing of the *lis pendens* and the underlying disputes among the Fulcrum estate, the Plaintiffs, and Bay Point.  In the meantime, the Hampton Island Preserve project requires funding for operations, maintenance, and repairs.

The Hampton Island Preserve project has been in financial distress for years.  It cannot regularly pay the persons who work to operate and maintain it.  The golf course

---

[17] 11 U.S.C. § 363(m).

requires regular upkeep and maintenance that has not occurred.  Hurricane damage needs to be addressed.  The inability to repair, maintain, and properly operate the Hampton Island Property may result in a decline in its value.

Bay Point has an interest in eliminating the continuing expenses of maintaining, operating, and insuring the properties of the Debtors that are necessary for the protection of its collateral.  Elimination of ongoing expenses are even more critical for Fulcrum's unsecured creditors, who are behind Bay Point.

Although not creditors of the Debtors, workers and residents in the Hampton Island Preserve have an interest in this controversy.  They need ownership of the subdivision project that has the financial ability to provide responsible management and maintenance and to complete the development of the project.  That is not going to happen in the absence of a sale and should not be delayed by months or years of appellate proceedings.

Denial of a stay serves the public interest.  No one benefits from a stalled subdivision project that is in irremediable financial distress.  Vacant lots do not produce the tax dollars that completed residences do.  Vacant lots do not produce customers for local businesses.

The public interest lies with the completion of a sale of the properties of the Debtors with the prospect that, after years of delay, the new owner will produce a viable subdivision.

Given the high likelihood that Mr. Leventhal's appeal will not be successful, given the fact that the circumstances of these Debtors require a prompt sale of their

properties to eliminate continuing harm to other parties and to further the public interest,

and given that the Debtors have not filed their own plans or their own motions for

§ 363(f) sales to provide a reasonable alternative, the possible irreparable injury does not

provide a basis for staying the Confirmation Order.

## I. The Court Will Deny Mr. Leventhal's Supplemental Motion

Three days after the hearing on his motions considered above, Mr.

Leventhal filed a "Supplemental Motion for Stay Pending Appeal of Confirmation

Order" (the "Supplemental Motion"). [Doc. No. 325]. As an initial matter, the Court

notes that the evidentiary record on confirmation and the motions to reconsider and for a

stay pending appeal is closed, and the time for argument has expired.

Nevertheless, the Court has reviewed the Supplemental Motion. Nothing in it

changes the Court's rulings set forth above.

First, the Court in Part III(A) addresses the requirement of an adversary

proceeding. Mr. Leventhal's additional arguments do not change the Court's ruling on

this issue.

Second, the Supplemental Motion complains about postconfirmation

administration of the Debtors; postconfirmation marketing of the properties;

postconfirmation activities that allegedly chill the bidding and taint the auction;

postconfirmation defamation of Mr. Leventhal; and postconfirmation disputes involving

Hampton Island Club, LLC. None of these postconfirmation issues are material to

confirmation of the plans.

26

Third, Mr. Leventhal renews his arguments about Bay Point's credit bidding and the need to determine the amount of Bay Point's claim and the Plaintiffs' interests in the property before a sale occurs.  Mr. Leventhal represents that, with confirmation of the amount due to Bay Point, "where he can walk in with a check for that amount and Bay Point must accept it, there will likely not be a need for an auction."  (Supplement at 11).

Parts III(B) and (E) address this issue.  Determination of Bay Point's debt cannot occur promptly.  Moreover, determination of Bay Point's debt does not solve the interests of the Plaintiffs in the Fulcrum Property.  Mr. Leventhal advises the Court that a hearing on the Special Master Report has been scheduled in the Fulton County Litigation for December 17, 2025.  The Fulton County Litigation is thus going forward, but it is still months, or more likely years, before all appeals are exhausted.

Sale of the properties cannot be delayed for the time it will take to resolve these issues.  If Mr. Leventhal can produce a check, he is free to bring it to the auction and acquire the properties unburdened by the Bay Point debt or the Plaintiffs' interests.

The Court will, therefore, deny the Supplemental Motion.

### IV.  Conclusion

Mr. Leventhal has established no grounds for the Court to reconsider the Confirmation Order.  Although the possibility of irreparable injury exists if the Court does not stay the Confirmation Order pending appeal, other factors that the Court must consider require denial of a stay.  It is highly unlikely that Mr. Leventhal will succeed on

appeal, other parties will be harmed if a stay is granted, and the public interest lies with denial of the stay.

Based on, and in accordance with the foregoing, therefore, it is hereby it is

**ORDERED and ADJUDGED** that Mr. Leventhal's Amended and Restated Motion for Reconsideration and/or to Stay Pending Appeal [308] (superseding his original motion [307]), his Motion for Stay Pending Appeal of Confirmation Order [306], and his Supplemental Motion [325] be, and the same hereby are **DENIED.**

**[End of Order]**

**THIS ORDER HAS NOT BEEN PREPARED FOR PUBLICATION AND IS NOT INTENDED FOR PUBLICATION.**

DISTRIBUTION LIST

| | |
|---|---|
| Ronald S. Leventhal<br>3600 Dallas Highway<br>Suite 230<br>Marietta, GA  30064<br><br>Benjamin R Keck<br>Keck Legal, LLC<br>Druid Chase - Suite 115<br>2801 Buford Highway NE<br>Atlanta, GA 30329<br><br>John Christopher Allerding<br>Thompson Hine LLP<br>Suite 1600<br>3560 Lenox Road NE<br>Atlanta, GA 30326<br><br>John Isbell<br>Law Offices of John F. Isbell LLC<br>3050 Peachtree Road, N.W., Ste 740<br>Atlanta, GA 30305<br><br>Steven G. Hall<br>Baker Donelson<br>Suite 1600, Monarch Plaza<br>3414 Peachtree Road, NE<br>Atlanta, GA 30326 | Mark Duedall<br>Baker, Donelson, Bearman, Caldwell &<br>Berkowitz, PC<br>Suite 1500<br>3414 Peachtree Road, N.E.<br>Atlanta, GA 30326<br><br>Alan Hinderleider<br>Office of the United States Trustee<br>362 Richard B Russell Federal Building<br>75 Ted Turner Drive, S.W.<br>Atlanta, GA 30303<br><br>Fletcher Beaumont Howard<br>Fox Rothschild LLP<br>Suite 1500<br>999 Peachtree St. NE<br>Atlanta, GA 30309<br><br>Alan R. Lepene<br>Thompson Hine LLP<br>3900 Key Center<br>127 Public Square<br>Cleveland, OH 44114-1291 |